# Exhibit B

# Exhibit B

Electronically Filed
01/19/2011 03:32:25 PM

**CLERK OF THE COURT**

1   **ACOM**
    CATHERINE CORTEZ MASTO
2   Attorney General
    ERNEST D. FIGUEROA
3   Consumer Counsel
    Nevada Bar No. 006295
4   775.684.1197 ph / 775.684.1179
    E-mail: EFigueroa@ag.nv.gov
5   BINU G. PALAL
    Deputy Attorney General
6   Nevada Bar No. 010178
    555 E. Washington Avenue, #3900
7   Las Vegas, Nevada  89101
    702.486.3128 ph / 702.486.3283
8   E-mail: BPalal@ag.nv.gov
    JEFFREY SEGAL
9   Deputy Attorney General
    Nevada Bar No. 005491
10  555 E. Washington Avenue, #3900
    Las Vegas, Nevada  89101
11  702.486.3130 ph / 702.486.3283
    E-mail: JSegal@ag.nv.gov
12  Attorneys for Plaintiff, State of Nevada

13                        **DISTRICT COURT**

14                    **CLARK COUNTY, NEVADA**

15

16  STATE OF NEVADA,                     )
                                         )
17         Plaintiffs,                   )
                                         )
18              vs.                      )    CASE NO.: A631557
                                         )    DEPT. NO.: XXV
19  BANK OF AMERICA CORPORATION,         )
    BANK OF AMERICA,                     )
20  NATIONAL ASSOCIATION,                )
    BAC HOME LOANS SERVICING,            )
21  LP, RECONTRUST COMPANY, N.A,         )
    COUNTRYWIDE FINANCIAL                )
22  CORPORATION, COUNTRYWIDE             )
    HOME LOANS, INC., FULL               )
23  SPECTRUM LENDING, INC.,              )
                                         )
24         Defendants.                   )
                                         )
25  _____

26                    **AMENDED COMPLAINT**

27         The undersigned, CATHERINE CORTEZ MASTO, Attorney General of the State of

28  Nevada, by and through her deputies ERNEST FIGUEROA, Consumer Counsel, BINU G.

*Attorney General's Office*
*555 E. Washington, Suite 3900*
*Las Vegas, NV 89101*

PALAL, Deputy Attorney General, JEFFREY SEGAL, Deputy Attorney General and, hereby alleges Defendants have violated, and continue to violate, the Nevada Deceptive Trade Practices Act.  The Attorney General also alleges that the Defendants have violated, and continue to violate, the Consent Judgment entered into among the Attorney General and Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc., ("Countrywide Defendants") filed on February 24, 2009.  *State of Nevada v. Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc.* (District Court, Clark County, Case No. A583442) ("Consent Judgment").

Defendants violated the Nevada Deceptive Trade Practices Act by:

(1)     Misleading consumers by promising to act upon requests for mortgage modifications within a specific period of time, usually one or two months, but stranding consumers without answers for more than six months or even a year;

(2)     Misleading consumers with false assurances that their homes would not be foreclosed while their requests for modifications were pending, but sending foreclosure notices, scheduling auction dates, and even selling consumers' homes while they waited for decisions;

(3)     Misrepresenting to consumers that they must be in default on their mortgages to be eligible for modifications when, in fact, current borrowers are eligible for assistance;

(4)     Making false promises to consumers that their modifications would be made permanent if they successfully completed trial modification periods, but then failing to convert these modifications;

(5)     Misleading consumers with inaccurate and deceptive reasons for denying their requests for modifications;

(6)     Falsely notifying consumers or credit reporting agencies that consumers are in default when they are not;

(7)     Misleading consumers with offers of modifications on one set of terms, but then providing them with agreements on different terms, or misrepresenting that consumers have been approved for modifications.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1   Bank of America's misconduct in misrepresenting its mortgage modification program

2   was confirmed in interviews with consumers, former employees, and other third parties and

3   through review of relevant documents.  Bank of America's own former employees describe an

4   environment in which the Bank failed to staff its modification functions with employees with the

5   training, skills, experience, authority, and information to carry out the Bank's commitments.

6   According to the employees, the modification process was chaotic, understaffed, and not

7   oriented to customers.  Bank employees even described being reprimanded for spending too

8   much time with individual consumers.

9   In addition, Defendants violated the terms of the Consent Judgment entered into with

10  the State of Nevada.  The Consent Judgment, which resolved allegations that the

11  Countrywide Defendants had engaged in consumer fraud in the origination, marketing and

12  servicing of residential mortgage loans in Nevada, required that the Countrywide Defendants,

13  *inter alia*, provide loan modifications to eligible Nevada borrowers according to a process and

14  on terms laid out in the Consent Judgment.  Defendants have violated these commitments by:

15  (1) Failing to provide loan modifications to eligible borrowers;

16  (2) Failing to make decisions on loan modifications within thirty days of receiving

17  complete applications from Nevada consumers; and

18  (3) Initiating or proceeding with foreclosures while consumers' modification requests

19  were pending;

20  Because of Bank of America's misconduct, many Nevada consumers continued to

21  make mortgage payments they could not afford, running through their savings, their retirement

22  funds, or their children's education funds.  Additionally, due to Bank of America's false

23  promises, consumers deferred short-sales and missed other opportunities to mitigate their

24  losses.  And they waited anxiously, month after month, calling Bank of America and submitting

25  their paperwork again and again, not knowing whether or when they would lose their homes.

26  Whatever the consumers' particular circumstances, they all suffered the stress and frustration

27  of being misled by Bank of America while trying to take responsible action to modify their

28  mortgages so they could continue to make their payments and remain in their homes.

-3-

1                               **JURISDICTION AND VENUE**

2         1.        This Court has jurisdiction to consider this Complaint pursuant to the Nevada

3 Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0989, and to order injunctive relief,

4 restitution, civil penalties, and costs and fees to prevent the practices alleged in this Complaint

5 and to remedy the consequences of those practices.

6         2.        Venue is appropriate in Clark County pursuant to Nev. Rev. Stat. § 598.0989.

7                                           **PARTIES**

8         3.        Plaintiff is the State of Nevada, *ex rel.* Catherine Cortez Masto, the Attorney

9 General of Nevada, who is authorized to bring this action under the Nevada Deceptive Trade

10 Practices Act ("DTPA"), Nev. Rev. Stat. §§ 598 *et seq.*, and the terms of the Consent

11 Judgment  Nev. Rev. Stat. § 598.0963(2).

12         4.        Defendant Bank of America Corporation ("Bank of America") is a foreign

13 corporation that is incorporated in Delaware, with its principal place of business located in

14 Charlotte, North Carolina.  At all times material to this Complaint, Bank of America was doing

15 business in the State of Nevada.  Bank of America is the parent corporation of Bank of

16 America, National Association and a successor in interest to the Countrywide Financial

17 Corporation.

18         5.        Defendant Bank of America, National Association (N.A.) is a national bank with

19 its principal place of business located in Charlotte, North Carolina.  At all times material to this

20 Complaint, Bank of America, N.A. was doing business in the State of Nevada.  Bank of

21 America, N.A. is the parent of BAC Home Loans Servicing, LP and ReconTrust, N.A..

22         6.        Defendant BAC Home Loans Servicing, LP services loans and is a subsidiary of

23 Bank of America, with its principal place of business in Texas.  At all times material to this

24 Complaint, BAC Home Loans Servicing, LP was doing business in the State of Nevada.

25         7.        Defendant ReconTrust Company, N.A. ("ReconTrust") is a wholly-owned

26 subsidiary of Bank of America, N.A. that services defaulted mortgages.  At all times material

27 hereto, ReconTrust's principal place of business was located in California, and ReconTrust

28 was doing business in the State of Nevada.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

8.     Defendant Countrywide Financial Corporation ("CFC" or "Countrywide") is a Delaware corporation and a thrift holding company doing business in Nevada.

9.     Defendant Countrywide Home Loans, Inc. is a New York corporation licensed to do business in Nevada, is a wholly owned subsidiary of CFC, and is or was a licensed mortgage banking organization.

10.     Defendant Full Spectrum Lending, Inc. is or was a California corporation, is or was a wholly-owned subsidiary of CFC, and is or was a licensed mortgage banking organization.

11.     On July 1, 2008, Bank of America completed its purchase of Countrywide in an all-stock transaction that Bank of America has described as a merger.  Former Countrywide shareholders were compensated with shares of a Bank of America subsidiary that was created solely for the transaction.

12.     In a press release issued that month, Bank of America touted the cost savings that would result from merging the two companies' operations[1].  *See* Ex. A at 1.  The savings would be generated by eliminating duplicative jobs, technology, vendors, and marketing expenses. Ex. A at 1.  Countrywide's press release announced that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world." [2] *See* Ex. B at 1.  Bank of America's 2008 Annual Report described the "combined company." [3]  *See* Ex. C at 14.

13.     Since Countrywide's acquisition, Bank of America has taken over servicing loans previously serviced by Countrywide, along with its own servicing portfolio.  Former Countrywide customers now use Bank of America customer service resources, including Bank of America service centers and website (to which they are redirected from Countrywide's website).  Former Countrywide customers receive mortgage statements from Bank of

---

[1] Press Release, Bank of America, Bank of America Completes Countrywide Financial Purchase (July 1, 2008), attached as Exhibit A.

[2] Press Release, Bank of America, Bank of America Agrees to Purchase Countrywide Financial Corporation (Jan. 11, 2008), attached as Exhibit B.

[3] Bank of America Corp., 2008 Annual Report 14 (2009), attached as Exhibit C (in relevant part).

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1  America, make their mortgage payments to Bank of America, and apply to Bank of America if
2  they wish to modify their mortgages.  The combined mortgage lending operations of Bank of
3  America and Countrywide, including Countrywide's branch network and origination platform,
4  now operate under the name Bank of America Home Loans.[4]  The servicing operations of
5  Bank of America and Countrywide were merged into BAC Home Loans Servicing, LP.

6        14.    As part of the merger, Bank of America assumed Countrywide's liabilities.  For
7  example, Bank of America agreed on Countrywide's behalf to modify certain Countrywide
8  home loans as a part of a $8.4 billion consumer fraud settlement with state attorneys general.
9  (The Consent Judgment was entered into as part of that multi-state settlement.)  In an
10  interview published on February 22, 2008 in *Corporate Counsel*, Bank of America
11  acknowledged: "We bought the company and all of its assets and liabilities, spokesman Scott
12  Silvestri says.  We are aware of the claims and potential claims against the company and
13  have factored these into the purchase."[5]  *See* Ex. D at 1.  Kenneth D. Lewis, then Chairman
14  and Chief Executive Officer of Bank of America, was quoted in a January 23, 2008 *New York*
15  *Times* article noting that:  "We looked at every aspect of the deal, from [Countrywide's] assets
16  to potential lawsuits and we think we have a price that is a good price."[6]  *See* Ex. E at 2.

17        15.    Countrywide has been completely integrated into Bank of America and has
18  virtually ceased to exist.  In November 2008, Countrywide's assets were transferred to Bank
19  of America.  Countrywide has stopped independently filing financial statements.  Instead,
20  Countrywide's assets and liabilities are reported on Bank of America's financial statements.
21  On April 27, 2009 Bank of America announced that "the Countrywide brand has been
22  retired."[7]  *See* Ex. F at 2.

23

---

24  [4] The official corporate entity is Bank of America, N.A.  Bank of America Home Loans is the brand name under which the combined entities are marketed.

25
26  [5] Amy Miller, *Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation*, Corporate Counsel, Feb. 22, 2008, attached as Exhibit D.

27  [6] Julie Creswell, *Bank of America Woes Go Beyond Mortgages*, N.Y. Times, Jan. 23, 2008, attached as Exhibit E.

28  [7] Press Release, Bank of America, Bank of America Responds to Consumer Desire for Increased Transparency in Home Loan Process with Tools that Clarify Mortgage Terms and Foster Informed Homeownership (Apr. 27, 2009), attached as Exhibit F.

## BACKGROUND

16.     Mortgage servicers are hired by the owners of mortgages (or "investors," whether private trusts set up to hold pools or mortgages or government sponsored enterprises, like Fannie Mae or Freddie Mac, which purchase mortgages) to provide services relating to the collection of mortgage payments in return for a servicing fee.  These services include negotiations of mortgage modifications of mortgages that are in default, or at risk of default, as well as the processing of foreclosures.  Pooling and servicing agreements between the investors and servicers set out the fees and terms for servicing the mortgages, including the manner and circumstances in which the servicer can offer modifications.

17.     In the wake of the financial crisis, Bank of America and other major servicers announced commitments to modify the mortgages of borrowers who are unable (or are unlikely to be able) to make their monthly mortgage payments.  In February 18, 2009, the federal government supported and extended these efforts by announcing its initiative, Making Home Affordable, or "MHA" or "HAMP," which provides guidelines and financial incentives for servicers to modify the mortgages of eligible homeowners.  By lowering the interest rate, reducing principal, forbearing payments, or extending the terms of home mortgage loans, servicers aim to reach a payment that consumers can afford.  Modifications assist homeowners by allowing them to remain in their homes.  Modifications also serve the investors by preserving payment streams on the mortgages and by reducing the chance of foreclosures, which often result in significant loss of value.

18.     Consumers who receive mortgage modifications enter into new loan agreements with Bank of America.  These agreements are entered into for "consideration of the mutual promises and agreements exchanged and for good and valuable consideration, the sufficiency of which is hereby acknowledged."  Bank of America Home Loans Servicing, LP, *Addendum to Loan Modification Agreement*.  As noted above, Bank of America, like other participating servicers, receive financial payments from the Department of Treasury for each successful modification.  The loan modification agreement reflects the new terms of the loan, including delinquent payments, interest and other fees that may be capitalized into the principal balance

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1  of the loan. In the loan agreement, the borrower also agrees, as consideration for the

2  modification, to deliver any documentation needed to cure a lost or inaccurate note. The

3  borrower also agrees to provide Bank of America with updated financial information about the

4  borrower that Bank of America would not otherwise be entitled to receive.

5        19.    Over the last three years, Bank of America repeatedly represented that it would

6  offer mortgage modifications to eligible consumers. For example, in Congressional testimony

7  on July 16, 2009, before the Senate Committee of Banking, Housing, and Urban Affairs, a

8  Bank of America executive assured that the Bank: "understands and fully appreciates its role

9  in helping borrowers through these difficult economic times. We want to ensure that any

10  borrower who has sufficient income and the intent to maintain homeownership has the ability

11  to do so using any and all resources we have available."[8] *See* Ex. G at 3. As it has in other

12  contexts, Bank of America also promised unequivocally that: "customers will not lose their

13  homes to foreclosure while their loans are being considered for a modification. The Bank

14  places foreclosure sales on hold while it determines a customer's eligibility for its home

15  retention programs." Ex. G at 6.

16        20.    Upon information and belief, thousands of Nevada consumers responsibly have

17  reached out to Bank of America to seek modifications of their mortgages so they could

18  continue to make payments and remain in their homes.

19        21.    In reviewing and investigating complaints from more than One-Hundred Fifty

20  (150) consumers, housing counselors, and other industry sources over the last year, the

21  Office of the Attorney General has identified a common pattern of misconduct by Bank of

22  America. Bank of America has and, in many cases, continues to:

23        a. Mislead consumers with false promises that it will act on their modifications

24           within a set period of time, but keeps them waiting for months, and sometimes

25           more than a year, beyond the promised term;

26        b. Mislead consumers with assurances that they will not be foreclosed upon while

27

28  [8] *Preserving Homeownership: Progress Needed to Prevent Foreclosures Before S. Comm. on Banking, Housing & Urban Affairs*, 111th Cong. 3 (July 16, 2009) (statement of Allen H. Jones, Bank of Am. Default Mgmt. Policy Exec.), attached as Exhibit G.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-8-

1   the Bank considered their requests for modifications.  However Bank of

2   America has sold the homes of some Nevada consumers and sent foreclosure

3   notices to many more while their requests for modifications still were pending;

4     c.   Misrepresent to consumers that they must be delinquent on their loans in order

5   to qualify for assistance, even though neither Bank of America's proprietary

6   programs nor the federal HAMP program requires that homeowners have

7   missed payments;

8     d.   Mislead consumers with false promises that their initial, trial modifications would

9   be made permanent if and when they made the required three payments on

10  those plans, but then failed to convert those modifications;

11    e.   Tell consumers their modifications were denied for reasons that were untrue,

12  such as that:  (i) the owner of the loan refused to allow the modification when

13  Bank of America had full authority to modify the loan without the investor's

14  approval; (ii) the Bank had tried unsuccessfully to reach the consumer, even

15  though the consumer repeatedly called the Bank; (iii) the loan was previously

16  modified when it was not; (iv) the borrower failed to make trial payments, when

17  they made all payments; and (v) the borrower was current on his or her loan,

18  when delinquency is not a condition of a modification;

19    f.   Falsely notify consumers or credit reporting agencies that consumers are in

20  default when they are not;

21    g.   Mislead consumers with offers of modification on one set of terms, and then

22  provide agreements with materially different terms, or inform consumers that

23  their modifications had been approved, but then tell them that their requests

24  were denied, often months before.

25      22.   The Attorney General's Office also has interviewed numerous former Bank of

26  America call center employees involved in the loan modification or mitigation process.  They

27  describe an environment in which Bank of America:

28

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

a.  Threw inexperienced staff into handling mortgage modifications with little training, direction, or supervision.  Said one former employee:

> In my experience, call center employees received almost no training or direction from Bank of America . . . I and other employees frequently complained to our supervisors about our lack of training.  Before I was transferred to handle calls relating to mortgage modifications, I received no special instruction.  I only remember one meeting on the Making Home Affordable program, which lasted only ten to fifteen minutes, where they told us to expect more information on the program soon.  I did not receive any additional information.
> …
> From time to time, we received new program guidelines and other directives by email.  On information and belief, many of the people I worked with did not have time to read these emails.  The direction that we received was often confusing and contradictory.  An email would say one thing and then a manager would instruct us to do something else.

Noting that many employees were hired through temporary agencies, another former employee noted:

> These employees don't receive adequate training on how to use all of the computer programs and how to make sure documents don't get lost.  The main point of the training is to teach us how to get customers off the phone in less than ten minutes.

b.  Frequently misinformed borrowers about the requirements for modifications, the status of their requests, the likelihood of foreclosure, and even the fax numbers to which to send their documents.  One former employee reported:

> When checking a borrower's status I often found that the modification request had not been dealt with or was so old that the request had become inactive.  Yet, I was instructed to inform borrowers that they were "active and in status." ...One time I complained to my supervisor, that I felt I was always lying to borrowers.  Her instructions in response were just to give the borrowers their status and to tell them that they are "in the process," in spite of the fact that the computer showed that nothing was happening.

c.  Regularly lost borrowers' paperwork;

d.  Failed to communicate with borrowers, and deployed a front line staff without the authority or information to help borrowers.  Said one employee:

> From what I've seen, a borrower can get different explanations from every BOA representative, because our supervisors don't make this information clear in training and

nobody at BOA seems to care what we actually say to the borrower, as long as we get them off the phone.

e. Wrongly foreclosed upon borrowers, or failed to stop foreclosures while borrowers' modification requests were pending. One employee described:

I often fielded calls from borrowers who had received foreclosure notices or been foreclosed upon while they had modification applications pending. Some of the people I spoke with had made more than three months of payments on their trial modifications. I also saw borrowers who were foreclosed upon despite being current on their modification payments.

f. Reprimanded employees for spending too much time on individual borrowers' calls.

23. The experience of Nevada consumers is confirmed by data published each month by the Department of Treasury, which administers HAMP. Bank of America ranks last in virtually every customer service measure catalogued in the Servicer Performance Report (Making Home Affordable Program)[9]. According to the October 2010 report, Bank of America has the worst customer service metrics for its call centers and the worst time for resolving third-party complaints (e.g., from housing counselors) to the federal government. Bank of America also ranks at the bottom of servicers in its conversion of trial modifications to permanent modifications, and the number of trial modifications that have languished more than six months.

24. Upon information and belief, Bank of America has mislead consumers and failed to live up to its commitments to offer modifications as a result of financial incentives that make it more profitable for Bank of America to delay or deny modifications. For instance, Bank of America earns substantial late fees and other default-related fees, which operate as disincentives to modify mortgages so that borrowers can afford to remain current on their obligations. Moreover, servicing fees are too low to encourage Bank of America and other servicers to provide the level of service required to modify mortgages. Finally, the fact that Bank of America (and other servicers) hold second liens on many of these mortgages may

---

[9] Available at http://www.financialstability.gov/docs/Oct%202010%20MHA%20Public%20Final.pdf (Oct. 2010).

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1 | explain their reluctance to pursue certain modifications involving principal forgiveness, which

2 | would require them to recognize losses on these second liens.[10]

3 |   25.   Bank of America's deceptive conduct in offering and providing (or failing to offer

4 | and provide) loan modifications, as described above, constitutes a deceptive practice under

5 | the Nevada Deceptive Trade Practices Act.

6 | ## VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT

7 |   26.   Complaints received by the Attorney General's Office, some of which are

8 | described below, and its own investigation demonstrate that Bank of America has engaged,

9 | and continues to engage, in a pattern and practice of misleading consumers about its

10 | mortgage modification program.

11 | ### BANK OF AMERICA REPEATEDLY MISREPRESENTED THE TIME
12 | ### FOR MAKING DECISIONS ON CONSUMERS' MODIFICATIONS

13 |   27.   On its website and in its interactions with individual consumers, Bank of

14 | America repeatedly promised consumers answers on their modification requests within a

15 | specific time frame, typically 30 or 60 days.  Many consumers have waited 6 months or even

16 | a year and still have not received decisions.

17 |   28.   Bank of America's website indicates that it will "typically" take 30 to 45 calendar

18 | days from the receipt of a consumer's documents to make a decision on a loan modification

19 | request.  *See* Ex. H.[11]  In addition, Bank of America promises on its website that: "You can

20 | expect to hear back from us within 10 business days from when we receive all your required

21 | documents.  The purpose of contacting you is to confirm receipt of your information, as well

22 | as let you know how the evaluation process works and how long it takes."  Ex. H.

23 |   29.   Bank of America sent consumers seeking modifications a document with

24 | "Frequently Asked Questions" about HAMP.  One question asks how long it will take for Bank

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

---

[10] *See, e.g., Problems in Mortgage Servicing From Modification to Foreclosure: Hearing Before S. Comm. on Banking, Hous. & Urban Affairs*, 111th Cong. (2010) (Statement of Diane Thompson, National Consumer Law Center).

[11] http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html  (Next Steps: Documents) (visited May 27, 2010, last visited Dec. 14, 2010), attached as Exhibit H.

1    of America to process consumers' modification request. The answer: "up to 45 days." *See*

2    Ex. I.

3         30.    These assurances are reinforced in one-on-one conversations between Nevada

4    consumers and Bank of America representatives in which Bank of America promises that

5    consumers will have an answer on their requests within 30, 60, or 90 days.

6         31.    Bank of America has kept Nevada consumers waiting for 6 months, one year, or

7    longer for a decision. These consumers have suffered delay, anxiety, and often foreclosure

8    while trying to secure an affordable payment that allows them to meet their obligations and

9    keep their homes.

10        32.    One critical source of delay is Bank of America's routine loss of consumer

11   documents. For some time, HAMP required Bank of America to obtain updated financial

12   information from consumers if the information was more than 90 days old. [12]  *See* Ex. J. As a

13   result, Bank of America's delayed processing of consumers' modifications required them to

14   obtain additional documentation from consumers, which further delayed the processing of

15   their requests and compounded the logistical demands on the Bank. Even beyond this

16   mandated update, Bank of America consistently has lost consumers' documents; causing

17   delays while consumers re-sent–sometimes more than half a dozen times–the same

18   documents. Bank of America has publicly acknowledged "shortcomings" in its document

19   maintenance. [13]  *See* Ex. K at 3. Also upon information and belief, consumers were denied

20   modifications because of "missing" paperwork that Bank of America had received.

21        33.    Bank of America routinely fails to notify consumers of missing documents. In

22   fact, most consumers found out that their documents were missing or incomplete months after

23   they submitted their modification requests, and only upon calling Bank of America. In many

24   instances, Bank of America told consumers that documents were missing after previously

25   assuring them, often repeatedly, that their files were complete and under review.

26

27   [12] Dep't of the Treasury, Home Affordable Modification Program Supplemental Directive 09-01, Introduction of the Home Affordable Modification Program (Apr. 6, 2009), attached as Exhibit J.

28   [13] *The Private Sector and Government Response to the Mortgage Foreclosure Crisis Before H. Fin. Servs. Comm.*, 111th Cong. 142 (Dec. 8, 2009) (statement of Jack Schakett, Bank of America Credit Loss Mitigation Strategies Exec.), attached as Exhibit K.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

34.    While waiting for answers, consumers call Bank of America regularly to check on the status of their modification requests.  They are promised calls or letters with updates, which almost never come.  Instead, many receive multiple foreclosure-related communications, including collection calls.  This long waiting period is not only inconsistent with Bank of America's oral and written commitments to consumers, but extremely trying for homeowners who do not know from day to day whether they will get help or lose their homes.

35.    Bank of America knew, or should have known, that its statements were false because its employees were aware that consumers often suffer delays of more than three months while waiting for action on their modification requests.

**BANK OF AMERICA ASSURED CONSUMERS THAT IT WOULD NOT FORECLOSE WHILE THEIR MODIFICATIONS WERE PENDING, BUT SOLD THEIR HOMES ANYWAY**

36.    As noted above, consumers waiting for decisions on their modifications often receive foreclosure-related notices.  Upon receiving these communications, many consumers call the number provided by Bank of America on the notices to find out what they mean.  Bank of America has repeatedly and deceptively assured Nevada consumers that they should not worry, their modifications are still in review, and their homes will not be sold while their modification requests were pending.

37.    This promise is reinforced by commitments on Bank of America's website.  Under "Frequently Asked Questions," Bank of America represents to homeowners that their homes will not be sold while they are awaiting decisions on their modification requests or on modification plans:

> I want to try to get a home loan modification under the Making Home Affordable program, but I'm afraid that my lender will go ahead with the foreclosure while I'm trying to make it happen.  Can I get more time to explore this option?

> Yes.  While we review your eligibility for the program, your loan will not go to foreclosure sale.  When you enter a trial plan under the program, your loan will not be referred to foreclosure, and any pending foreclosure proceeding will not go to sale. [14]

---

[14] http://homeloanhelp.bankofamerica.com/en/frequently-asked-questions.html?documentstate =Foreclosure (visited May 27, 2010), attached as Exhibit L; (last visited Dec. 14, 2010), attached as Exhibit M; Help for Homeowners, *Supplemental*

*See* Ex. L, M, N.

38.     Despite these assurances, Bank of America has pursued or completed foreclosures while homeowners were awaiting decisions upon loan modifications or on trial modification plans.  In other cases, homeowners incurred foreclosure fees, even though the foreclosure process should never have started or proceeded.

39.     Bank of America knew, or should have known, that its statements were false and misleading.  Its employees regularly encountered consumers whose homes were wrongfully foreclosed while their modifications were still under review.  As noted above, interviews with former Bank of America call center employees indicate that foreclosures while consumers were awaiting decisions on their modifications were common.

40.     One Las Vegas homeowner, struggling to make ends meet as a single mother but still current on her mortgage, applied for and received a HAMP trial modification in the spring of 2009.  She made eight payments on her trial modification and wrote to Bank of America, explaining that the trial payments had not been calculated correctly because they were more than 31% of her income (the threshold established by HAMP).  Bank of America called her and said that they were fixing the error and that her next payment should be $900, which she sent.  After two weeks, having not heard from Bank of America, the homeowner called again.  Bank of America told her to make a payment of $800 to remain current while they continued to work on her modification; she made that payment, too.  Though the borrower had never missed a payment and had made the modified payments as instructed by Bank of America, Bank of America sent the homeowner a Notice of Intent to Accelerate.  After receiving the notice, the homeowner called Bank of America and was told that someone would be in touch with her in 48 hours.  She did not receive a call, but Bank of America sent a second Notice of Intent to Accelerate.  The next month, ReconTrust filed a Notice of Default.  Bank of America has advised the homeowner that they do not know why she made the lower payments and still has not told her the amount her monthly payment should be.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

---

*Directive 10-02, Home Affordable Modification Program – Borrower Outreach and Communication* at 3, 5-7 (Mar. 24, 2010), available at: https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1002.pdf, attached as Exhibit N.

## BANK OF AMERICA TOLD CONSUMERS THAT THEY MUST BE BEHIND ON THEIR MORTGAGES TO QUALIFY FOR MODIFICATIONS, THOUGH DELIQUENCY IS NOT REQUIRED

41.    Bank of America represents publicly, and federal rules require, that consumers need not be delinquent to be eligible for a modification.

42.    Bank of America's website notes: "If you've suffered a hardship that is affecting your ability to make your mortgage payments or have already missed a payment, you may be able to receive a more affordable mortgage payment under the Home Affordable Modification Program."[15] See Ex. O. See also, Ex. P at 19, Treasury Department's MHA Handbook.[16] ("A loan is eligible for HAMP if the servicer verifies that all of the following criteria are met: . . . The mortgage loan is delinquent or default is reasonably foreseeable.")

43.    Yet Bank of America representatives frequently advised consumers that they must miss payments in order to be considered for loan modifications.  One Nevada consumer received a letter advising: "One of the guidelines under the MHA [or HAMP] program requires the loan be 60 days delinquent." Ex. W.  This letter—likely a form document--was inaccurate and deceptive; HAMP never required a loan to be delinquent in order to be eligible for a modification.

44.    In addition, Bank of America has notified consumers or credit agencies that consumers are in default when they are not.  One Las Vegas homeowner, who suffered a heart attack that caused him to incur substantial medical expenses and a loss in his income, applied to Bank of America for a modification even though he was current on his mortgage payments.  He continued to pay both his first and second mortgages with Bank of America in full while he waited for a decision on his request.  However, for six months, Bank of America reported to credit agencies that he was delinquent on his loans.  Despite being current, he also received a Notice of Intent to Accelerate.

---

[15] http://homeloanhelp.bankofamerica.com/en/home-affordable-modification.html (visited May 27, 2010, last visited Dec. 14, 2010), attached as Exhibit O.

[16] Treasury Department's MHA Handbook (V.2) available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_20.pdf, at 19 (Sept. 22, 2010), excerpt attached as Exhibit P.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

45.    These false credit reports make it harder and more expensive for consumers to obtain credit.  In addition, misrepresenting the delinquency status of consumers' loans allows Bank of America to impose late fees and other charges to which it is not entitled and which make it even harder for a consumer to remain or become current on their mortgages.

46.    Such misrepresentations about the consumer's payment status violate the Fair Debt Collection Practices Act., 15 U.S.C. §§ 1692e(2)(A) & (8), and, as a result, the Nevada Deceptive Trade Practices Act.  Nev. Rev. Stat. § 598.0923(3).

### BANK OF AMERICA MISREPRESENTED TO CONSUMERS THAT THEIR TRIAL MODIFICATIONS WOULD BE CONVERTED TO PERMANENT MODIFICATIONS IF THEY MADE THEIR TRIAL PAYMENTS

47.    HAMP sets up a two tier framework.  Borrowers first must qualify for an initial, three-month trial modification.  Consumers who make each of the three payments on time will receive permanent modifications.

48.    Bank of America has made unequivocal promises that consumers who successfully complete trial plans would receive permanent modifications.  For example, its website announced:

    a. "If you successfully make all your Trial Period Plan payments, you will receive a Modification Agreement defining the changes. After this document has been signed, notarized and returned to us, your modification will be officially made permanent." [17] *See* Ex. R, S.

    b. "If you successfully make your Trial Period Plan payments during the trial period, you will be approved for a permanent modification of your loan." [18] *See* Ex. T.

49.    In addition, Bank of America led consumers to believe that it would convert them

---

[17] http://homeloanhelp.bankofamerica.com/en/home-affordable-modification.html (viewed May 27, 2010, last visited Dec. 14, 2010), attached as Exhibit R.  *See also,* http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html (viewed May 27, 2010, last visited Dec. 14, 2010), attached as Exhibit S.

[18] http://homeloanhelp.bankofamerica.com/en/home-affordable-modification.html (viewed May 27, 2010), attached as Exhibit T.

1   to permanent modifications after three or four months on a trial period.  Consumers received

2   three payment coupons with their modification agreement, and report being confused about

3   what to do when they reach the fourth month but have not heard from Bank of America.

4   Some consumers called the Bank and were told at that time, or were told at the time the trial

5   modification was offered, that they will receive a permanent modification within a month of

6   completing their trial periods.

7        50.     Bank of America's website again confirms its oral representations:  "Your trial

8   period will last 3 or 4 months, depending on your circumstances."[19]  See Ex. U.  Bank of

9   America certainly did not advise consumers that they would wait six months or more.

10        51.     Bank of America's trial modification offer assures consumers, "[i]f you make all

11   of your trial period plan payments ... and return any additional documents that may be

12   required, you may receive a Modification Agreement." See Ex. V.

13        52.     One Nevada consumer made six payments on his first trial modification.  He

14   then received documents for a different loan modification.  When he called Bank of America

15   for an explanation, Bank of America told him that he would have to restart the modification

16   process and complete another trial period before receiving a permanent modification.  After he

17   made those payments, he received yet another trial modification with different terms.

18        53.     Bank of America knew, or should have known, that its promise that consumers

19   who made their trial payments would be converted to permanent modifications was deceptive

20   as it knew the significant number of consumers with trial modifications that were never made

21   permanent.  Bank of America also tracked the "age" of trial periods, and knew that many

22   consumers waited more than four (or even six) months for their modifications to be made

23   permanent (or declined).

24        54.     Though consumers benefit from temporarily lower payments during their trial

25   modification, consumers who are not converted to a permanent modification may end up

26

27

---

[19] http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html (Next Steps: Trial Period) (viewed May 27, 2010, last viewed Dec. 14, 2010), attached as Exhibit U.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

worse off. [20]  In his most recent report[21], the Inspector General of the Troubled Assets Relief Program, which oversees HAMP, discussed the fate of borrowers in failed trial modifications who "even in circumstances where they never missed a payment, … may face back payments, penalties, and even late fees that suddenly become due on their 'modified' mortgages and that they are unable to pay, thus resulting in the very loss of their homes that HAMP is meant to prevent."

## BANK OF AMERICA MISREPRESENTED THE BASIS FOR DENYING CONSUMERS' MODIFICATIONS

55.   Bank of America told consumers, by letter and often by phone, the reasons that their requests for modifications were denied.  Among the commonly cited reasons for denying Nevada consumers' applications were:

    a.  investor denial:  the owner of the loan with authority to approve the modification would not permit the modification;

    b.  inability to reach the consumer or to obtain missing documents needed to review the request;

    c.  previous modification;[22]

    d.  consumer's income insufficient to support the modified payment;

    e.  failure to make trial payments or to accept previous modification; and

    f.  current on mortgage payments.

56.   In several cases reviewed by the Attorney General's Office, the reasons offered by Bank of America for denying modifications were inaccurate and misleading.

57.   For instance, Bank of America told some consumers that it had denied their modifications because it was unable to reach them.  However, the borrowers regularly called

---

[20] HAMP rules permit servicers to impose late fees on borrowers who make modified payments that are less than the original, contractual payment amount. However, if the modification is permanently approved, those late fees are forgiven. Borrowers whose permanent modifications are eventually denied, must pay those fees.

[21] Office of the Special Inspector General for the Troubled Asset Relief Program, *Quarterly Report to Congress* at 12 (Oct. 26, 2010), available at http://www.sigtarp.gov/reports/congress/2010/October2010_Quarterly_Report_to_Congress.pdf.

[22] HAMP only provides incentives for one HAMP modification for each loan. Ex. P, HAMP Handbook § 1.1.

-19-

1  Bank of America to obtain updates on their status and/or resubmit their documents.  In

2  addition, none of these consumers reported ever receiving calls from Bank of America but,

3  instead, noted that they were unable to reach their assigned contacts, even after multiple

4  attempts.  In other cases, Bank of America claimed that it was missing documents, even

5  though consumers had repeatedly sent in their documents and/or were told by Bank of

6  America that their files were complete and being reviewed for modifications.

7       58.     As noted above, Bank of America's authority to offer modifications is defined by

8  the Pooling and Servicing Agreement ("PSA") that governs the servicing of specific pools of

9  loans.  In some instances, the investor or owner of the loans delegates to Bank of America full

10  authority to make modification decisions consistent with the investor's best interest.  Under

11  some PSAs, only certain types of loans can be modified or certain types of modifications

12  made.  Other investors do not permit modifications or require Bank of America to seek

13  approval before offering modifications.

14       59.     Upon information and belief, Bank of America notified consumers that their

15  modifications were declined by the investors in instances where Bank of America had full

16  authority, without the investors' approval, to offer modifications.

17       60.     In another case, Bank of America denied a loan modification, claiming that a

18  consumer previously received a modification when the consumer had instead rejected a

19  modification based on inaccurate income figures.

20       61.     Bank of America turned away another consumer on the grounds that the

21  consumer had failed to make her payments during a three month trial modification when, in

22  fact, the consumer had made (and Bank of America had cashed) all of her trial payments.

23  This denial directly contradicted Bank of America's repeated promises on its website that

24  consumers who make their trial plan payments will receive permanent modifications. *See,*

25  *supra* ¶ 41.

26  **BANK OF AMERICA MISLED CONSUMERS BY INDICATING THAT THEY HAD BEEN**
**APPROVED FOR MODIFICATIONS AND BY OFFERING CONSUMERS MODIFICATIONS**
27  **ON DIFFERENT TERMS THAN PROMISED**

28
     62.     For consumers who were able to secure modification commitments, Bank of

-20-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

America misrepresented whether and on what terms their modification requests had been approved.

63.    Bank of America told consumers that their modifications had been approved, but then notified them that they had never received modifications. Often, this news came only after consumers had made several payments on trial modifications.

64.    Nev. Rev. Stat. § 107.086, passed by the Nevada Legislature on May 22, 2009, allows homeowners who receive Notices of Default to participate in a pre-foreclosure mediation with their servicers. If a homeowner sends in the required election form, the servicer must appear at an assigned mediation date with all required documents and the authority to negotiate an appropriate agreement with the borrower. Participation in good faith in the mediation is prerequisite to moving forward with the foreclosure.

65.    Often, Bank of America representatives did not show up at assigned mediation dates, or did not have the documents or negotiating authority required by law. As a result, in a number of instances, mediators issued findings that Bank of America had acted in bad faith.

66.    One mediator's findings issued in January 2010 regarding a Bank of America mediation illustrate the problems:

> Lender initiated foreclosure procedure, did not respond rationally or reasonably in mediation, and under stressful conditions obtained an agreement from HO's [homeowners] to allow foreclosure sale to proceed on May 7. In sum the attached SSA [short sale agreement] was entered into by HOs under the duress of "Boulware-like" bargaining strategy and a "take it or leave it" basis of Lender that does not allow HOs to retain their residence even temporarily, but will dispossess the HOs as soon as possible. ...

> I find the Lender failed to participate in mediation in good faith as evidenced by its failure to produce required documentation and information, the lack of serious retention proposal, and the nature of and take-it-or-leave-it basis for its non-retention proposals. ...

Addendum to Mediator's Statement (Feb. 6, 2010).

67.    In addition, a number of consumers were promised modifications on a set of terms worked out with (and witnessed by) the mediators. In one case, Bank of America offered a modification at mediation and promised to send the consumer an agreement

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

reflecting its terms.  Bank of America did not provide the consumer the promised modification agreement.  When Bank of America, after repeated calls, finally provided the agreement, its terms were materially different than those offered at the mediation.

68.     For example, Bank of America told one recently widowed, elderly Las Vegas homeowner at her mediation that she was approved for a trial HAMP modification and promised to send her the modification agreement in two to four weeks.  The homeowner never received the documents.  When she called Bank of America to follow up, the representative said her file was still being reviewed and told her to send in updated financial information.  She submitted the documents and kept calling.  On one call, a Bank of America representative suggested she re-start the application process.  Bank of America also explained that an employee had failed to enter the results of the mediation into her account.  The homeowner received multiple foreclosure notices.  In June 2010, Bank of America offered the homeowner a permanent modification increasing her payments to more than half her income. She accepted the modification despite the financial strain because, as she explained, "my nerves, my blood pressure, my state of mind could not stand another 3 months, 6 months, or however long it would have taken of living in fear of thinking this might be the day or the week I lose my home."

69.     Bank of America's promises of modifications, which it failed to provide, constitutes a deceptive practice.

**THE DEFENDANTS VIOLATED THE CONSENT JUDGMENT[23] ENTERED INTO WITH THE NEVADA ATTORNEY GENERAL BY FAILING TO OFFER MODIFICATIONS TO ELIGIBLE HOMEOWNERS, INITIATING FORECLOSURES WHEN CONSUMERS HAD ACTIVE MODIFICATIONS, AND FAILING TO MAKE DECISIONS ON MODIFICATIONS WITHIN THIRTY DAYS**

70.     Under the Consent Judgment entered into among the Attorney General and the Countrywide Defendants, Countrywide undertook several obligations, including:

---

[23] Consent Judgment, *Nevada v. Countrywide Fin. Corp*, No. A583442 (Clark Cty. Feb. 24, 2009) is attached as Exhibit X.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1   • To provide National Homeownership Retention Program ("NHRP") modifications

2   to "Eligible Borrowers"[24] in "Qualifying Mortgages"[25] on the terms laid out in the

3   Consent Judgment;

4   • To not initiate or advance foreclosures for Eligible Borrowers who are being

5   evaluated for loan modifications;[26] and

6   • To make decisions on modification requests, on average, within 60 days of

7   receiving complete applications from Eligible Borrowers.[27]

8   #.   Based on numerous complaints reviewed by the Attorney General's Office, Bank

9   of America has:

10   • Failed to provide modifications to Eligible Borrowers;

11   • Proceeded with foreclosures while Eligible Borrowers were awaiting decisions

12   on their modification requests; and

13   • Failed to make decisions on modification requests within 60 days, on average.

14   71.   Consumers with Qualifying Mortgages were unable to obtain decisions on

15   modifications or were wrongly denied NHRP modifications.  Bank of America denied one

16   couple a modification because they failed to complete their application, though the

17   homeowners and their credit counseling agency had repeatedly re-sent all of the documents

18   requested by Bank of America.  Bank of America also told Eligible Borrowers that they would

19   not receive modifications because they were not 60 days delinquent, even though the

20

21

22   [24] An Eligible Borrower is a borrower with a first mortgage payment due on or before December 31, 2007, secured by an
owner-occupied 1-to-4-unit residential property, and serviced by a Countrywide servicer or its affiliate. Consent Judgment ¶

23   III.4.1,

24   [25] A Qualifying Mortgage is defined in the Consent Judgment as a Subprime Mortgage or Pay Option Adjustable Rate
Mortgage where the Eligible Borrower is either "Delinquent" or "Seriously Delinquent" and the ratio between the value of

25   the mortgage and the value of the home ("LTV") is 75% or more.  Consent Judgment ¶ III.4.2.  A Seriously Delinquent
Borrower is 60 days or more behind on his or her payments.  A Delinquent Borrower is Seriously Delinquent or subject to

26   an imminent reset or recast and, as a result, likely to become Seriously Delinquent on or before June 30, 2012.  Consent
Judgment ¶ III.1.2.

27   [26] Consent Judgment ¶ III.4.6(a).

28   [27] Consent Judgment ¶ III.4.9.

borrowers faced resets or recasts that made imminent default reasonably likely. As a result, these consumers were eligible under the Consent Judgment.

72.     In addition, Bank of America delayed decisions on Eligible Borrowers' requests for modifications for far more than 60 days. Though Bank of America exclusively possesses the information necessary to calculate the average wait time for decisions, the number of Eligible Borrowers who waited for six months, a year, or more for decisions supports the conclusion that Bank of America did not make decisions, on average, within the time period required by the Consent Judgment.

73.     Finally, Bank of America initiated foreclosures on Eligible Borrowers even though the Bank had failed to decide their active requests for modifications. Bank of America sent Notices of Default and Elections to Sell to Eligible Borrowers, even triggering their rights to mediation, in instances where the homeowners' modification requests were pending.

74.     The consumer complaints summarized below demonstrate some of the deceptive practices in which Bank of America engaged and are illustrative of the many consumer complaints reviewed by the Office of the Attorney General.

**CONSUMERS 1**

75.     The homeowners, who lived in Henderson, applied for a modification in April 2009. At the time, a Bank of America representative told them they must be delinquent on their mortgage to receive a modification. The homeowners became delinquent and began following up regularly with Bank of America. They sent their documents repeatedly and called monthly. In early November, they received a modification that did not reduce their mortgage payments to 31% of their income, as directed by HAMP. Later in November, Bank of America offered another modification that increased their monthly mortgage payment. The homeowners declined it.

76.     In a letter to the Attorney General's office on October 27, 2010, Bank of America explained that on October 30, 2009, they mailed a HAMP trial modification agreement to the homeowners. Bank of America also acknowledged that it initiated foreclosure proceedings on October 30, 2009.

-24-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

77.     In January 2010, Bank of America sent the homeowners another modification offer that again increased their payments.  When the husband called Bank of America for an explanation, the representative told him if he couldn't afford the payment, he should get an extra job.  He got a second job as an airport greeter, bringing in an additional $200 per month.

78.     A February 20, 2010, letter from Bank of America thanked the homeowners for executing and returning their trial modification agreement and requested additional documents.  The homeowners had not returned the agreement, but re-sent their documents.

79.     On April 6, 2010, Bank of America denied workout assistance because, "Borrower did not return documents," though the homeowners had submitted all required documents.  On April 15th, 2010, Bank of America sent another denial letter, this time for the homeowners' failure to comply with the modification they had declined.

80.     In May, when the homeowners again called, Bank of America told them that they were not eligible for HAMP, but were being considered for another modification program.

81.     In June, Bank of America posted an unsigned Notice of Trustee Sale on the homeowners' door.  When the homeowner called Bank of America, Bank of America told him that he had not qualified for any modification, though he had never received a denial notice.  On June 25, 2010, the homeowners received a Notice of Trustee Sale setting the sale date for July 12, 2010.  Yet, when the husband called on July 2, 2010, Bank of America told him that they would be sending him a package for the "Attorney General program"[28] in 30 to 45 days and that no sale date was set.

82.     On July 1, 2010, Bank of America sent the homeowners a letter noting Bank of America's commitment to assisting borrowers experiencing financial hardships and inviting them to set up a meeting with a housing counselor.  On July 9, 2010, when the homeowner called Bank of America he again was told that there was no sale date set.  On July 12, 2010, Bank of America assured him that the house was not in foreclosure: Bank of America sold the home the very same day.

---

[28] This presumably refers to the National Homeownership Retention Program, a modification program established in the Attorney General's settlement with Countrywide.

-25-

**CONSUMER 2**

83.     On May 22, 2008, a Henderson homeowner battling cancer called Countrywide to ask how to apply for a hardship forbearance.  The representative requested specific documents, which the homeowner sent.  The homeowner enlisted the help of a HUD counselor and together they called Countrywide on June 3, 2008.  The Countrywide representative said that the bank had received the complete application and directed her to call back in two weeks to confirm that a negotiator had been assigned.

84.     On June 9, 2008, the homeowner called Countrywide and a representative told her that she was not eligible for a "payment suspension" and suggested she call Countrywide's "FHA Collections Department."  Countrywide said it would take 30 to 90 days to reach a final resolution.

85.     On June 17, 2008, the consumer again called Countrywide to check in on her status.  A Countrywide representative told the homeowner that the "system is really designed for someone in default" and not for someone who is current on their mortgage payments but struggling financially.  The representative submitted her loan for an interest rate reduction and told the homeowner there would be a decision in about 30 days.

86.     After 30 days and no word from Countrywide, the homeowner called again.  Countrywide told the homeowner to resubmit her paperwork because nothing had happened with the file.  Weak from treatments, the homeowner did not again follow up with Countrywide until December 1, 2008.  Countrywide informed her that the investor had denied her loan modification application because "they're not modifying interest-only loans."  The homeowner never received a written denial of her modification request.  The owner of the consumer's mortgage denies ever having such a policy.

87.     At the urging of her HUD counselor, the homeowner again reached out to Countrywide.  The bank told her there was a special forbearance program that could suspend payments for three months.  At Countrywide's request, she resubmitted all of her paperwork.  On December 15, 2008, she called Countrywide to inquire about the status of the hardship

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1  forbearance application.  A Countrywide representative told her that her application was
2  complete and a negotiator would be assigned to the case within 30 to 60 days.

3      88.     The homeowner called Countrywide 30 days later, in mid-January 2009.  A
4  Countrywide representative explained that her application had not been assigned to a
5  negotiator.  The homeowner then asked to be transferred to a supervisor.  After waiting on
6  hold for more than 20 minutes, the supervisor told her that her application had been rejected
7  because Countrywide had not received the necessary documents.

8      89.     On February 12, 2009, the homeowner and her husband filed Chapter 13
9  bankruptcy in order to set up a payment plan that would allow them to keep their home.  In
10  April of 2009, after Bank of America had acquired Countrywide, the homeowners restarted the
11  process of seeking a loan modification, this time from Bank of America.  On April 7, 2009, the
12  homeowner called Bank of America and was told it would take up to 120 days to process their
13  application.

14      90.     After submitting their paperwork, the homeowners called Bank of America
15  repeatedly to check on the status of their modification request.  Initially the wife called once a
16  month, then she began calling roughly once a week.  On an April 21, 2009, call, Bank of
17  America said that it would take between 45 and 60 days to assign a negotiator.  Each time the
18  homeowner called, Bank of America said that the application was complete, but that no one
19  had been assigned to review it.

20      91.     In October 2009, after six months without progress, the homeowner appealed to
21  her Congressional representative for help.  Soon thereafter, a Bank of America negotiator
22  called the homeowner, stating that she was assigned to the case and would call back in a few
23  days.  The negotiator never called back, though the homeowner called her repeatedly, leaving
24  messages on her voice mail almost every week.

25      92.     In January 2010, the homeowner was unable to make her mortgage payment.
26  On February 4, 2010, the Congressional representative's office notified the homeowner that
27  Bank of America would only offer a special forbearance agreement.  Because the forbearance
28  was only temporary and would require a large catch-up payment to Bank of America, the

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-27-

1   homeowner declined the agreement and waited for Bank of America to make a decision on

2   their modification request.

3       93.    On February 1, 2010, almost two years after the homeowner started the process

4   and despite dozens of calls to and with the bank, Bank of America sent a letter claiming that

5   the negotiator had been unable to contact her.  The letter also stated that a new application

6   and supporting paperwork would have to be submitted again to restart the process.

7       94.    On May 18, 2010, one week after the Nevada Attorney General's Office filed a

8   motion to intervene in the homeowner's bankruptcy, a Bank of America representative called

9   the homeowner.  During the call, the homeowner provided updated financial information.  On

10  May 20, 2010, Bank of America approved a loan modification.

11  **CONSUMER 3**

12      95.    The Gardnerville homeowner was struggling to make her $1100 monthly

13  mortgage payments after major surgery and accumulating medical bills.  She received a

14  solicitation from Bank of America in May 2009, inviting her to apply for a HAMP modification

15  and offering her an initial trial payment of $1074.67.  She sent in the application and all

16  required documents on May 22, 2009.  When she did not hear anything, she made several

17  follow-up phone calls to Bank of America and Bank of America told her to resubmit her

18  documents.

19      96.    There was no further communication until July 14, 2009, when the homeowner

20  called Bank of America to follow up and was told to re-send all of her documents. When she

21  called four days later, Bank of America told her that she would have a decision on her

22  modification request in 30 to 60 days.  In August 2009, Bank of America told her to expect a

23  FedEx package with modification paperwork.  She never received it; instead she received a

24  debt collection notice from ReconTrust.

25      97.    Several weeks later, Bank of America told the homeowner that her application

26  was referred to a different department and asked her to re-send her documentation, which she

27  did.  Bank of America requested the same documents one week later, and she again sent her

28  paperwork. On August 28, 2009, the consumer received an unsigned Notice of

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-28-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1  Default/Election to Sell.  On September 4, 2009, the homeowner called Bank of America to

2  confirm that it had the documents it needed for her modification.  Bank of America told her that

3  she would hear from her underwriter later that day.  The underwriter never called.

4      98.    The homeowner filed an election to mediate through the Nevada Supreme Court

5  Foreclosure Mediation Program on September 11, 2009.  On September 19, 2009, Bank of

6  America's Home Retention Department called and asked the homeowner to resubmit her

7  documents.  She subsequently called several times to check on the status of her request.

8      99.    A Bank of America representative returned her phone call and, reviewing her

9  financial information over the phone, told her she qualified for a six-month forbearance plan.

10  When the homeowner called two weeks later to check on the plan, Bank of America advised

11  the homeowner that she was conditionally approved for a HAMP modification with trial

12  payments of $561 and directed her to begin making the modified payment.  The homeowner

13  made the first payment over the phone in mid-October.

14      100.    At mediation a few days later, on October 20, 2009, the lawyer representing

15  Bank of America told the homeowner that she did not need to sign the mediation agreement

16  since the modification already had been worked out.  The Mediator recommended entering

17  into an agreement, and they did.  Bank of America agreed to provide the modification

18  agreement within 30 days, and the homeowner continued making the $561 modified

19  payments while she awaited the paperwork.

20      101.    A clause in the mediation agreement states, "Lender ... agrees to suspend all

21  foreclosure action."  Two days after mediation, ReconTrust posted an unsigned Notice of

22  Default/Election to Sell at her home.  On December 4, 2009, when she tried to reach the Bank

23  of America contact provided to her at mediation, she discovered that the number had been

24  changed and now belonged to another company.

25      102.    When the homeowner next contacted Bank of America in January to check on

26  the time frame for receiving the modification paperwork, Bank of America told the homeowner

27  that her modification request was still under review.  She continued to make her modified

28  payments and, after scheduling her fourth payment over the phone with Bank of America on