1  January 28, 2010, she learned than Bank of America had withdrawn $1196.54 from her

2  account, which was more than double her modified payment.  As a result, the homeowner was

3  unable to pay her medical expenses and was charged $320 in overdraft charges.

4       103.   In April, 2010, Bank of America sent the homeowner a letter denying a

5  permanent HAMP modification for failure to make all of the required trial period plan

6  payments.  The consumer had never missed her modified payment.

7  **CONSUMER 4**

8       104.   These Las Vegas homeowners applied to Bank of America for a loan

9  modification in August 2008.  They called weekly to check on the status of their request.  One

10  year later, Bank of America offered them a modification that increased their monthly mortgage

11  payment.  The consumers declined to accept the modification, explaining that it relied on

12  mistaken income figures.

13       105.   The homeowners reapplied for a modification on October 5, 2009.  On status

14  calls to Bank of America in October, November, and December, Bank of America told the

15  homeowners' third party representative that their file was in review with a negotiator.  On

16  January 15, 2010, the third party representative was told by phone that the file was closed on

17  January 12th because the homeowners rejected the August offer that increased their

18  payments.

19       106.   The homeowners reapplied for a loan modification in February, 2010.  A Bank of

20  America representative informed their third party representative that they were approved for a

21  trial modification with reduced payments of $1139 and advised them to expect a new

22  modification agreement within weeks.  The homeowners never received the agreement, even

23  though Bank of America impounded their escrow, which it said was necessary before a

24  modification could be completed.  In March, Bank of America requested additional documents

25  and the homeowners re-sent their modification request and documents.

26       107.   On May 12, 2010, Bank of America told the homeowners that their file was with

27  a negotiator and that the Bank would provide an answer within two weeks.  Instead, they

28  received a FedEx packet from Bank of America five days later requesting a new set of

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1   documents.  They completed the packet and returned it to Bank of America.   When they
2   called to check the status, Bank of America advised the homeowners that their file was under
3   review for the HAMP program and was with an assistant to the underwriter.

4        108.   In May, Bank of America incorrectly reported that they had a missed a payment
5   and added additional escrow fees.  The homeowners sent proof of payment and, when they
6   called to check on the status of their account, were promised that their file had been escalated
7   and that they would receive a decision by the end of July.

8        109.   Beginning in June, after nearly two years of waiting and after exhausting their
9   savings, the homeowners could no longer make their mortgage payments.  On July 2, 2010
10  Bank of America told the homeowners that it would make a decision of their modification by
11  the end of July.  On July 12, 2010, Bank of America requested Profit & Loss statements from
12  the homeowners, which they provided.  On status calls in August, September and October,
13  Bank of America told the homeowners that the file was with a vendor, awaiting an underwriting
14  decision.

15       110.   Bank of America's letter to the Attorney General in response to the homeowners'
16  complaint stated that all documents were received as of August 16, 2010.  Yet in September,
17  a Bank of America negotiator called the homeowners and said she did not have any
18  documents and needed a completely new packet.  The homeowners promptly sent it.

19       111.   On October 15, 2010, Bank of America sent the homeowners two overnight
20  packages with requests that they send updated financial information.  On October 20, 2010,
21  they received two more overnight packages requesting the same financial information.  The
22  consumers provided the information.

23       112.   On December 7, 2010, Fannie Mae's HAMP Solutions department contacted the
24  homeowners' third party representative.  Bank of America had reported to HAMP Solutions
25  that Bank of America was missing the homeowners' tax documents and could not proceed
26  with a modification review.  The homeowners sent those documents to Bank of America in
27  quadruplicate in early November.

28

**CONSUMERS 5**

113.    A Henderson couple first applied for a modification in February 2009. The homeowners are senior citizens on social security and with a small business, which was producing less of an income for them. While awaiting a decision on their modification, they called Bank of America numerous times to check on its status. Bank of America gave them different advice each time they called regarding whether to make partial mortgage payments or whether to make payments at all while their modification request was being reviewed.

114.    In May 2009, a Notice of Default was filed and, in June, the homeowners filed for bankruptcy. When they called Bank of America in August, Bank of America told them that their paperwork was lost and needed to be resent. The homeowners sent their documents again.

115.    On August 24, 2009, a Notice of Trustee Sale was filed setting a sale date for September 7, 2009. When the homeowners called Bank of America, they were informed that the foreclosure was not "active" since their modification review was pending. In October, their bankruptcy was discharged and, in November, Bank of America set a trustee sale date again.

116.    After almost a year of trying to obtain a loan modification on their own, the homeowners sought legal assistance. On December 30, 2009, Bank of America told their legal representative that the homeowners were prequalified for HAMP and would have a new mortgage payment of $1140. The modification offer Bank of America finally sent in February 2010, listed a payment of $1528 per month.

117.    The homeowners called Bank of America, explained that the proposed payment was more than 31% of their income, and again reviewed their financials with Bank of America. Bank of America told them they qualified for a modification with a monthly payment of $863 and that a new agreement would be mailed to them. The homeowners declined the earlier modification in writing and waited for the new one.

118.    The new modification documents never came. Instead, Bank of America sent the homeowners a letter denying the new modification because their loan "was previously modified under the Home Affordable Modification Program." On June 3, 2010, Bank of

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-32-

America emailed the homeowners' legal representative explaining that Bank of America did not know why the loan was disqualified when no previous HAMP modification was done and promising to have an answer the next day.

119. On July 2, 2010, Bank of America still did not have an answer. Bank of America told their legal representative that a request was submitted through the "appeals database." When the homeowner next called Bank of America, Bank of America told her that she would receive a loan modification packet during the week of July 12, 2010. She never received the modification packet.

120. When the case came to the attention of the Attorney General's Office, the Office forwarded the homeowners' complaint to Bank of America. Bank of America wrote to the Attorney General's Office on September 15, 2010. The letter acknowledged that the homeowners' modification has been wrongly declined. The Bank reported that, on June 29, 2010, it appealed the decline and requested the loan be reviewed again for a HAMP modification.

121. As of November, 2010, almost two years after they began the process, the homeowners' modification still has not been resolved and a trustee sale is still pending.

**CONSUMERS 6**

122. A retired Pahrump couple applied for a modification in February 2009, when the decline in the home's value caused their reverse mortgage to fall through. In July, Bank of America offered them a modification that lowered their interest rate about 2% and decreased their mortgage payments to $1,694. On August 3, 2009 Bank of America sent the homeowners a 6-month forbearance agreement, which lowered their mortgage to $947 per month. When they called Bank of America to find out which amount to pay, Bank of America told them the forbearance agreement replaced the modification offer and to make the forbearance payment while the Bank continued to review their modification request. The consumers began paying $947 on September 1, 2009.

123. On November 23, 2009, Bank of America sent the homeowners a third offer for a modification with monthly payments of $1821. Bank of America advised them over the

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

phone to continue paying under the forbearance agreement, and they did.  On March 11, 2010, Bank of America sent the homeowners a Notice informing them there were "no available workout options based on [their] financial information."  When they called, Bank of America told them that their account was still in review and that they should continue making their forbearance payments.  On April 6, 2010, Bank of America sent them another denial letter, almost identical to the first.

124.   On April 25, 2010, when the homeowner called Bank of America, the representative told him that his loan was still in review, but that he should qualify for HAMP. In the meantime, Bank of America told the homeowner to make his payments, as before, and that he would receive a decision on the modification around June 10, 2010.  Bank of America gave the homeowners similar advice in status calls through May and June.

125.   In August, 2010, Bank of America returned the homeowners $947 forbearance payment.  ReconTrust filed an unsigned Notice of Default dated August 26, 2010.  On August 30, 2010, when the homeowners called Bank of America, they were told again their modification was still in review.  Bank of America advised them not to make any more payments, but to wait until the modification process was complete.

126.   On September 1, 2010, the homeowners received an election form allowing them to request a mediation with Bank of America, which they returned.  They called Bank of America and Bank of America informed them that it was placing a "special code" on their account so they could continue making the forbearance payment.  On September 8, 2010, Bank of America advised them that their file was in the Office of the President and an advocate would call them within 11 days.  A few weeks later, Bank of America sent the homeowners a HAMP trial modification offer reducing their payments to $1,046.  They accepted the offer and began paying this amount.

127.   The homeowners attended their mediation on November 5, 2010.  At the mediation, they agreed to continue making the trial payments under the September modification.  Bank of America told them that, if all went well, they could expect to receive a permanent modification offer in January 2011.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-34-

1    128.    The Nevada Attorney General's office escalated the homeowners' complaint to

2    Bank of America and received two responses.  In the first response of September 20, 2010,

3    Bank of America claims to have denied the homeowners' July MHA modification because the

4    property was not their primary residence.  The home has always been their primary residence

5    and the homeowner was not denied the MHA modification, they were told to ignore it and pay

6    the forbearance agreement instead.

7    129.    In addition, in their September 20th letter, Bank of America claims to have

8    offered a second MHA modification in June.  The homeowners did not receive this

9    modification; however, they were already paying that amount per the special forbearance until

10   their August payment was returned to them uncashed.

11   130.    On September 27, 2010, Bank of America sent the Nevada Attorney General

12   another response to the escalated complaint.  This time, Bank of America claims to have

13   offered a second forbearance agreement in April 2010, in the same amount as the first, $947.

14   The Bank says the payments were not submitted timely and thus canceled.  This letter does

15   not mention the supposed MHA offer in June.  The homeowners accepted a six-month

16   forbearance and made the forbearance payments of $947 for 11 months.  Their 12th payment

17   was returned to them by Bank of America.

18   131.    The homeowners are currently making their trial payments under the September

19   modification.

20   **CONSUMERS 7**

21   132.    In August, 2008, a Henderson couple requested a loan modification from Taylor

22   Bean & Whitaker, which serviced their loan.  When Taylor Bean & Whitaker closed its doors

23   and their loan was taken over by Bank of America, they repeatedly submitted their documents

24   to Bank of America.  They also called Bank of America over and over again regarding a loan

25   modification.

26   133.    On September 11, 2009, Bank of America told the homeowners' third party loan

27   modification company, that the loan was in review and there was no sale date.   Bank of

28   America asked the company to resubmit the homeowners' documents, which it did on October

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-35-

2, 2009.  On October 22, 2009, when the third party company called Bank of America, Bank of America informed them that their home was sold the day before.  The homeowners received a notice on the door giving them three days to move out in March 2010.

134.  When the homeowners called Bank of America for an explanation, Bank of America told them that "it was a mistake" caused by the overwhelming volume of modification requests Bank of America was handling.  After more than two years of trying to obtain a loan modification, the homeowners lost their home and moved out.

135.  On April 23, 2010; May 31, 2010; June 14, 2010; July 23, 2010; August 3, 2010; and August 11, 2010, Bank of America sent the homeowners notices thanking them for their "recent correspondence" (though none had been sent) and promising a response within 20 business days.  The homeowners received no other correspondence from Bank of America regarding the foreclosure.

**CONSUMERS 8**

136.  These Las Vegas homeowners, who later became eligible for a modification under the Consent Judgment, first contacted Countrywide in October, 2008 to apply for a loan modification.  They both worked in real estate and their incomes had dropped significantly.  In addition, the monthly payment on their payment option adjustable rate mortgage jumped from $1800 to $2657.  Two days after applying for the modification, they called to follow up and Countrywide told them that it did not have their documents.  They re-faxed all of the documents.

137.  The homeowners called Countrywide again three days later to confirm receipt of their documents.  Countrywide told them that its review would take 30 to 90 days.  When the homeowners called on November 3, 2008, a Countrywide representative told them that all of their documents were received and their modification was under review.

138.  However, in December, 2008, when the homeowners called to check again on their status, they were advised that their modification was canceled because the bank had not received all of the necessary paperwork.  They resubmitted their documents and were told in January 2009, that their application was being reviewed.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

139.   The homeowners solicited the help of a consumer credit counseling service. Together, they called Bank of America, which had purchased Countrywide, in February and Bank of America asked them to re-send their documents, which they did. On March 12, 2009, the homeowners called, and Bank of America again reported that it did not have their documents.  The homeowners re-faxed them.  In July, August, and September, Bank of America requested updated financial information, which the homeowner sent.

140.   In August, 2009, the homeowners received an unsigned Notice of Default/Election to Sell.  When the wife called Bank of America, the bank told her that her modification was cancelled, but provided no reason.  Bank of America also told her that she qualified for HAMP and requested her documents again.  She sent the documents to the bank.  The homeowner then began calling the bank on a weekly basis to check on the status of her modification.  Bank of America told her each time that a decision had not been made.

141.   On December 15, 2009, Bank of America told the homeowner that her HAMP request was cancelled in November and again provided no explanation.  The homeowner sent her documents to Bank of America again to restart the process.

142.   In December 2009, they homeowners filed an election to mediate.  In April 2010, the homeowners participated in mediation in which Bank of America agreed to modify the terms of their loan by waiving fees and penalties, reducing the interest rate, and reducing their payments on a trial basis to $2,278 beginning in May 2009. Further, according to the mediation agreement if the homeowners made their "trial payments ... Lender to consider Homeowners for permanent modification under investor guidelines, which are anticipated to result in a similar initial payment amount."

143.   On April 5, 2010, Bank of America's representative sent the homeowners a forbearance agreement, not a trial modification, as promised.  The forbearance agreement set the same monthly payment as the mediation agreement; however, it did not modify the terms of the loan, but only deferred payments.  The homeowners tried repeatedly to reach Bank of America's representative.  They left several messages and received no return call.  Within five days, the Special Forbearance Agreement expired.

144.    In July, 2010, a Bank of America representative called the homeowners and informed them that they qualified for a loan modification and asked them to send updated documents, which they did.  One week later, Bank of America called and asked that the documents be faxed again.  The homeowners re-faxed their materials in August, 2010. They followed up with repeated phone calls, but never received a return call or any information on the status of their review.  In a letter to the Attorney General's office dated October, 18, 2010, Bank of America explained that they closed the homeowners' file on August 9, 2010 because they did not receive the financial information requested.

**CONSUMERS 9**

145.    In November 2009, these Las Vegas homeowners with a Qualifying Mortgage applied for a loan modification with Bank of America.  On January 12, 2010, during a regular call to Bank of America to check the status of their request, Bank of America told the consumers' third party modification company that they would receive a decision by February 24th.

146.    Instead, Bank of America sent the homeowners a Notice of Intent to Accelerate dated February 16, 2010, stating that they needed to pay $2,439 to cure their default. At that time the homeowners were still current on their loan.  When the homeowners called Bank of America, they were told, in order to keep their home, they needed to make additional payments.  As instructed, the homeowners made extra payments on their mortgage over the next two months.  They were only able to make two more payments in June and July before exhausting their savings.

147.    From March through July, the homeowners, as well as their third party loan modification company, made regular calls to Bank of America to check the status of their modification.  They were told their file was in review and that no negotiator was yet assigned. They sent updated documents as requested and, on July 14, 2010, Bank of America told them the review would be completed in 30 to 45 days.  The consumers still have not received a decision.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

148.   In a September 29, 2010 letter from Bank of America to the Attorney General in response to the escalation of the homeowners' complaint, Bank of America explained that it denied the homeowners a NHRP modification because '[their] loan was less than 60 days delinquent." On information and belief, the homeowners were Delinquent, as defined by the Consent Judgment, and should not have been denied a modification.  Bank of America also noted that it requested documents several times from the homeowners but did not receive them.  The homeowners and their third party agent responded to every document request and never had been advised of missing documents during their regular conversations with Bank of America.

**CONSUMER 10**

149.   A former realtor whose income dropped with the collapse of the housing market owns a home in Las Vegas for which she has been trying to obtain a loan modification.  She has a Pay Option ARM, one of the loan types covered by the Countrywide Consent Judgment. She first applied for a loan modification with Countrywide in May 2008 and waited 9 months without a decision, frequently calling to check on the status of her request.

150.   After Bank of America acquired Countrywide, the homeowner began calling Bank of America to pursue her modification.  Bank of America repeatedly advised that her modification was in review.  In April 2009, Bank of America denied her modification because of an inconsistent appraisal.  The appraiser had gone to the wrong house.  She reapplied for a modification, but Bank of America denied her request again in August because she had not accepted an "AG offer," presumably a modification under the Consent Judgment.  Bank of America had never offered her a modification.

151.   In September 2009, the homeowner applied for a modification for a third time. She also received an unsigned Notice of Default/Election to Sell .  She elected to mediate.  In May, 2010, Bank of America attended the mediation without the required documents.  The mediation was rescheduled for several days later.  This time, Bank of America did not show up at all.  Over the course of two years, the homeowner has called Bank of America twice a

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

month and has faxed documents to the Bank more than a dozen times.  Bank of America twice wrongfully denied her request and has kept her waiting more than a year for a decision on her most recent request.

152.   The misrepresentations described above were made in connection with the promotion and operation of Bank of America's modification program.

## COUNT I – VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT

153.   The State re-alleges all preceding paragraphs in their entirety.

154.   Bank of America's misrepresentations to Nevada consumers regarding the operation of its mortgage modification practice violates the Nevada Deceptive Practices Act. In particular, Bank of America's deceptive conduct breached its obligations under:

a.   Nev. Rev. Stat. § 598.0915(9), which provides that it is a deceptive practice for a person to "[a]dvertise[] goods or services with the intent not to sell or lease them as advertised;"

b.   Nev. Rev. Stat. § 598.0915(15), making it a deceptive trade practice for a person to "[k]nowingly make[] any other false representation in a transaction;"

c.   Nev. Rev. Stat. § 598.092(8), which declares that it is a deceptive trade practice for a person to "[k]nowingly misrepresent[] the legal rights, obligations or remedies of a party to a transaction;"

d.   Nev. Rev. Stat. § 598.0923(3), which makes knowing violations of "a state or federal statute or regulation relating to the sale or lease of goods or services" a violation of the Deceptive Trade Practices Act; and

e.   Nev. Rev. Stat. § 598.0973, allowing a court to impose heightened penalties for "engage[ing] in a deceptive trade practice directed toward an elderly person or a person with a disability."

155.   As alleged herein, Bank of America engaged in unlawful practices in violation of the Nevada Deceptive Trade Practices Act §§ 598, *et seq.*, in that it made false promises and

-40-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

used deception, deceptive practices, and/or misrepresentations in connection with mortgage modifications.

156.   On information and belief, affected consumers included consumers over the age of 60.

157.   In all matters alleged herein, the Defendants acted willfully in violation of Nev. Rev. Stat. §§ 598, *et seq.* as required by Nev. Rev. Stat. § 598.0999(2).

## RELIEF REQUESTED

**WHEREFORE**, the State respectfully requests that the Court:

1.   Enter a declaratory judgment that the Defendant's operation of its loan modification program has violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.* and the Consent Judgment in the *State of Nevada v. Countrywide Financial Corporation et al.*.

2.   Prohibit the Defendant from continuing the course of conduct alleged herein as violating the Consent Judgment and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.* as written now or amended in the future.

3.   Hold Defendants in contempt and order them to comply immediately with all provisions of the Consent Judgment pursuant to Paragraph III.10.4 of the Consent Judgment.

4.   Order the Defendant to pay civil penalties pursuant to Nev. Rev. Stat. § 598.0999(2) or Nev. Rev. Stat. § 598.0973 and Nev. Rev. Stat § 598.0999, and restitution pursuant to Nev. Rev. Stat. § 598.0993 and Paragraph III.10.4 of the Consent Judgment.

5.   Extend the Termination Date established in the Consent Judgment and impose additional reporting requirements to allow the State to evaluate Defendants' compliance.

. . .

. . .

. . .

. . .

. . .

. . .

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1    6.    Order Defendants to pay the costs of investigation and reasonable attorney's

2    fees pursuant to Nev. Rev. Stat. § 598.0999(2).

3    7.    Order such other and further relief as the Court may deem just and proper.

4    DATED this 19th day of January, 2011.

5                                    SUBMITTED BY:

6                                    CATHERINE CORTEZ MASTO

7                                    Attorney General

8                            By:    _____

9                                    BINU G. PALAL
                                     Deputy Attorney General
10                                   Nevada Bar No. 010178
                                     702-486-3128 ph / 702-486-3283 fax
11                                   555 E. Washington Avenue, #3900
                                     Las Vegas, Nevada  89101
12                                   Attorneys for Plaintiff, State of Nevada

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

# EXHIBIT A



Home · Locations · Contact Us · Help · Sign In

[ Search ]

## Investor Relations

Overview
Corporate Governance
Stock Information
**Financial Releases**
    2009 Financial Releases
    2008 Financial Releases
    2007 Financial Releases
    2006 Financial Releases
    2005 Financial Releases
    2004 Financial Releases
    2003 Financial Releases
    Archived Releases
Services for Shareholders
Fixed Income Investor Relations
Securitization
Dividend History
Annual Reports
SEC Filings
Call Reports
Basel II Pillar 3 Reports
Investor Fact Book
Webcasts
Presentations
Analyst Coverage
Earnings Estimates
Fundamentals
Ownership Summary
E-mail Alerts
Anti-Money Laundering
Newsroom

## Financial Releases

View printer-friendly version

<< Back

### Bank of America Completes Countrywide Financial Purchase

CHARLOTTE, N.C., July 1 /PRNewswire/ -- Bank of America Corporation today completed its purchase of Countrywide Financial Corp. to create the nation's leading mortgage originator and servicer.

Bank of America will focus on responsible home lending, serving as a reliable source of mortgages for the American consumer. Bank of America also will assist new and existing customers with selecting the right product to meet their needs.

Mortgages are one of the three main cornerstone consumer financial products along with deposits and credit cards, said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. This purchase significantly increases Bank of America's market share in consumer real estate, and as our companies combine, we believe Bank of America will benefit from excellent systems and a broad distribution network that will offer more ways to meet our customers' credit needs.

As previously announced in April, Bank of America plans to offer the following types of first-lien mortgages: conforming loans underwritten to standard guidelines of government-sponsored enterprises and the government, including FHA and VA loans and other loans designed for low-and moderate- income borrowers; non-conforming loans with terms expected to produce no greater risk of default than conforming loans; interest-only fixed-rate and adjustable-rate mortgages (ARMs) that are subject to a 10-year minimum interest-only period, which lessens the possibility of short-term payment shock, and fixed-period ARMs that provide borrowers low initial rates with the security of fixed payments, subject to protections against steep increases in payment amounts.

Bank of America reiterated it will continue its long-established policy of not originating subprime mortgages. As announced previously, Bank of America will discontinue certain nontraditional mortgages – including option-ARM loans. It also will significantly curtail some other nontraditional mortgages, such as certain low-documentation loans and will implement enhanced borrower protections over time as part of the transition process.

Countrywide's existing customers eventually will gain access to a broad set of consumer financial products such as credit cards and deposit services.

Now we begin to combine the two companies and prepare to introduce our new name and way of operating, said Barbara Desoer, president of the combined mortgage, home equity and insurance businesses. We have the opportunity to renew America's confidence in homeownership with unmatched capabilities to deliver the products homebuyers need and understand and give customers a simple process and service experience they've come to expect.

The company reiterated its combined national consumer mortgage division will be based in Calabasas, Calif. The combined company will begin originating mortgage and home equity products under the Bank of America brand by mid-2009.

The company anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses. In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers.

Under the terms of the agreement, shareholders of Countrywide received .1822 of a share of Bank of America stock in exchange for each share of Countrywide.

As previously announced in April, Bank of America will pursue a new goal to lend and invest $1.5 trillion for community development over the next 10 years beginning in 2009. The goal will focus on affordable housing, economic development and consumer and small business lending and replace existing community development goals of both companies.

Bank of America also previously announced a $35 million neighborhood preservation and foreclosure prevention package by both companies focusing on grants and low-cost loans to help local and national nonprofit organizations engaged in foreclosure prevention, and to purchase vacant single-family homes for neighborhood preservation. The combined company will modify or workout about $40 billion in troubled mortgage loans in the next two years and these efforts will keep an estimated 265,000 customers in their homes. The combined loss mitigation staffs will be maintained at the level of more than 3,900 for at least one year.

Bank of America

Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services. The company provides unmatched convenience in the United States, serving more than 59 million consumer and small business relationships with more than 6,100 retail banking offices, nearly 18,500 ATMs and award-winning online banking with nearly 25 million active users. Bank of America is the No. 1 overall Small Business Administration (SBA) lender in the United States and the No. 1 SBA lender to minority-owned small businesses. The company serves clients in more than 150 countries and has relationships with 99 percent of the U.S. Fortune 500 companies and 83 percent of the Fortune Global 500. Bank of America Corporation stock (NYSE: BAC) is a component of the Dow Jones Industrial Average and is listed on the New York Stock Exchange.

SOURCE Bank of America Corporation

CONTACT: Investors: Kevin Stitt, +1-704-386-5667, Lee McEntire, +1-704-388-6780, Leyla Pakzad, +1-704-386-2024, or Reporters May Contact: Scott Silvestri, +1-980-388-9921, scott.silvestri@bankofamerica.com, all of Bank of America

🖷 Print Page
✉ E-mail Page
Terms of Use

Bank of America, N.A. Member FDIC. Equal Housing Lender 🏠
© 2010 Bank of America Corporation. All rights reserved.

# EXHIBIT B

Bank of America | Investor Relations | Financial Releases                     Page 1 of 4



Home · Locations · Contact Us · Help · Sign In

| Search |

**Investor Relations**

Overview
Corporate Governance
Stock Information
Financial Releases
  2009 Financial Releases
  2008 Financial Releases
  2007 Financial Releases
  2006 Financial Releases
  2005 Financial Releases
  2004 Financial Releases
  2003 Financial Releases
  Archived Releases
Services for Shareholders
Fixed Income Investor Relations
Securitization
Dividend History
Annual Reports
SEC Filings
Call Reports
Basel II Pillar 3 Reports
Investor Fact Book
Webcasts
Presentations
Analyst Coverage
Earnings Estimates
Fundamentals
Ownership Summary
E-mail Alerts
Anti-Money Laundering
Newsroom

# Financial Releases

🖶 View printer-friendly version

<< Back

### Bank of America Agrees to Purchase Countrywide Financial Corp.

Creates Largest U.S. Mortgage Lender and Servicer

CHARLOTTE, N.C., Jan. 11 /PRNewswire/ -- Bank of America Corporation today announced a definitive agreement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4 billion.

The purchase will make Bank of America the nation's largest mortgage lender and loan servicer. This is an important advancement in the company's desire to help customers and clients meet all of their financial needs. A mortgage is one of the key foundations of many customer relationships.

Countrywide will benefit from the stability of being part of the largest and one of the most financially strong financial institutions in the United States.

Bank of America will benefit from Countrywide's broader mortgage capabilities, including its extensive retail, wholesale and correspondent distribution networks. The Calabasas, California-based company operates more than 1,000 field offices and has a sales force of nearly 15,000. Countrywide also has a leading mortgage technology platform, a well known brand in home lending and management expertise in a number of key areas.

Bank of America would gain greater scale in originating and servicing mortgages in the U.S. Countrywide had $408 billion in mortgage originations in 2007 and has a servicing portfolio of about $1.5 trillion with 9 million loans. The purchase also includes Countrywide's Lender Placed Insurance and other businesses.

"Countrywide presents a rare opportunity for Bank of America to add what we believe is the best domestic mortgage platform at an attractive price and to affirm our position as the nation's premier lender to consumers," Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis said. "Countrywide customers will gain access to a broad set of consumer products including credit cards and deposit services. Home ownership is a fundamental pillar of the U.S. economy and over time it will be a key area of growth for Bank of America."

"We are aware of the issues within the housing and mortgage industries," Lewis continued. "The transaction reflects those challenges. Mortgages will continue to be an important relationship product, and we now will have an opportunity to better serve our customers and to enhance future profitability."

Countrywide's deep retail distribution will enhance Bank of America's network of more than 6,100 banking centers throughout the U.S. After closing, Bank of America plans to operate Countrywide separately under the Countrywide brand with integration occurring no sooner than 2009.

"We believe this is the right decision for our shareholders, customers and employees," said Countrywide Chairman and Chief Executive Officer Angelo R. Mozilo. "Bank of America is one of the largest financial institutions in the U.S. and internationally, and we are confident that the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world. We have had a long and positive relationship with Bank of America and our servicing and origination businesses, as well as other aspects of our operations, will be substantially enhanced as a result of this transaction."

Financial Terms

Under the terms of the agreement, shareholders of Countrywide would receive .1822 of a share of Bank of America stock in exchange for each share of Countrywide.

The purchase is expected to close in the third quarter and to be neutral to Bank of America earnings

per share in 2008 and accretive in 2009, excluding merger and restructuring costs.

Bank of America expects $670 million in after-tax cost savings in the transaction, or 11 percent of the expense base of the two companies' mortgage operations. About one third of those savings would come in 2009, two thirds would be realized in 2010 and savings would be fully realized in 2011.

The agreement has been approved by Bank of America's board of directors and Countrywide's board of directors and is subject to approval by Countrywide's shareholders and customary regulatory approvals.

Subprime Initiatives

Origination of subprime loans is not planned for the combined company. Both companies share the goal of keeping distressed mortgage borrowers in their homes when possible. Both Bank of America and Countrywide continue to work with public officials and community groups to explore new initiatives to help homebuyers and communities affected by the subprime issue.

- Bank of America and Countrywide both support efforts to fight predatory lending practices.
- Bank of America and Countrywide are active participants in the Hope Now Alliance, which has launched a letter campaign to delinquent borrowers, created a counseling hotline and facilitates the sharing of best servicing practices. Bank of America also will continue Countrywide's commitment to participate in the American Securitization Forum's December 2007 reset freeze framework for 2/28 and 3/27 adjustable rate mortgages (ARMs).
- Bank of America will continue Countrywide's commitment to participate in California Governor Arnold Schwarzenegger's November 2007 subprime ARM program.

Bank of America plans to expand the capacity and marketing of credit counseling programs and internal capacity and flexibility for loan modifications for loan workout teams following the purchase of Countrywide.

Countrywide also has a number of programs in place designed to minimize foreclosures where feasible.

- On October 23, 2007, Countrywide announced a major expansion of its foreclosure prevention efforts by starting a $16 billion home preservation program to assist as many as 82,000 subprime hybrid ARM customers facing ARM resets through the end of 2008.
- On October 24, 2007, Countrywide entered into a groundbreaking partnership with the Neighborhood Assistance Corporation of America (NACA) to leverage Countrywide's market leading home retention programs and NACA's unique model for counseling borrowers.
- On December 21, 2007, Countrywide announced work on an agreement with the Association of Community Organizations for Reform Now (ACORN) to serve as a blueprint for home retention and foreclosure prevention initiatives in the mortgage industry, with a particular focus on subprime borrowers.

Bank of America was advised by Banc of America Securities and the law firms of Cleary, Gottlieb, Steen & Hamilton LLP and K&L Gates in the transaction. Countrywide was advised by Sandler O'Neill & Partners LP and Goldman Sachs Group Inc. and the law firm of Wachtell Lipton Rosen & Katz. Countrywide's Board of Directors was advised by Sandler O'Neill & Partners LP. Both Goldman Sachs and Sandler O'Neill delivered fairness opinions to the Countrywide Board.

Note: Bank of America management will present transaction details in an 8:30 a.m. webcast today. The presentation and supporting materials can be accessed on the Bank of America Investor Relations Web site at http://investor.bankofamerica.com. For a listen-only connection to the conference call, dial 800.895.1241 and the conference ID: 79795.

Bank of America

Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services. The company provides unmatched convenience in the United States, serving more than 57 million consumer and small business relationships with more than 6,100 retail banking offices, more than 17,000 ATMs and award-winning online banking with more than 23 million active users. Bank of America is the No. 1 overall Small Business Administration (SBA) lender in the United States and the No. 1 SBA lender to minority-owned small businesses. The company serves clients in 175 countries and has relationships with 99 percent of the U.S. Fortune 500 companies and 80 percent of the Fortune Global 500. Bank of America Corporation stock (NYSE: BAC) is listed on the New York Stock Exchange.

http://www.bankofamerica.com

Countrywide Financial

Founded in 1969, Countrywide Financial Corporation (NYSE: CFC) is a diversified financial services provider and a member of the S&P 500, Forbes 2000 and Fortune 500. Through its family of companies, Countrywide originates, purchases, securitizes, sells, and services residential and commercial loans; provides loan closing services such as credit reports, appraisals and flood determinations; offers banking services which include depository and home loan products; conducts fixed income securities underwriting and trading activities; provides property, life and casualty insurance; and manages a captive mortgage reinsurance company. For more information about the Company, visit Countrywide's website at http://www.countrywide.com.

Forward-Looking Statements

This press release contains forward-looking statements, including statements about the financial conditions, results of operations and earnings outlook of Bank of America Corporation. The forward-looking statements involve certain risks and uncertainties. Factors that may cause actual results or earnings to differ materially from such forward-looking statements include, among others, the following: 1) projected business increases following process changes and other investments are lower than expected; 2) competitive pressure among financial services companies increases significantly; 3) general economic conditions are less favorable than expected; 4) political conditions including the threat of future terrorist activity and related actions by the United States abroad may adversely affect the company's businesses and economic conditions as a whole; 5) changes in the interest rate environment and market liquidity reduce interest margins, impact funding sources and effect the ability to originate and distribute financial products in the primary and secondary markets; 6) changes in foreign exchange rates increases exposure; 7) changes in market rates and prices may adversely impact the value of financial products; 8) legislation or regulatory environments, requirements or changes adversely affect the businesses in which the company is engaged; 9) changes in accounting standards, rules or interpretations, 10) litigation liabilities, including costs, expenses, settlements and judgments, may adversely affect the company or its businesses; 11) mergers and acquisitions and their integration into the company; and 12) decisions to downsize, sell or close units or otherwise change the business mix of any of the company. Accordingly, readers are cautioned not to place undue reliance on forward- looking statements, which speak only as of the date on which they are made. Bank of America does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements are made. For further information regarding Bank of America Corporation, please read the Bank of America reports filed with the SEC and available at www.sec.gov.

Additional Information About this Transaction

In connection with the proposed merger, Bank of America will file with the SEC a Registration Statement on Form S-4 that will include a proxy statement of Countrywide that also constitutes a prospectus of Bank of America. Countrywide will mail the proxy statement/prospectus to its stockholders. Bank of America and Countrywide urge investors and security holders to read the proxy statement/prospectus regarding the proposed merger when it becomes available because it will contain important information. You may obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website (www.sec.gov). You may also obtain these documents, free of charge, from Bank of America's website (www.bankofamerica.com) under the tab "About Bank of America" and then under the heading "Investor Relations" and then under the item "SEC Filings". You may also obtain these documents, free of charge, from Countrywide's website (www.countrywide.com) under the tab "investor relations" and then under the heading "SEC & other filings."

Proxy Solicitation

Bank of America, Countrywide and their respective directors, executive officers and certain other members of management and employees may be soliciting proxies from Countrywide stockholders in favor of the merger. Information regarding the persons who may, under the rules of the SEC, be considered participants in the solicitation of the Countrywide stockholders in connection with the proposed merger will be set forth in the proxy statement/prospectus when it is filed with the SEC. You can find information about Bank of America's executive officers and directors in its definitive proxy statement filed with the SEC on March 19, 2007. You can find information about Countrywide's executive officers and directors in definitive proxy statement filed with the SEC on April 27, 2007. You can obtain free copies of these documents from Bank of America and Countrywide using the contact information above.

SOURCE Bank of America

Case 3:11-cv-00135-RCJ -RAM   Document 5-2    Filed 02/24/11   Page 21 of 30

CONTACT: Investors, Kevin Stitt, +1-704-386-5667, Lee McEntire, +1-704-388-6780, or Leyla Pakzad, +1-704-386-2024, all of Bank of America; or David Bigelow, +1-818-225-3121, or Lisa Riordan, +1-818-225-3959, both of Countrywide; or Media, Scott Silvestri, Bank of America, +1-980-388-9921, scott.silvestri@bankofamerica.com; or Countrywide Media Hotline, +1-800-796-8448

Print Page

E-mail Page

Terms of Use

Home · Privacy & Security · Careers · Site Map

Bank of America, N.A. Member FDIC. Equal Housing Lender 
© 2010 Bank of America Corporation. All rights reserved.

# EXHIBIT C



**Bank of America** | 2008 Annual Report

Bank of America

**Q. What actions have you taken to improve results in underperforming business units?**

A. In Capital Markets & Advisory Services, we reduced our exposures in certain higher-risk securities as markets allowed, and we have exited some securities markets. These actions reduced the amount of capital at risk in the business.

We have taken a number of steps to deal with rising loan losses. While we continue to extend credit across our businesses, we also have tightened our underwriting requirements for higher-risk segments, and we are using more judgmental underwriting in determining credit-worthiness of applicants. We are also reaching out to customers who appear to be struggling.

In the mortgage area, historically low rates are generating customer applications for mortgage financing at more than double the levels that existed before the government announced its intention in November to buy mortgage-backed securities. The capabilities and scale added through Countrywide are helping us respond to this high customer demand, and we're taking additional steps to further expand our capacity in sales and fulfillment as demand warrants.

**Q. How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?**

A. Our long-term strategy is to have leading positions in the four corner-stone products of a consumer relationship — deposits, credit and debit cards, mortgages and investments — either through organic growth or through acquisitions.

We have long been one of the leaders in deposits and, more recently, credit cards. The acquisition of Countrywide gives us mortgage capabilities and scale that are critical to our consumer relationships. We were able to acquire the best mortgage platform in the business, with state-of-the-art technology systems, at an attractive price, immediately becoming the No. 1 provider of both mortgage originations and servicing. As a combined company, we believe we will be recognized as a responsible lender who is committed to helping our customers be successful homeowners.

The acquisition of Merrill Lynch makes us a leading U.S. wealth management firm, with more than 18,000 financial advisors and more than $1.8 trillion in total client assets. As investment advice and expertise continue to grow in importance to our huge customer base, we now have the

scale to better serve the millions of affluent customers who already bank with us, and to help attract new customers with our comprehensive banking and investment solutions. In addition, Merrill Lynch's global reach and strong markets capabilities will enhance what we can offer our business clients and provide us with greater geographic diversity.

**Q. How does the financial crisis and the changing competitive landscape alter the bank's revenue and earnings opportunities?**

A. Earnings are expected to be pressured in the near term as we work our way through the current recession. There is no question that the entire industry will be smaller, with simpler, more transparent products. However, in the longer term we believe we are remarkably well-positioned to benefit when the economic outlook improves.

For our retail customers, we offer industry-leading products, convenience and access. And we believe our size and scale enable us to offer consumers better value.

For our business clients, we provide a complete range of banking and investment banking products and services. We can deliver the full power of a combined commercial and

# EXHIBIT D



## CORPORATE counsel

Select 'Print' in your browser menu to print this document.

Copyright 2010. ALM Media Properties, LLC. All rights reserved. *Corporate Counsel* Online

Page printed from: http://www.corpcounsel.com

Back to Article

## Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation
Amy Miller
Corporate Counsel
February 22, 2008

Sandor Samuels has, quite possibly, the least enviable in-house legal job right now in corporate America. As general counsel and litigation chief of embattled mortgage lender Countrywide Financial Corp., he's facing huge lawsuits on all fronts. Everyone from disgruntled investors and shareholders to mortgage customers and government regulators is taking Countrywide to court in a wave of suits that will probably be the litigation story for the next couple of years.

At least Samuels, one of 20 *Fortune* 250 GCs who also serve as litigation chiefs, won't have to face it alone. In January, Bank of America Corp. made a $4 billion buyout offer for Countrywide, which could be a much-needed lifeline for the country's largest home lender. How the acquisition will affect Samuels' in-house litigation team was unclear at press time; he and other Countrywide executives declined to comment for this story.

Still, the litigation could be a painful headache for Bank of America's David Onorato, another one of the *Fortune* 250 litigation bosses on our chart. The Charlotte-based bank will not only assume Countrywide's financial woes when the deal goes through later this year, but it will also take on the swelling number of suits against the Calabasas, Calif.-based Countrywide that began when the subprime mortgage market collapsed last year. Meanwhile, Bank of America faces its own lawsuits related to the subprime meltdown, and individual shareholders filed at least three class action suits against the bank in January challenging the purchase of Countrywide.

Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. "We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says. "We are aware of the claims and potential claims against the company and have factored these into the purchase."

In Countrywide's third-quarter report last year, officials denied that pending litigation would hurt the lender financially. Yet according to that same report, the company spent $52.4 million on legal, consulting, and accounting expenses, according to Securities and Exchange Commission records, up from $47.3 million during the same period the previous year.

At the center of the banking crisis are the adjustable-rate home loans given to borrowers with less-than-stellar credit histories. Countrywide and other lenders in 2006 issued more than $600 billion in subprime loans during the peak. In that year, 45 percent of Countrywide's loans carried adjustable rates, up from 18 percent only a few years earlier, according to company filings.

Subprime loans or not, Countrywide used to be a Wall Street favorite. In 2005 its share price was 561 percent higher than it had been a decade earlier. The lender boasted revenue of $11.4 billion and a pretax income of $4.3 billion. As recently as 2005, Barron's named Countrywide founder and CEO Angelo Mozilo one of the world's 20 most respected chief executives. Samuels, who had been a general counsel at First Interstate Bancorp before joining Countrywide, was named "Outstanding Corporate Counsel of the Year" in 2005 by the Los Angeles County Bar Association.

The accolades ceased last year when low subprime teaser rates began to expire, bumping borrowers' interest rates toward double digits. Many homeowners could no longer pay their mortgages, leading to a wave of delinquencies and defaults. And the fallout dealt a harsh blow to high-flying Countrywide. During the third quarter of last year, one-fourth of the subprime loans that Countrywide made were delinquent, up from 17 percent in 2006, according to company filings. It also posted a $1.2 billion loss in the third quarter. Shares in Countrywide lost nearly 80 percent of their value last year, and the company last year laid off more than 11,000 employees, according to a January analysis by mortgagedaily.com, an online trade publication.

The percentage of delinquencies will likely climb higher this year and next, says Keith Miller, a partner at Paul, Hastings,

Janofsky & Walker, who specializes in subprime mortgage litigation. Interest rates on $362 billion in adjustable-rate subprime mortgages will jump in 2008, according to data calculated by Bank of America. "That's why people are so concerned, after seeing what happened in 2007," Miller says. But Samuels and his legal team face more than dispossessed homeowners. Investors, too, are taking a hit. Subprime mortgages were bundled into securities and sold to individuals and organizations. When cash-strapped homeowners defaulted on their mortgages, those investments became practically worthless.

All of this means more work for lawyers, both for in-house and outside counsel. In fact, legal departments will need lots of outside help, says John Coffee, a securities law professor at Columbia University Law School. At the same time, litigation chiefs such as Onorato and Samuels should consider implementing new controls and new procedures on mortgage-backed securities and other asset-backed securities, to prevent future problems, Coffee says. "I don't think that's going to happen in the next six months," he says, "We've just had 'Jaws' come through the water, and no one is rushing back into the water right away."

For now, the lawyers defending Countrywide are wading through murky waters. Here's a sampling of the noteworthy cases filed against the company in federal court since the mortgage market soured:

**Investors:** In December two New York pension funds that bought mortgage-backed securities were named lead plaintiffs for five combined class action suits in Los Angeles federal district court. They allege that Countrywide and 26 securities underwriters misled investors by saying they could easily navigate turbulent real estate and credit markets and that Countrywide artificially boosted income by understating loan loss reserves in SEC filings.

As late as April 2007, Countrywide stated that Moody's, a credit rating agency, had upgraded its banking segment rating and that its home loans segment was also under review for possible upgrade, according to court documents. These statements hid growing loan delinquencies, which hurt the quality of Countrywide's collateralized debt obligations, earnings and profits. Once the truth was revealed, shares tumbled and investors lost money, plaintiffs claim. At press time Countrywide attorneys had not responded to the complaint.

**Employees:** In September a group of Countrywide employees filed a class action suit in California federal court against Countrywide CEO Angelo Mozilo and executives in charge of the company's retirement plan. The suit claims that executives concealed information from employees about the company's financial problems, which caused thousands of 401 (k) plan participants to lose millions of dollars during the company's recent stock collapse. The suit claims that employees relied on information supplied by the company when they decided to contribute to the plan. Therefore, the company misled employees. At press time defense attorneys moved to dismiss; a hearing is scheduled for late March.

**Shareholders:** Not every investor who's suing Countrywide wants to get reimbursed directly. On behalf of Countrywide and its shareholders, both a lone shareholder and the International Brotherhood of Electrical Workers Local 98 filed shareholder derivative suits in Delaware federal court. The suits allege that Countrywide's board of directors, including Mozilo, gave shareholders false and misleading statements in 2006 and 2007 that concealed the true costs of Mozilo's compensation and failed to list the full cost of stock options granted to him since 2003.

The total amount of compensation listed for Mozilo in 2007 was $48 million for the 2006 fiscal year. It was actually $58 million, the pension fund says. In addition to misleading shareholders, the board grossly overcompensated Mozilo in comparison to chiefs of both much larger and comparably sized financial services companies. "This misconduct shocks the conscience," the union's complaint says. Three similar derivatives cases on behalf of Countrywide are also pending in California federal court, and defense attorneys have requested that all these cases be combined and moved to that court.

**Borrowers:** A class action filed in September in federal district court in Los Angeles claims that Countrywide violated the federal Racketeer Influenced and Corrupt Organizations Act by luring "unwary borrowers" into subprime mortgages when they could have qualified for lower-cost prime loans. Others have claimed racial discrimination. One lawsuit filed in federal district court in Boston by three African American borrowers alleges that subsidiaries Countrywide Home Loans Inc., and Countrywide Bank violated federal housing discrimination laws. Black homeowners paid higher fees to Countrywide agents than did white borrowers in similar financial situations, the plaintiffs allege. The suit seeks class action status and $100 million to reimburse black customers of Countrywide and its subprime subsidiary, Full Spectrum Lending Inc. Countrywide's attorneys have moved for dismissal.

When the wave of litigation tied to the current housing crisis will ebb is anyone's guess, experts and attorneys agree. And no one, it seems, is certain what the long-term effect will be. "I don't think anyone has any conclusions yet," says Faten Sabry, vice president of NERA Economic Consulting, which tracks subprime-related litigation across the country. "People are trying to sort through the information and trying to understand what is going on." But one thing is certain: The legal troubles plaguing mortgage lenders and banks won't end anytime soon, and will continue to spread across the world. "I don't think this is an isolated U.S. problem," Miller says, "It really is a global problem."

# EXHIBIT E

Case 3:11-cv-00135-RCJ -RAM   Document 5-2   Filed 02/24/11   Page 29 of 30

The New York Times



The upheaval in the mortgage market, a slowing economy and an increasingly stretched consumer have made the last few quarters among the toughest since Kenneth Lewis, the chairman and chief executive of Bank of America, took over in 2001.

So Tuesday's emergency rate cut by the Federal Reserve was a "pleasant surprise" to Lewis, who said the move should help stave off a recession.

"It was a bold and decisive move and was exactly what the market needed," Lewis said in an interview. "Growth had become very sluggish. Absent any moves, we were very close to a recession. This gives us a chance not to have one."

Yet Lewis said the problems that banks — including his — have been facing would continue, and he predicted "anemic" growth in the first half of the year.

He made his remarks as Bank of America became the latest financial institution to offer results that showed the depth of the problems in the credit and mortgage markets. The bank said net income in the fourth quarter tumbled 95 percent, to $268 million, or 5 cents a share, from $5.26 billion, or $1.16, a year earlier.

Like other banks, a huge write-down for bad bets in mortgage-related securities cut deep into earnings. Bank of America, based in Charlotte, North Carolina, wrote off $5.28 billion in collateralized debt obligations, or CDO's, in the quarter. The bank still holds about $8 billion in CDO's.

Bank of America's results also reflected another troublesome front: problems with consumer credit. The bank doubled its provisions for loan losses to $3.31 billion from $1.57 billion a year earlier. The percentage of net charge-offs, or loans that the bank does not expect to collect, rose to 0.91 percent from 0.80 percent in the third quarter of 2007.

Likewise, large write-downs in mortgage-related securities and the need to raise provisions for loan losses nearly wiped out all of the fourth-quarter earnings at the Wachovia Corporation, Bank of America's cross-town rival. Wachovia reported net income of $51 million in the fourth quarter, or 3 cents a share, from $2.3 billion, or $1.20, a year earlier.

For his part, Lewis sees no relief anytime soon from consumer woes from credit cards and home equity loans. "We think late payments, delinquencies will continue. There are several

Case 3:11-cv-00135-RCJ -RAM   Document 5-2   Filed 02/24/11   Page 30 of 30

states that are causing most of the deterioration, such as California, Arizona, Florida and Nevada," where housing prices have collapsed, he said. "There is a correlation between places where there have been housing declines and the spread of delinquencies into other products," Lewis added.

But for customers with good credit, Lewis said the bank was ready to make loans.

"We have tightened standards across the board as we have seen deterioration in the market and our loss rates go up, particularly in small business," said Lewis. "But to the extent that people do meet our standards, we're open for business."

Wachovia shares rose $1.11, to $31.91, while Bank of America shares rose $1.42, to $37.39.

Last week, Merrill Lynch, the brokerage firm, posted a $9.8 billion fourth-quarter loss, which reflected a $16.7 billion write-downs, while Citigroup wrote down $23.2 billion and reported a $9.83 billion fourth-quarter loss. JP Morgan Chase & Company took a much smaller write-down, but saw its net income decline to $2.97 billion from $4.53 billion in the period a year earlier.

On Tuesday, Lewis also confirmed the bank's plan to acquire the assets of troubled mortgage lender Countrywide Financial. In recent days, there has been growing speculation that Bank of America, the nation's largest retail bank, might try to reprice or abandon its plans to buy the lender. When the deal was announced earlier this year, the stock deal was valued at $4 billion.

"We did extensive due diligence. We had 60 people inside the company for almost a month. It was the most extensive due diligence we have ever done. So we feel comfortable with the valuation," Lewis said. "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price."

Still, one hurdle Lewis hopes to get over before closing on the Countrywide deal is shoring up crucial capital ratios that have tumbled in recent months at the bank. The bank hopes to raise at least $2 billion from the capital markets in the coming weeks.

"It should be easy for them to raise the money, but it's going to cost them," as credit conditions remain tight, said Meredith Whitney, a research analyst at CIBC.

Meanwhile, JPMorgan Chase, the investment bank, granted its chief executive, James Dimon, two million stock options after he helped keep subprime-related write-downs to a fraction of those reported by competitors.

The award was not part of Dimon's regular compensation and is the first given to him since he