Case 3:11-cv-00135-RCJ -RAM   Document 5-3-   Filed 02/24/11   Page 1 of 30

took over the bank's top job in January 2006, the company said in a regulatory filing. The options are worth at least $30 million, said Henry Higdon, a managing partner at consultant Higdon Partners.

While JPMorgan this month reported its first profit decline since Dimon took over, the bank's $1.3 billion subprime write-down for the fourth quarter compared favorably to others.

# EXHIBIT F

Bank of America Corporation | Newsroom | Press Release                    Page 1 of 3



Print Page  |  Close Window

# Bank of America Responds to Consumer Desire for Increased Transparency in Home Loan Process with Tools that Clarify Mortgage Terms and Foster Informed Homeownership

View printer-friendly version

<< Back

*Company Launches Bank of America Home Loans Brand, Reinforces Responsible Lending Practices*

CALABASAS, Calif., April 27 /PRNewswire/ -- Bank of America today introduced its Bank of America Home Loans brand at locations nationwide and unveiled new tools through which homebuyers and homeowners will find greater clarity in the home finance process. The Clarity Commitment™, a single, one-page loan summary clearly presents to borrowers their interest rate, terms and other details of the loan in plain language. The Bank of America Home Loan Guide is an interactive Web site that arms customers with the personalized information to prepare for homeownership and make informed home buying and refinance decisions.

(Logo: http://www.newscom.com/cgi-bin/prnh/20050720/CLW086LOGO-b )

"We met with thousands of customers and created tools that reflect the transparency they want in the home-buying process," said Barbara Desoer, president, Bank of America Home Loans. "Doing the right thing for our customers is the foundation of our brand promise to always be a responsible lender and help create successful homeowners, and these tools exemplify that promise."

**New Tools to Help Customers Make Informed Decisions**

The Clarity Commitment is a simple one-page summary in straightforward language designed to make it easier for customers to understand terms of their loan. The summary includes information regarding interest rate, monthly payment, payment terms, and an explanation of closing costs and other loan information. Provided both at application and at closing, the Clarity Commitment document is available on most new purchase and refinance transactions, including traditional and government-backed loans.

In addition, the company introduced the Bank of America Home Loan Guide as part of the new Bank of America Home Loans Web site (bankofamerica.com/homeloans). The unique interactive guide is designed to provide prospective homebuyers and existing homeowners looking to refinance with a personalized simulation of the home loan process. It helps consumers understand the criteria that drive lenders' decisions, steps they can take to be more successful in the search for the appropriate

home loan, and how a home loan fits into their budget and total financial picture. By explaining key data inputs, highlighting "rules of thumb" tips with each step, and providing context around the results, the easy-to-use guide gives consumers relevant, personalized information that helps them understand their options and make informed decisions.

"Purchasing a home is one of the biggest decisions an individual makes, and we take seriously our responsibility to educate customers and arm them with the information they need to make smart decisions," said Desoer. "Especially in this environment, it's important that consumers understand the true, comprehensive costs of homeownership so they can buy a home and enjoy it with confidence."

Bank of America Home Loans also introduced Flat Fee Mortgage Plus through the 6,100 Bank of America banking centers. A new mortgage product, Flat Fee Mortgage Plus has no application fee and one single closing fee that represents the lender and other fees required for third-party services. The product features a close-on-time guarantee and best value guarantee. Flat Fee Mortgage Plus will be available through additional channels in the future.

**Introducing Bank of America Home Loans**

The Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008. The Countrywide brand has been retired.

Countrywide customers already have access to Bank of America's 6,100 banking centers, a coast-to-coast network of Bank of America Home Loans retail locations, and one of the nation's largest ATM networks. As the new brand becomes more visible through rebranded locations, account statements, marketing materials and advertising, customers should continue to use current methods for managing their accounts and contacting customer service until the full systems conversion later this year.

The company originates and services one out of every five mortgages in the country, representing a servicing portfolio of almost 14 million loans. During the first quarter of 2009, Bank of America funded $85 billion in first mortgages, helping more than 382,000 Americans purchase a home or refinance. More than $16 billion of those mortgages were for 102,000 low- and moderate-income borrowers.

"Bank of America Home Loans has the scale, capacity and capability to respond to the significant customer demand we've seen recently," Desoer added. "We are actively lending in this economic environment and continue to be open for business to new and existing customers."

Other businesses gained through the Countrywide acquisition will retain their brands, including Balboa Insurance Services, one of the leading providers of lender-placed property insurance, and LandSafe, a supplier of pre- and post-closing services.

**Reaffirming a Commitment to Stabilize and Strengthen Communities**

Bank of America has committed to offer modifications for as many as 630,000 customers to help them stay in their homes. In the first quarter, the company completed loan modifications for 119,000 borrowers. Bank of America has more than 6,400 home retention associates dedicated to this effort.

The company also previously announced a $35 million neighborhood preservation and foreclosure prevention package focusing on grants and low-cost loans to help local and national nonprofit organizations engaged in foreclosure prevention, and to purchase vacant single-family homes for neighborhood preservation.

**Bank of America**

Bank of America is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk management products and services. The company provides unmatched convenience in the United States, serving approximately 55 million consumer and small business relationships with more than 6,100 retail banking offices, more than 18,500 ATMs and award-winning online banking with nearly 30 million active users. Bank of America is among the world's leading wealth management companies and is a global leader in corporate and investment banking and trading across a broad range of asset classes serving corporations, governments, institutions and individuals around the world. Bank of America offers industry-leading support to more than 4 million small business owners through a suite of innovative, easy-to-use online products and services. The company serves clients in more than 150 countries. Bank of America Corporation stock is a component of the Dow Jones Industrial Average and is listed on the New York Stock Exchange.

www.bankofamerica.com

Photo: http://www.newscom.com/cgi-bin/prnh/20050720/CLW086LOGO-b

SOURCE: Bank of America

Web site: http://www.bankofamerica.com/
http://www.bankofamerica.com/homeloans/

# EXHIBIT G

TESTIMONY OF

ALLEN H. JONES

DEFAULT MANAGEMENT POLICY EXECUTIVE

BANK OF AMERICA

Before the

SENATE COMMITTEE ON BANKING, HOUSING AND URBAN AFFAIRS

WASHINGTON, DC

JULY 16, 2009

Good morning, Chairman Dodd, Ranking Member Shelby and Members of the Committee. I am Allen Jones, Bank of America's Default Management Policy Executive. Thank you for the opportunity to appear and update you on the efforts of Bank of America to help families avoid foreclosures wherever possible and stay in their homes.

Let me start by making two important points on which I will elaborate later in the testimony.

First, as you will recall Bank of America exited subprime lending nearly nine years ago. Upon acquiring Countrywide, we have taken the steps to ensure our combined company is a leader in traditional mortgage products. Our April launch of the Clarity Commitment -- a clear and simple one page disclosure that accompanies every new and refinanced loan -- is one demonstration of our focus on ensuring customers understand what loan they are getting and the associated costs.

Second, Bank of America has been at the forefront of government and industry efforts to develop loan modification programs as a way of avoiding foreclosures and helping financially distressed customers remain in their homes. We modified 230,000 mortgage loans in 2008, and we are pleased to report that in the first six months of this year, modification offers have been accepted or rate relief has been provided for more than 150,000 customers.

In recent weeks, as the Administration's Making Home Affordable modification program guidelines have been completed and our systems have been converted, Making Home Affordable has become the centerpiece of Bank of America's overall home retention efforts. Already, approximately 80,000 Bank of America customers are in the trial modification period or are responding to modification offers we have extended under Making Home Affordable.

2

We have achieved this level of success by devoting substantial resources to this effort. Our Home Loans business has more than 7,400 associates dedicated to home retention. This team has nearly doubled since this time one year ago. They respond to an average of 80,000 customer calls a day - and more than 1.8 million calls a month. In addition to personnel, we have devoted substantial systems, training and other resources to our loan modification efforts.

Our country is slowly emerging from the worst economic crisis since the Great Depression, the impacts of which have been felt deeply by consumers because at its center has been the deterioration in value of an asset important to individual wealth and stability - the home. Home values in some areas of the country have depreciated to less than half their value at the market's peak, and unemployment continues to rise - recently hitting a 26 year high.

Against this backdrop, millions of families are struggling. As one of the country's leading mortgage lenders and servicers, Bank of America understands and fully appreciates its role in helping borrowers through these difficult economic times. We want to ensure that any borrower who has sufficient income and the intent to maintain homeownership has the ability to do so using any and all resources we have available.

With that introduction, let me describe more specifically how we are leveraging Making Home Affordable and other programs to help borrowers, and provide some suggestions for improvement.

3

### Support for Administration's Foreclosure Relief Efforts

Bank of America supports the Obama Administration's Making Home Affordable refinance and loan modification programs for their potential to help millions of homeowners who otherwise may have faced certain foreclosure.

The program's focus on affordability of payment in the loan modification and refinance processes is consistent with the approach we have successfully developed for our customers, and we appreciate the opportunity we have had to work with the Administration in developing guidelines for its Making Home Affordable programs.

While our primary focus here today is loan modifications, it's important to recognize the benefits of the Making Home Affordable refinance program and its role in helping more Americans retain their homes.

Bank of America was one of the first lenders to process refinance applications through the Making Home Affordable program. We have taken more than 90,000 Making Home Affordable refinance applications (the majority of which have locked) and funded nearly 40,000 refinances since launching the program.

*Responsiveness to borrowers.* We understand the importance of responding promptly when our customers call, and providing clear, timely answers to their questions. As noted earlier, our home retention division responds to an average of 80,000 customer calls daily. We seek to

4

answer calls from customers in 90 seconds or less - and in the second quarter we met that goal more than 80 percent of the time.

*Making Home Affordable Modification Process.* Our process for evaluating Making Home Affordable modifications generally works as follows: A customer is contacted through solicitation or offer letters or they contact us, and we perform an analysis of their financial situation, focusing primarily on their income and expenses and any hardships they may be suffering. In many cases, particularly where we have delegated authority from our investors to modify their loans, the customer can be pre-qualified for the Making Home Affordable program over the phone.

A pre-qualified customer receives a trial modification plan in the mail to execute and return within 30 days, along with supporting financial documentation and their first trial period payment. During the trial period, the customer's documentation is evaluated to ensure compliance with program guidelines. A customer who meets all program requirements, including timely making of all payments during this three or four month period, will receive a second agreement that must be signed and promptly returned to receive a final modification.

We continually strive to make our processes efficient and customer-friendly. We have established new processes for, among other things, verifying borrower income and expenses, managing trial modification periods, securing the payment of mortgage insurance pre-claims at the time of modification so as to enable more borrowers to qualify for modifications, and working with third party contractors engaged by the GSEs.

5

*Delays in Foreclosure Sales.*  Bank of America customers will not lose their homes to foreclosure while their loans are being considered for a modification.  The Bank places foreclosure sales on hold while it determines a customer's eligibility for its home retention programs.

### Bank of America's Home Retention Operations

While the focus of today's hearing is on Making Home Affordable modification implementation, we also want to highlight our early leadership to address avoidable foreclosures.  As the largest servicer in the U.S., servicing one in five mortgages, or a total of 14 million loans, we understand our responsibility to help our customers sustain homeownership.  Before the government's announcement of Making Home Affordable earlier this year, Bank of America had proactively put in place industry-leading assistance programs for distressed borrowers.  We continue to leverage those programs to ensure that we consider every potential solution for our customers.

*National Homeownership Retention Program.*  Shortly after acquiring Countrywide, Bank of America announced the creation of our National Homeownership Retention Program for nearly 400,000 borrowers with discontinued Countrywide subprime and pay option ARM products. Outreach under the program began in December 2008.  Like Making Home Affordable, our National Homeownership Retention Program focuses on affordability and sustainability, while providing a streamlined loan modification process.

*Hope for Homeowners.* Bank of America believes the Hope for Homeowners program provides another useful tool for assisting borrowers.  We have not been able to implement the program as we are still awaiting final guidance from the Department of Housing and Urban Development.

6

The program, as originally rolled out, had a series of unique requirements which were very different from standard FHA programs, and presented serious implementation challenges for lenders. The Helping Families Save Their Homes Act signed into law by President Obama in May of 2009 includes helpful changes to Hope for Homeowners that are designed to make the program more consistent with standard FHA practices. We understand the Department of Housing and Urban Development is hard at work on developing final Hope for Homeowners guidance that will provide lenders with the tools they need to move forward and implement the program. It is important to note that once final guidelines are issued, it will still take lenders several months to implement the program.

*Community Outreach and Partnerships.* We have also devoted significant resources to community outreach. Since the beginning of this year, we have participated in more than 120 community outreach events in 26 states. We have reached more than 5,000 borrowers through these events, with about 50% of whom we had no prior contact in the last 60 days.

We have partnered with the National Council of La Raza, National Urban League, and the National Coalition for Asian Pacific American Community Development in the creation of the Alliance for Stabilizing Communities, and we provided $2.5 million in funding to support this national coalition dedicated to assisting individuals facing foreclosure. The Alliance will hold 40 housing rescue fairs over the next two years in 24 communities hardest hit by the foreclosure crisis.

7

In addition, Bank of America partners with 440 HUD-approved non-profit counseling agencies. Empowering the counselors with knowledge about Bank of America Home Loans and the Making Home Affordable modification program is significant because counselors can educate borrowers and assist in the modification application process. This year, we have trained over 500 counselors in sessions across the United States.

### Making Home Affordable Challenges and Improvements

Bank of America appreciates the opportunity we've had to work closely with members of the Administration in developing the Making Home Affordable program. We all understand there is still more work to be done on various aspects of the program to improve its success and the success of those homeowners that rely on it for assistance during these difficult economic times.

We would like to take this opportunity to offer some suggestions for improvement:

*Announcement of Program Changes or Guidance.* Communications by Treasury to servicers and at-risk homeowners regarding program features and effective dates could be improved. Advanced notification to loan servicers once new guidelines or program changes are determined (but before they become effective) would enable servicers to establish early necessary systems and practices to better address customer inquiries. The current method of publicly announcing new guidelines or changes concurrently with their effective dates creates immediate demand with insufficient lead time for operational readiness. This can lead to negative customer experience and, ultimately, public backlash against the programs.

8

We also would suggest that new or revised guidelines not be issued until they have been reviewed with industry representatives and their details have been completed. For example, while we appreciate the spirit in which it was done, the issuance by Treasury of its brief and limited guidelines for the second lien and short sale programs months before their comprehensive rules have been finalized or even drafted has led to a great deal of confusion and delay in the industry and with the public.

*Promoting uniform interpretations of program guidelines.* Consistency in the creation and interpretation of program guidelines between Treasury and the GSEs, as well as consistent guidelines for Fannie Mae- and Freddie Mac-owned or securitized loans, also would reduce homeowner confusion and simplify servicers' ability to operationalize these programs as they evolve. Similarly, it is important to encourage states to limit modification-related legislation which may complicate participation in federal programs such as MHA. And there also should be consistency among the various federal regulators and agencies as to the options servicers should utilize and the process servicers should follow for implementing Making Home Affordable.

*Requirement of complete documentation.* One of the benefits of the MHA program is the trial modification period. Servicers can approve trial modifications almost instantly and use the trial period to collect the necessary documentation to complete the modification. One factor that slows down the process during the trial period is that many borrowers initially provide incomplete information. We hope to work with the Administration to address the challenges we are experiencing with some of the required documentation returned by customers by reinforcing through the media and other communications the importance of complete and accurate

9

documentation.  Servicers also should have some flexibility to determine the materiality of the incomplete response, such as whether we can accept an electronically filed tax return without a signature.

*No program for the unemployed.*  As a general matter, we would welcome the opportunity to work with Treasury on a program that would offer short term relief while unemployed borrowers seek re-employment.  This is already a significant population, and a growing need.

## Customer Impacts

Despite problems in the economy, most of our customers continue to pay their mortgages on time; and less than 375,000 loans, or fewer than 3% of the 14 million loans in our servicing portfolio, face foreclosure.  While foreclosures are a relatively small percentage of our portfolio, we recognize that the impact they have on our communities, neighborhoods and customers is significant.  That is why we have exhausted and will continue to exhaust every possible avenue to help families stay in their homes.

Despite our best efforts, there are limits to what we can do.  With unemployment at a 26 year high, even the most ambitious modification plan will not help when there is no income.  Often the largest impediments to completing loan modifications are the changed circumstances of the borrower, such as unemployment, divorce, illness, or dissatisfaction with the property that may make a loan modification unattainable.  We can only modify loans where the borrower has the ability and willingness to repay.

Our goal is to keep as many families in their homes as possible. Often we will succeed, but regardless, we believe every customer deserves to be treated with compassion and respect, and we work to provide a dignified process for everyone.

## Bank of America Mortgage Lending Update

We strongly believe that long-term recovery in the economy and housing markets relies upon lenders responsibly and effectively providing loans to creditworthy borrowers. To that end, in April we launched Bank of America Home Loans, which is built on a brand promise to always be a responsible lender and help create successful homeowners.

At that time, we introduced several new tools in response to valuable customer feedback. One such tool – the Clarity Commitment – is a one-page summary of a borrower's loan terms in plain English. We have it in place on 95% of our products, and it has been very well received by our customers and community partners. Since we introduced it, already 400,000 customers have received this document with their loan papers.

We are making new mortgage loans available to eligible customers for buying homes and refinancing their current mortgage loans. On Friday, July 17, Bank of America will report second quarter earnings. In the first quarter of 2009, we generated:

- o More than $85 billion in first mortgage production – representing more than 382,000 customers who purchased homes or saved money on the home they already own.
- o More than $4 billion in home equity and reverse mortgage production, representing almost 23,000 customers.

11

One in four of these loans were to low- and moderate-income customers.

## Conclusion

I want to thank you for the opportunity to describe our ongoing home retention efforts. We recognize there is still much more to be done. The ongoing economic crisis demands expedient, affordable loan modifications that help borrowers within the framework of our contractual obligations to investors.

This is a critically important undertaking that must be done right if we as a country are going to preserve the flow of mortgage credit to support sustainable homeownership and at the same time protect communities and neighborhoods from avoidable foreclosures. We look forward to working with Congress and the Administration to accomplish these goals. I would be happy to answer any questions you might have.

# EXHIBIT H

FHA Home Affordable Modification                    http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modi...

**Bank of America** ➤➤➤ Home Loans                  Home Loan Assistance

Home  Locations  Contact Us  Sign In

Loan Assistance Home | Loan Assistance Solutions | Additional Support | My Status & Tools |

FHA Home Affordable Modification

## The Federal Housing Administration Home Affordable Modification Program

If you have an FHA-insured home loan and you're having trouble paying your mortgage, you may be able to receive a more affordable mortgage payment under this government program.

Is it right for me? | How do I get started? | Next Steps | FAQs

**Now that I'm in the process, what's next?**                    Print page

If you're already in the process of modifying your loan through the federal government's FHA Home Affordable Modification Program, we can help you understand what you need to do next.

**Additional Support**

▸ Upcoming Events
▸ Avoiding Scams
▸ Homeowner Counseling Services
▸ Frequently Asked Questions
▸ Glossary

**My Status & Tools**

**Call Us**

**I have requested an FHA Home Affordable Modification**

When you receive your financial information packet, you'll need to complete the enclosed financial forms and submit proof of income and residency.

The following forms must be filled out and signed by all borrowers listed on your loan.

Request for Modification and Affidavit (RMA) form

IRS Form 4506-T Request for Transcript of Tax Return
(only one required if you file your tax returns jointly)

You can expect to hear back from us within 10 business days from when we receive all your required documents. The purpose of contacting you is to confirm receipt of your information, let you know how the evaluation process works and how long it takes—typically about 30-45 calendar days. If documents are missing, we may contact you to let you know what information you need to send us.

Next

1. These eligibility requirements are informational and are not intended as a commitment to modify your home loan nor is this an exhaustive list of the parameters of the Program.

2. This calculation is for informational purposes only, is based upon unverified information you provided at our website and should not be construed to mean that you qualify or do not qualify for a home loan modification. We are required to consider other factors in assessing whether you qualify for a home loan modification.

**Bank of America** 🏦 **Home Loans**

Hon

| Loan Assistance Home | Loan Assistance Solutions | Additional Support | My Status & Tools |

## FHA Home Affordable Modification

# The Federal Housing Administration Home Affordable Modification Program



If you have an FHA-insured home loan and you're having trouble paying your mortgage, you may be able to receive a more affordable mortgage payment under this government program.

  Next Steps

 Print page 🖶

### Now that I'm in the process, what's next?

If you're already in the process of modifying your loan through the federal government's FHA Home Affordable Modificat
Program, we can help you understand what you need to do next.

 »  » 

#### I have requested an FHA Home Affordable Modification

When you receive your financial information packet, you'll need to complete the enclosed financial forms and subn
proof of income and residency.

The following forms must be filled out and signed by all borrowers listed on your loan.

- Request for Modification and Affidavit (RMA) form
- IRS Form 4506-T Request for Transcript of Tax Return
  (only one required if you file your tax returns jointly)
- Hardship Affidavit

Case 3:11-cv-00135-RCJ -RAM   Document 5-3   Filed 02/24/11   Page 22 of 30

You can expect to hear back from us within 10 business days from when we receive all your required documents. purpose of contacting you is to confirm receipt of your information, let you know how the evaluation process work and how long it takes—typically about 30-45 calendar days. If documents are missing, we may contact you to let you know what information you need to send us.



**Bank of America > Home Loans > Home Loan Assistance**

**Loan Assistance Solutions**
Refinance
Forbearance
Reverse Mortgage
Tax & Insurance Help with a Reverse Mortgage
Short Sale
Deed in Lieu
Foreclosure
National Homeownership Retention Program

Home Affordable Refinance
Home Affordable Modification
FHA Home Affordable Modification
Home Affordable Foreclosure Alternatives

**Additional Support**
Upcoming Events
Avoiding Scams
Homeowner Counseling Services
Frequently Asked Questions
Glossary

Home | Privacy & Security | Site Map

Bank of America, N.A. Member FDIC. Equal Housing Lender
© 2010 Bank of America Corporation. All rights reserved.

# EXHIBIT I

**Bank of America** ❤️ Home Loans

## SECTION 5b: FREQUENTLY ASKED QUESTIONS (FAQs)

**Q.** What is the Home Affordable Modification Program?
**A.** The Home Affordable Modification Program, part of the Making Home Affordable Program announced recently by the federal government, is designed to help 3 million to 4 million financially struggling homeowners by modifying loans to a level that is affordable for borrowers now and sustainable over the long term. **To learn more about the Home Affordable Modification Program, visit www.MakingHomeAffordable.gov.**

**Q.** If I qualify, how will my mortgage be modified?
**A.** The modification may involve some or all of the following changes to your mortgage loan:
- Bringing your account current by capitalizing past due amounts as permitted
- Reducing the interest rate on your loan
- Extending the term of your loan
- Delaying your repayment of a portion of the mortgage principal until the end of the loan term

**Q.** How long will it take to process my modification request and determine if I qualify for the program?
**A.** It may take up to **45 days** for us to review your documents once they are received. We will process your modification request as quickly as possible. Please note that your loan modification will not be final until you meet all of the applicable conditions and you are notified in writing that your modification has been approved.

**Q.** Will a foreclosure occur if I participate in the Home Affordable Modification Program?
**A.** As long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started. If you fail to comply with the terms of the Trial Period Plan and do not make other arrangements, your loan will be enforced according to its original terms, which could include foreclosure.

**Q.** Where should I mail or send my trial period mortgage payments?
**A.** Please use the enclosed loan coupon or monthly mortgage statement information to ensure your payment is mailed or routed to BAC Home Loans Servicing, LP. Please continue to use your preferred method of payment.

**Q.** What happens to my trial period mortgage payments if I do not comply with the terms of the Trial Period Plan?
**A.** Your trial period mortgage payments will be applied to your existing loan according to the terms of your loan documents.

**Q.** What if my trial period mortgage payment is less than the payment I currently owe on my loan?
**A.** Your monthly statement will continue to include your regular payment amount and any regularly accruing late charge amounts. You only need to pay the trial period amount during the three month trial period. The difference between the amount of the trial payment and your normal monthly payment will be added to your loan balance.

**Q.** Could my trial period mortgage payment be more than my current payment?
**A.** Yes. For example, if your existing payment does not include an escrow payment and you are now required to make monthly escrow payments, your trial period mortgage payment could be higher than your current payment. Please note: The increase in your payment under these circumstances could be offset by other tax and insurance bills you would no longer have to pay directly as we would pay those for you out of your escrow account.

**Q.** What do you do with my first trial period mortgage payment if I do not qualify for the program?
**A.** Your first trial payment will be applied to your existing loan in accordance with the terms of your loan documents. If you do not qualify for the program, we will help you evaluate other options to help you keep your home or ease your transition to a new residence.

**Q.** If I got a Home Affordable Modification, can my modified loan terms ever revert to the original loan terms?
**A.** No. This is one of the advantages of the Home Affordable Modification Program. Once your loan is modified, the new terms stay in place for the remainder of your loan.

# EXHIBIT J

 **Home Affordable Modification Program**

*Supplemental Directive 09-01*                    *April 6, 2009*

## Introduction of the Home Affordable Modification Program

### Background

On February 18, 2009, President Obama announced the Homeowner Affordability and Stability Plan to help up to 7 to 9 million families restructure or refinance their mortgages to avoid foreclosure. As part of this plan, the Treasury Department (Treasury) announced a national modification program aimed at helping 3 to 4 million at-risk homeowners -- both those who are in default and those who are at imminent risk of default -- by reducing monthly payments to sustainable levels. On March 4, 2009, the Treasury issued uniform guidance for loan modifications across the mortgage industry. This Supplemental Directive provides additional guidance to servicers for adoption and implementation of the Home Affordable Modification program (HAMP) for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages).

Under the HAMP, a servicer will use a uniform loan modification process to provide a borrower with sustainable monthly payments. The guidelines set forth in this document apply to all eligible mortgage loans secured by one- to four-unit owner-occupied single-family properties.

In order for a servicer to participate in the HAMP with respect to Non-GSE Mortgages, the servicer must execute a servicer participation agreement and related documents (Servicer Participation Agreement) with Fannie Mae in its capacity as financial agent for the United States (as designated by Treasury) on or before December 31, 2009. The Servicer Participation Agreement will govern servicer participation in the HAMP program for all Non-GSE Mortgages. Servicers of mortgage loans that are owned or guaranteed by Fannie Mae or Freddie Mac should refer to the HAMP announcement issued by the applicable GSE.

The HAMP reflects usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. As detailed in the Servicer Participation Agreement, participating servicers are required to consider <u>all</u> eligible mortgage loans unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out any modification under the HAMP.

To help servicers implement the HAMP, this Supplemental Directive covers the following topics:

- HAMP Eligibility
- Underwriting
- Modification Process
- Reporting Requirements
- Fees and Compensation
- Compliance

## HAMP Eligibility

A Non-GSE Mortgage is eligible for the HAMP if the servicer verifies that all of the following criteria are met:

- The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009.
- The mortgage loan has not been previously modified under the HAMP.
- The mortgage loan is delinquent or default is reasonably foreseeable; loans currently in foreclosure are eligible.
- The mortgage loan is secured by a one- to four-unit property, one unit of which is the borrower's principal residence.  Cooperative share mortgages and mortgage loans secured by condominium units are eligible for the HAMP.  Loans secured by manufactured housing units are eligible for the HAMP.
- The property securing the mortgage loan must not be vacant or condemned.
- The borrower documents a financial hardship and represents that (s)he does not have sufficient liquid assets to make the monthly mortgage payments by completing a Home Affordable Modification Program Hardship Affidavit and provides the required income documentation. The documentation supporting income may not be more than 90 days old (as of the date the servicer is determining HAMP eligibility).
- The borrower has a monthly mortgage payment ratio of greater than 31 percent.
- A borrower in active litigation regarding the mortgage loan is eligible for the HAMP.
- The servicer may not require a borrower to waive legal rights as a condition of the HAMP.
- A borrower actively involved in a bankruptcy proceeding is eligible for the HAMP at the servicer's discretion.  Borrowers who have received a Chapter 7 bankruptcy discharge in a case involving the first lien mortgage who did not reaffirm the mortgage debt under applicable law are eligible, provided the Home Affordable Modification Trial Period Plan and Home Affordable Modification Agreement are revised as outlined in the *Acceptable Revisions to HAMP Documents* section of this Supplemental Directive.
- The borrower agrees to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.
- Borrowers may be accepted into the program if a fully executed Home Affordable Modification Trial Period Plan is in the servicer's possession on December 31, 2012.

- The current unpaid principal balance (UPB) of the mortgage loan prior to capitalization must be no greater than:
  - o 1 Unit: $729,750
  - o 2 Units: $934,200
  - o 3 Units: $1,129,250
  - o 4 Units: $1,403,400

Note: Mortgage loans insured, guaranteed or held by a federal government agency (e.g., FHA, HUD, VA and Rural Development) may be eligible for the HAMP, subject to guidance issued by the relevant agency. Further details regarding inclusion of these loans in the HAMP will be provided in a subsequent Supplemental Directive.

The HAMP documents are available through www.financialstability.gov. Documents include the Home Affordable Modification Trial Period Plan (hereinafter referred to as Trial Period Plan), the Home Affordable Modification Agreement (hereinafter referred to as the Agreement), the Home Affordable Modification Program Hardship Affidavit (hereinafter referred to as the Hardship Affidavit) and various cover letters.

## Underwriting

### Hardship Affidavit

Every borrower and co-borrower seeking a modification, whether in default or not, must sign a Hardship Affidavit that attests to and describes one or more of the following types of hardship:

1. A reduction in or loss of income that was supporting the mortgage.
2. A change in household financial circumstances.
3. A recent or upcoming increase in the monthly mortgage payment.
4. An increase in other expenses.
5. A lack of sufficient cash reserves to maintain payment on the mortgage and cover basic living expenses at the same time. Cash reserves include assets such as cash, savings, money market funds, marketable stocks or bonds (excluding retirement accounts and assets that serve as emergency fund – generally equal to three times the borrower's monthly debt payments).
6. Excessive monthly debt payments and overextension with creditors, e.g., the borrower was required to use credit cards, a home equity loan, or other credit to make the mortgage payment.
7. Other reasons for hardship detailed by the borrower.

Note: The borrower is not required to have the Hardship Affidavit notarized.

### Reasonably Foreseeable (Imminent) Default

A borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, appears potentially eligible for a modification, and claims a hardship must

be screened for imminent default. The servicer must make a determination as to whether a payment default is imminent based on the servicer's standards for imminent default and consistent with applicable contractual agreements and accounting standards. If the servicer determines that default is imminent, the servicer must apply the Net Present Value test.

In the process of making its imminent default determination, the servicer must evaluate the borrower's financial condition in light of the borrower's hardship as well as inquire as to the condition of and circumstances affecting the property securing the mortgage loan. The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc. The hardship and financial condition of the borrower shall be verified through documentation.

### Documenting the Reason for and Timing of Imminent Default

A servicer must document in its servicing system the basis for its determination that a payment default is imminent and retain all documentation used to reach its conclusion. The servicer's documentation must also include information on the borrower's financial condition as well as the condition and circumstances of the property securing the mortgage loan.

## Net Present Value (NPV) Test

All loans that meet the HAMP eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent must be evaluated using a standardized NPV test that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed "positive" and the servicer MUST offer the modification. If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed "negative" and the servicer has the option of performing the modification in its discretion. For mortgages serviced on behalf of a third party investor for which the modification result is deemed "negative," however, the servicer may not perform the modification without express permission of the investor. If a modification is not pursued when the NPV result is "negative," the servicer must consider the borrower for other foreclosure prevention options, including alternative modification programs, deeds-in-lieu, and preforeclosure sale programs.

Whether or not a modification is pursued, the servicer MUST maintain detailed documentation of the NPV model used, all NPV inputs and assumptions and the NPV results.

Fannie Mae has developed a software application for servicers to submit loan files to the NPV calculator. The software application is available on the Home Affordable

Modification servicer web portal accessible through www.financialstability.gov. On this portal, servicers will have access to the NPV calculator tool as well as detailed guidelines for submitting proposed modification data.

Servicers having at least a $40 billion servicing book will have the option to create a version of the NPV calculator that uses a set of cure rates and redefault rates estimated based on the experience of their own portfolios, taking into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status and other loan or borrower attributes. Detailed guidance on required inputs for custom NPV calculations is forthcoming.

For mortgages serviced on behalf of a third party investor, the servicer must use a discount rate at least as high as the rate used on the servicer's own portfolio, but in no event higher than the maximum rate permitted under the HAMP.

To obtain a property valuation input for the NPV calculator, servicers may use either an automated valuation model (AVM), provided that the AVM renders a reliable confidence score, or a broker's price opinion (BPO). A servicer may use an AVM provided by one of the GSEs. As an alternative, servicers may rely on their internal AVM provided that:

(i)      the servicer is subject to supervision by a Federal regulatory agency;
(ii)     the servicer's primary Federal regulatory agency has reviewed the model; and
(iii)the     AVM renders a reliable confidence score.

If a GSE AVM or the servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a BPO or a property valuation method acceptable to the servicer's Federal regulatory supervisor. Such assessment must be rendered in accordance with the Interagency Appraisal and Evaluation Guidelines (as if such guidelines apply to loan modifications). In all cases, the property valuation used cannot be more than 90 days old.

### Verifying Borrower Income and Occupancy Status

Servicers may use recent verbal financial information obtained from the borrower and any co-borrower 90 days or less from the date the servicer is determining HAMP eligibility to assess the borrower's eligibility. The servicer may rely on this information to prepare and send to the borrower a solicitation for the HAMP and an offer of a Trial Period Plan. When the borrower returns the Trial Period Plan and related documents, the servicer must review them to verify the borrower's financial information and eligibility – except that documentation of income may not be more than 90 days old as of the determination of eligibility.

As an alternative, a servicer may require a borrower to submit the required documentation to verify the borrower's eligibility and income prior to preparing a Trial Period Plan. Upon receipt of the documentation and determination of the borrower's