CATHERINE CORTEZ MASTO
Attorney General
ERNEST D. FIGUEROA
Consumer Counsel
Nevada Bar No. 006295
775.684.1197 ph / 775.684.1179
E-mail: EFigueroa@ag.nv.gov
BINU G. PALAL
Deputy Attorney General
Nevada Bar No. 010178
555 E. Washington Avenue, #3900
Las Vegas, Nevada 89101
702.486.3128 ph / 702.486.3283
E-mail: BPalal@ag.nv.gov
JEFFREY SEGAL
Deputy Attorney General
Nevada Bar No. 005491
555 E. Washington Avenue, #3900
Las Vegas, Nevada 89101
702.486.3130 ph / 702.486.3283
E-mail: JSegal@ag.nv.gov
LINDA SINGER
*Admitted Pro Hac Vice*
1100 New York Avenue, Suite 500
Washington, DC 20005
202.408.4600 ph / 202.408.4699
E-mail: LSinger@cohenmilstein.com
Attorneys for Plaintiff, State of Nevada

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA, | ) |
| Plaintiffs, | ) Case No.  3:11-cv-00135-RCJ (RAM) |
| vs. | ) |
| BANK OF AMERICA CORPORATION, | ) **STATE'S OF NEVADA'S SECOND** |
| BANK OF AMERICA, N.A., | ) **AMENDED COMPLAINT** |
| BAC HOME LOANS SERVICING, LP; | ) |
| RECONTRUST COMPANY, N.A.; | ) (Assigned to the Honorable Robert C. Jones) |
| COUNTRYWIDE FINANCIAL | ) |
| CORPORATION; COUNTRYWIDE | ) |
| HOME LOANS, INC; and FULL | ) |
| SPECTRUM LENDING, INC. | ) |
| Defendants. | ) |

## I.    NATURE AND SUMMARY OF THE ACTION

1.     Defendants Bank of America Corporation ("Bank of America Corp."); Bank of America, National Association ("Bank of America, NA"); ReconTrust Company, N.A. ("ReconTrust"); BAC Home Loans Servicing, LP ("BAC Home Loans" and collectively with Bank of America Corp., and Bank of

America NA, ReconTrust, and Countrywide, "Bank of America"); Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc. ("Countrywide Home" or "CHL"), Full Spectrum Lending, Inc. ("Full Spectrum"), Countrywide Home Loans Servicing, L.P. ("Countrywide Servicing" and collectively with Countrywide Financial, Countrywide Home and Full Spectrum, "Countrywide" ) engaged in a pattern and practice of deceptive conduct in violation of the Nevada Deceptive Trade Practices Act ("DTPA"), Nev. Rev. Stat. §§ 598 *et seq.* Their misconduct cut across virtually every aspect of Defendants' operations -- from originating to servicing and, all too often, to foreclosing on the loans and homes of Nevada consumers. Countrywide misrepresented the nature and terms of their mortgage loans, ensnaring Nevada consumers in loans that they did not understand and could not repay. When consumers defaulted on these loans, Defendants misrepresented whether, when, and how they would modify these loans. And when they failed to deliver this promised relief, Defendants provided to Nevada consumers, recorded, and filed with Nevada courts fraudulent documents as they moved, sometimes without authority, to collect mortgages and foreclose on homes that never should have been bought.

2.      First, the State alleges that Countrywide engaged in a broad range of deceptive practices to sell and service mortgage loans to Nevada consumers. During the height of the mortgage boom, Countrywide originated 262,622 loans in Nevada making it one of the biggest -- and almost certainly the most dangerous -- mortgage lenders in the State. From 2004 until Countrywide stopped lending and servicing loans in July 2008, Countrywide:

- structured mortgage loans that relied on deceptive terms and underwriting to artificially lower borrowers' initial mortgage payments;

- engaged in misleading marketing and sales techniques to convince Nevada consumers to take out these risky loans;

- misrepresented to investors the characteristics and therefore the riskiness of the mortgages they sold them; and

///

2

> - falsely represented that Nevada consumers in default or foreclosure owed fees that were inflated and improper under their mortgages.

3.    In the alternative, the State continues to allege that Defendants materially and almost immediately violated the Consent Judgment that Countrywide entered with the State on February 24, 2009 to resolve the State's claims (summarized above) regarding Countrywide's deceptive origination, marketing, and servicing practices, Consent Judgment, *State of Nevada v. Countrywide Financial Corporation*, No. A583442 (Dist. Ct., Clark Cnty, Nev.) ("Consent Judgment"), by:

> - failing to provide loan modifications to Eligible Borrowers;
> - failing to make decisions on loan modifications within sixty days of receiving requests from Nevada consumers;
> - initiating or proceeding with foreclosures while consumers' modification requests were pending;
> - requiring Nevada consumers to submit full documentation of their income despite the Consent Judgment's promise of "streamlined" modifications; and
> - increasing the interest rates on the loans of Nevada consumers, despite Defendants' clear commitment to *decrease* their rates.

4.    Beginning in 2009, Bank of America also violated the Nevada DTPA by engaging in a pattern and practice of misrepresentations in their loan modification programs. Specifically, Defendants misled consumers by:

> - promising to act upon requests for mortgage modifications within a specific period of time, usually one or two months, but instead stranding consumers without answers for more than six months or even a year;
> - falsely promising consumers that their initial, trial modifications would be made permanent if and when they made the required three payments on those plans, but then failing to

convert those modifications;

- falsely assuring them that their homes would not be foreclosed while their requests for modifications were pending, but sending foreclosure notices, scheduling auction dates, and even selling consumers' homes while they waited for decisions;

- misrepresenting the eligibility criteria for modifications and providing consumers with inaccurate and deceptive reasons for denying their requests for modifications;

- falsely notifying consumers or credit reporting agencies that consumers were in default when they were not; and

- offering modifications on one set of terms, but then providing them with agreements on different terms, or misrepresenting that consumers have been approved for modifications.

5.     Bank of America's misconduct in misrepresenting its mortgage modification program continues through the present and has been confirmed in interviews with consumers, former employees, and other third parties and through review of relevant documents.  Bank of America's own former employees describe an environment in which the Bank failed to staff its modification functions with employees with the training, skills, experience, authority, and information necessary to carry out the Bank's commitments.  According to the employees, the modification process was chaotic, understaffed, wrought with technical problems, and not oriented to customers.  According to at least one former employee, Bank of America reprimanded them for spending too much time with individual customers and directed them to limit call times with consumers to an average of seven to ten minutes – leaving them almost no time to fully or accurately answer questions or provide explanations, correct or update relevant information, or offer assistance.  *See, e.g.,* Examination before Trial of Ryan Quinn (attached as Exhibit A).

6.     In addition, Bank of America misrepresented, both in communications with Nevada consumers and in documents they recorded and filed, that they had authority to foreclose upon consumers' homes as servicer for the trusts that held these mortgages.  Defendants knew (and were on notice) that they had never properly transferred ████████████ these mortgages to those trusts, failing to deliver properly endorsed or assigned mortgage notes as required by the relevant legal contracts and state law.

Because the trusts never became holders of these mortgages, Defendants lacked authority to collect or foreclose on their behalf and never should have represented they could.

7.      The course of unlawful conduct described in this Complaint began with Countrywide.  As successor in interest to Countrywide, Bank of America is liable for its violations of Nevada law.  After acquiring Countrywide, Bank of America engaged in new, repeated, and systemic violations of Nevada law for which the State seeks to hold it responsible.

8.      Taken together and separately, Defendants' deceptive practices have resulted in an explosion of delinquencies and unauthorized and unnecessary foreclosures in the State of Nevada.  These foreclosures have had a devastating impact on Nevada's homeowners, communities, and economy, stripping homeowners of their assets (including those who do not have loans originated or serviced by Defendants, but whose property values have fallen dramatically), dislocating families, blighting neighborhoods, and deeply disrupting the State's housing market. *See* Ctr. for Responsible Lending, *The Cost of Bad Lending in Nevada* (Aug. 2010), http://www.Responsiblelending.org/mortgage-lending/tools-resources/factsheets/ nevada.html (estimating total loss of home equity wealth in Nevada due to nearby foreclosures at $54.4 billion for 2009-2012).

## II.   PARTIES AND VENUE

9.      Plaintiff is the State of Nevada, ex rel. Catherine Cortez Masto, the Attorney General of Nevada, who is authorized to bring this action under the Nevada Deceptive Trade Practices Act ("DTPA"), Nev. Rev. Stat. §§ 598 *et seq.*, and the terms of the Consent Judgment.

10.     Defendant Bank of America Corp. is a foreign corporation that is incorporated in Delaware, with its principal place of business located in Charlotte, North Carolina.  At all times material to this Complaint, Bank of America Corp. was doing business in the State of Nevada.  Bank of America Corp. is the parent corporation of Bank of America, NA and a successor in interest to Countrywide Financial.

11.     Defendant Bank of America, NA is a national bank with its principal place of business located in Charlotte, North Carolina.  At all times material to this Complaint, Bank of America, N.A. was doing business in the State of Nevada.  Bank of America, N.A. is the parent of BAC Home Loans and ReconTrust.

///

12.     Defendant BAC Home Loans services loans and is a subsidiary of Bank of America, with its principal place of business in Texas.  On July 1, 2011, BAC Home Loans Servicing was merged into Bank of America, NA.  At all times material to this Complaint, BAC Home Loans was doing business in the State of Nevada.

13.     Defendant ReconTrust is a wholly-owned subsidiary of Bank of America, N.A. that services defaulted mortgages.  At all times material hereto, ReconTrust's principal place of business was located in California and ReconTrust was doing business in the State of Nevada.

14.     Defendant Countrywide Financial is a Delaware corporation and a thrift holding company doing business in Nevada.

15.     Defendant Countrywide Home is a New York corporation licensed to do business in Nevada, is a wholly owned subsidiary of Countrywide Financial, and is or was a licensed mortgage banking organization.

16.     Defendant Full Spectrum Lending, Inc. is or was a California corporation, is or was a wholly-owned subsidiary of CFC, and is or was a licensed mortgage banking organization.

17.     At all relevant times, defendant Countrywide Servicing is or was a Texas limited partnership directly owned by two wholly-owned subsidiaries of Countrywide Home.  Countrywide Servicing serviced loans originated by Countrywide Home and for government and private entities.

18.     On July 1, 2008, Bank of America completed its purchase of Countrywide in an all-stock transaction that Bank of America has described as a merger.  Former Countrywide shareholders were compensated with shares of a Bank of America subsidiary that was created solely for the transaction.

19.     In a press release issued that month, Bank of America touted the cost savings that would result from merging the two companies' operations.[1]  *See* Ex. B at 1.  The savings would be generated by eliminating duplicative jobs, technology, vendors, and marketing expenses.  *Id.*  Countrywide's press release announced that "the combination of Countrywide and Bank of America will create one of the most

---

[1] Press Release, Bank of America, Bank of America Completes Countrywide Financial Purchase (July 1, 2008), attached as Exhibit B.

1    powerful mortgage franchises in the world."[2] *See* Ex. C at 1.  Bank of America's 2008 Annual Report

2    described the "combined company."[3] *See* Ex. D at 14.

3          20.     Since Countrywide's acquisition, Bank of America has taken over servicing loans

4    previously serviced by Countrywide, along with its own servicing portfolio.  Former Countrywide

5    customers now use Bank of America customer service resources, including Bank of America service

6    centers and website (to which they are redirected from Countrywide's website).  Former Countrywide

7    customers receive mortgage statements from Bank of America, make their mortgage payments to Bank of

8    America, and apply to Bank of America if they wish to modify their mortgages.  The combined mortgage

9    lending operations of Bank of America and Countrywide, including Countrywide's branch network and

10   origination platform, now operate under the name Bank of America Home Loans. The servicing operations

11   of Bank of America and Countrywide were merged into BAC Home Loans Servicing, LP.

12         21.     As part of the merger, Bank of America assumed Countrywide's liabilities.  For example,

13   Bank of America agreed on Countrywide's behalf to modify certain Countrywide home loans as a part of

14   an $8.4 billion consumer fraud settlement with state attorneys general.  (The Consent Judgment was

15   entered into as part of that multi-state settlement.)  In an interview published on February 22, 2008 in

16   Corporate Counsel, Bank of America acknowledged:  "We bought the company and all of its assets and

17   liabilities, spokesman Scott Silvestri says.  We are aware of the claims and potential claims against the

18   company and have factored these into the purchase."[4] *See* Ex. E at 1.  Kenneth D. Lewis, then Chairman

19   and Chief Executive Officer of Bank of America, was quoted in a January 23, 2008 New York Times

20   article noting that:  "We looked at every aspect of the deal, from [Countrywide's] assets to potential

21   lawsuits and we think we have a price that is a good price."[5] *See* Ex. F at 2.

22         22.     Countrywide has been completely integrated into Bank of America and has virtually ceased

23   to exist.  In November 2008, Countrywide's assets were transferred to Bank of America.  Countrywide has

24

25   [2] Press Release, Bank of America, Bank of America Agrees to Purchase Countrywide Financial
26   Corporation (Jan. 11, 2008), attached as Exhibit C.
     [3] Bank of America Corp., 2008 Annual Report 14 (2009), attached as Exhibit D (in relevant part).
27   [4] Amy Miller, *Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation*, Corporate Counsel, Feb.
     22, 2008, attached as Exhibit E.
28   [5] Julie Creswell, *Bank of America Woes Go Beyond Mortgages,* N.Y. Times, Jan. 23, 2008, attached as
     Exhibit F.

stopped independently filing financial statements. Instead, Countrywide's assets and liabilities are reported on Bank of America's financial statements. On April 27, 2009 Bank of America announced that "the Countrywide brand has been retired."[6] *See* Ex. G at 2.

## III.   JURISDICTION AND VENUE

23.   The State originally filed this case on December 17, 2010 in the District Court of Clark County where jurisdiction and venue were proper pursuant to the DTPA, Nev. Rev. Stat. § 598.0989, as well as the Consent Judgment. See Consent Judgment § 10.4 (ordering that the Clark County District Court "retain jurisdiction over this matter for the purposes of (a) enabling the Office of the Attorney General of the State of Nevada to apply, at any time, for enforcement of any provision of this Judgment").

24.   On February 23, 2011, Defendants filed a Notice of Removal in Reno, removing the case to the Federal District Court for the District of Nevada. Notice of Removal, Feb. 23, 2011, ECF No. 1. The State moved to remand the action, which this Court denied on July 5, 2011. Order, July 5, 2011, ECF No. 52. The State has requested that the Court of Appeals for the Ninth Circuit grant it leave to appeal that decision. Appl. for Leave to Appeal Order Den. Remand, July 15, 2011, ECF No. 57. On July 11, 2011 the State moved to transfer this action to the District of Nevada's courts in Las Vegas for the convenience of the potential witnesses and parties. State's Mot. Transfer of Venue, July 20, 2011, ECF No. 56. That motion is currently pending.

## IV.   COUNTRYWIDE'S DECEPTIVELY STRUCTURED, UNDERWRITTEN, AND MARKETED MORTGAGES

25.   Countrywide, which billed itself as "America's #1 Home Loan Lender," was, until its near collapse and acquisition by Bank of America, the largest mortgage lender and home loan servicer in the United States.

26.   Until 2003, Countrywide primarily made traditional first-lien home loans to individuals with strong credit. Such "conforming" loans are generally safer for lenders and consumers, as they must meet the guidelines of government sponsored enterprises ("GSE") Fannie Mae and Freddie Mac, which

---

[6] Press Release, Bank of America, Bank of America Responds to Consumer Desire for Increased Transparency in Home Loan Process with Tools that Clarify Mortgage Terms and Foster Informed Homeownership (Apr. 27, 2009), attached as Exhibit G.

1  include maximum loan amounts, debt-to-income ratio limits and documentation requirements.

2  "Nonconforming" loans are all loans that do not meet GSE guidelines because they are too large, have

3  debt-to-income ratios that are too high, or do not satisfy GSE documentation requirements.

4      27.     Beginning in 2003, a significant culture change began at Countrywide. With a stated goal

5  of doubling its market share to 30 percent in three to four years, Countrywide began to originate more

6  nonconforming loans,[7]  As part of this shift, Countrywide transitioned from making traditional, fixed-rate

7  mortgages to originating new and far riskier loan products, such as hybrid adjustable rate mortgages

8  ("Hybrid ARMs"), pay-option adjustable-rate mortgages ("Option ARMs"); and Home Equity Lines of

9  Credit ("HELOCs").  These loans were attractive to Countrywide for two reasons:  (1) they generated

10  artificially low monthly payments, which allowed it to reach less creditworthy consumers and increase its

11  loan volume; and (2) they allowed it to charge consumers higher fees and included features that generated

12  a higher return in the secondary market.[8]  As explained below and described in the illustrative consumer

13  stories attached in Exhibit H, Countrywide structured and marketed these mortgages in a manner that

14  would and did deceive consumers.

15  **A.**    **Countrywide's Deceptive Mortgage Products**

16      28.     Several of Countrywide's mortgage products were structured and underwritten in ways that

17  seemed designed to mislead consumers.  For the reasons described below, the most deceptive of these

18  products were the Option ARM (or Pay Option ARM), Hybrid ARM, and Home Equity Line of Credit

19  ("HELOC").

20          **1.**    **"Option" ARMs/ "Pay Option" ARMs**

21      29.     Countrywide first originated Option ARMs in 2004.  One year later, 21 percent of

22  Countrywide's loans were Option ARMS.

23      30.     Option ARMs had three core features that lent themselves to deception.  First, an Option

24  ARM offered a "teaser rate" – often as low as 1 percent – for an introductory period of one to three

25

26  [7] In 2002, Countrywide originated about $250 billion in mortgages; three years later, that number jumped
    to almost $500 billion.  Countrywide Fin. Corp., 2005 Annual Report (Form 10-K), at *2 (Feb. 28, 2006).

27  In 2002, approximately 25 percent of loans originated by Countrywide were nonconforming, but by 2005,
    over 45 percent of loan originations were nonconforming. *Id.* at *24.

28  [8] Investors tended to pay premiums for riskier or nonconforming loans, as they contained features, such as
    prepayment penalties, which produced higher payouts to investors.

months. At the end of this initial period, the interest rate, and thus the interest owed, increased

dramatically. Second, the Option ARM allowed borrowers to make minimum payments that did not cover

the full interest (or any of the principal) due for the month.[9] As a result, Option ARMs could produce

negative amortization as the amount of accrued interest not paid each month was added to the consumer's

loan balance (yielding even higher monthly interest owed). Third, when negative amortization caused the

loan balance to reach a ceiling – typically 115 percent of the loan's value – or after five years, the loan

recast. After recast, the borrower could no longer make a minimum payment and had to begin making

fully-amortizing principal and interest payments that were often double the minimum payment.[10] *See*

Mara Der Hovanesian, *Nightmare Mortgages*, Bloomberg Businessweek (Sept. 11, 2006).

    31.    For example: the monthly payment on a typical Nevada Option ARM with a term of 30

years, an initial principal balance of $235,000, a teaser rate of 1 percent and an interest rate based on the

12-month moving Treasury Average of 4.28 percent plus a margin of 3.075 percent,[11] would increase from

$755.85 per month in the first year to $1,946.13 per month after it recast, a payment level that reflects

almost $35,000 in negative amortization.[12]

    32.    Most Countrywide borrowers made only the minimum payment on their loans. As of

December 31, 2006, almost 88 percent of Countrywide's Option ARM portfolio had experienced some

negative amortization; a year later, that percentage reached 91 percent. Countrywide carried the negative

amortization accrued by borrowers who made minimum payments as uncollected income; in 2007, the

value of the negative amortization had reached $1.215 billion. Countrywide Fin. Corp., 2007 Annual

Report (Form 10-K), at *126 (Feb. 29, 2008).

    33.    Countrywide generally coupled its Option ARM loans with three-year prepayment

penalties. A consumer seeking to refinance his or her loan within the first three years would be required to

pay the equivalent of six months' accrued interest on the loan. Thus, even if consumers became aware of

---

[9] The minimum payment was the payment owed at the initial 1 percent teaser rate (or "payment rate"), even once the interest rate had adjusted well above that rate, which is why the payment did not represent the actual amount owed.

[10] A borrower making the minimum payment most likely hit the negative amortization cap and suffered payment shock well before the standard five year recast date.

[11] Countrywide's Option and Hybrid ARMs both set the interest rate (after the initial period) at the rate set by a specific index plus an additional margin.

[12] Borrowers who made the interest-only payment option also would experience payment shock, though not as steep.

the risky features of their mortgage, they were effectively trapped in their loans and could not refinance to avoid increasing loan payments and balances.[13]

34.    As explained below, Countrywide failed to adequately disclose and/or affirmatively misrepresented to borrowers that: (1) the teaser rate was not the actual interest rate in effect for most of the term of the loan; (2) the minimum payment was not a full payment and would result in negative amortization; (3) they would experience payment shock when their loans recast and they were required to make a fully-amortizing payment; and (4) borrowers could (and would have to) refinance their loans in order to avoid defaulting when the higher payment kicked in.

### 2.    Hybrid ARMs

35.    Hybrid ARMs, another large and growing segment of Countrywide's lending, were often referred to as "2/28" or "3/27" loans, given that the loans had low initial interest rates for the first two or three years (the "2" in "2/28," for example), which adjusted every six months for the remaining term of the loan. Sometimes, the payment during the initial fixed period was interest-only.

36.    Once the initial fixed-rate period expired, the increase in payment, particularly if the payment became fully amortizing, could be dramatic. A consumer whose loan had an initial rate of 8.5 percent, for example, would see the interest rate increase to the index rate plus a margin of 6.5 percent in the 25th month of the loan. While Countrywide would cap the interest rate at 11.5 percent on the first change date and the lifetime maximum interest rate at 14.5 percent, the interest rate could never fall below the initial rate no matter how low the rate index. Thus, consumers assumed all of the interest rate risk: their rates and payments would almost certainly increase and could never decrease below a set floor.

37.    A Nevada consumer who borrowed $250,000 could expect to see his or her monthly payment of principal and interest increase from $1,922.28 per month in the initial two year period with a fixed "teaser" rate to $2,550.01 per month in the third year of the loan after the rate began to adjust. Because Countrywide underwrote these Hybrid ARMs based on the payment required while the initial rate

---

[13] Although prepayment penalties are touted by lenders as a bargaining tool for consumers, analysis has revealed that borrowers generally received no appreciable benefit in exchange for this penalty; it appears the main point of this risky feature was to generate additional profit for Countrywide. *See* Keith S. Ernst, Ctr. for Responsible Lending, *Borrowers Gain No Interest Rate Benefits from Prepayment Penalties on Subprime Mortgages* (Jan. 2005), http://www. responsiblelending.org/mortgage-lending/research-analysis/rr005-PP_Interest_Rate-0105.pdf.

was in effect, Countrywide was able to extend loans to borrowers who could not have afforded its fully indexed payment. Further, many of the Hybrid ARMs were written to subprime borrowers – meaning that the loans were higher priced and made to less creditworthy borrowers. Therefore, it was even less likely that borrowers would have the capacity to pay the substantially higher payments in effect for most of the loans' terms.

38.   As with Option ARMS, Countrywide deceptively marketed Hybrid ARMs. Countrywide emphasized the low monthly payment and low "fixed" interest rate, without disclosing that the interest rate was fixed only temporarily and then became adjustable and that, when it did, consumers would experience payment shock. And, as with Option ARMs, Countrywide misrepresented that borrowers could refinance their loans to avoid payment increases.

### 3.   Home Equity Lines of Credit ("HELOCs")

39.   Countrywide aggressively marketed HELOCs, often in connection with first mortgages taken out by borrowers. Countrywide referred to a home equity line of credit as a "piggyback loan." The first loan typically covered 80 percent of the appraised value of the home, while the HELOC rested atop the first loan and covered any of the home's remaining value up to 20 percent. Because Countrywide offered HELOCs with Option and Hybrid ARMs, borrowers could obtain 100 percent financing on loans that were subject to negative amortization or interest-only payments, which added layers of complexity and risk that borrowers were unlikely to understand or manage.

40.   Countrywide not only failed to disclose these risks to borrowers, but typically urged borrowers to draw down the full line of credit when funding HELOCs. This meant that borrowers would make the maximum interest payments under the loan, which increased the value of the loan to the secondary market, but drove the borrower deeper into debt.

41.   Piggyback HELOCs typically required only interest-only payments for the first five years of the loan (or ten years, at Countrywide's option), also known as the "draw period." Countrywide did not disclose or explain the amount of the monthly payment that would be due after the interest-only period expired. Yet, as with Countrywide's other high-risk mortgage products, borrowers faced significant payment increases after the draw period due to Countrywide's formula requiring repayment of principal in equal installments during the 15 year "repayment period." For example, a consumer with a fully drawn

$75,000 HELOC at a 7 percent interest rate would have initial monthly payments of approximately $437.50. At the end of a five year, interest-only draw period, the borrower would have to pay $846.43 per month (on top of likely increases to the borrower's first mortgage payments).

42.     Like the Hybrid ARMs, Countrywide originated HELOCs at discounted "teaser" rates, which adjusted after three (3) to six (6) months to a fully-indexed rate based on an interest rate index (such as the prime rate) plus a margin, a structure that also hid the true cost of the credit line.

**B.      Countrywide's Deceptive Steering**

43.     Countrywide not only offered deceptive mortgage products, but pushed these products on unwitting borrowers who could have qualified for less expensive and more stable mortgages. As outlined in a *New York Times* piece on August 26, 2007, Countrywide's subprime unit chose not to offer Federal Housing Administration ("FHA") loans because of a desire to generate higher fees and returns.[14] Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, Aug. 26, 2007. A former senior executive quoted in the article remembered one instance when he priced a $275,000 loan with a 30-year term for a borrower who put down 10 percent, with fully documented income and credit score of 620, at the subprime interest rate of 9.875 percent, even though the borrower was eligible for a FHA loan at approximately 7 percent. *Id.* The monthly payment of the FHA loan would have been $1,829, while Countrywide's subprime loan generated a $2,387 monthly payment. *Id.* Countrywide never disclosed this less expensive alternative to eligible borrowers.

44.     Countrywide's bonus system created incentives for employees to steer borrowers into subprime and nonconforming Option ARMs, Hybrid ARMs, and HELOCs and to say whatever it took to close the sale. For example, the company paid a yield spread premium to brokers if a loan was made at a higher interest rate than the rate for which the borrower qualified, encouraging brokers to place consumers in higher margin Option ARMs, for example. According to one Countrywide sales representative quoted in the New York Times, adding a three-year prepayment penalty to a loan generated an extra 1 percent of the loan's value in a commission. *Id.* Other features offered similar returns:

---

[14] According to a November 2007 *New York Times* article, internal company documents indicate that Countrywide made gross profit margins of more than 4 percent for Option ARMs, compared with 2 percent on FHA loans. On subprime loans with riskier features, like three-year prepayment penalties, Countrywide's margins could reach 15 percent. Gretchen Morgenson & Geraldine Fabrikant, *Countrywide's Chief Salesman and Defender*, N.Y. Times, Nov. 11, 2007.

- "the higher the rate at reset, the greater the commission earned." *Id.*

- "Persuading someone to add a home equity line of credit to a loan carried extra commissions of 0.25 percent…" *Id.*

- Brokers who persuaded consumers to take out subprime loans received commissions of .50 percent of the loan's value, versus .20 percent on loans one step up the quality ladder … *Id.*

45.     These incentives were not limited to Countrywide's sales force and brokers.  On information and belief, Countrywide compensated underwriters for their loan volumes and rewarded managers with bonuses and other compensation when their units produced high risk loans and features that increased Countrywide's return in the secondary market.  Neither these incentives nor their impact on borrowers' loan options were disclosed to consumers.

### C.     Countrywide's Deceptive Underwriting

46.     Countrywide used risky and deceptive underwriting to qualify borrowers for these risky and deceptive loans.  More than 75 percent of the Option ARMs and the majority of all ARMs originated by Countrywide were reduced or no documentation loans (known internally as liars' loans), which did not require Countrywide to confirm the borrower's income and allowed borrowers' income to be misrepresented.  While some borrowers misreported their incomes, brokers also made up borrowers' income on loan applications and coached borrowers to claim the incomes required to qualify for their loans.[15]  On information and belief, Countrywide's own audits informed them that the income provided for many of these no and low documentation loans had been fraudulently inflated.

47.     In order to reach more borrowers and increase the price of its loans in the secondary market, Countrywide also combined multiple risk factors in the loans it originated.  By offering a stated income, piggyback Hybrid ARM, for example, Countrywide was able to make loans to borrowers who

---

[15] *See* the Testimony of Audrey Sweet, before the U.S. Congress Joint Economic Committee, on July 25, 2007 (testifying that Countrywide falsified her income, bank balance, and tax payment on her loan documents); Glenn R. Simpson and James R. Hagerty, *Countrywide Loss Focuses Attention on Underwriting – Evidence of Abuses by Outside Brokers*, The Wall Street Journal, April 30, 2008 (while working for Countrywide, broker misrepresented borrower's income and bank account balance so that it appeared that borrower qualified and avoided further review).

could not make a down payment or qualify at fully-amortizing payments. While each of those features was dangerous and hard to understand on their own, together, they were toxic.

48.     On information and belief, Countrywide also engaged in deceptive practices with regard to its appraisals. First, Countrywide encouraged appraisers to inflate appraisal values by as much as 6 percent, to "roll up" closing costs. This misled consumers about both the value of their homes and the cost of their loans. *See Zachary v. Countrywide Fin. Corp.*, No. 08-cv-00214 (S.D. Tex. Oct. 7, 2008). For borrowers who took out loans at or near 100 percent LTVs the inflated appraised values made buyers unwittingly upside down on their homes immediately after purchasing them. Second, Countrywide loan officers were permitted to hire appraisers of their own choosing and could discard appraisals that did not support loan transactions and substitute more favorable replacement appraisers when necessary. Consumers with these so-called "shopped for" appraisals had no idea that their home's actual value was not its appraised value. Further, according to at least one lawsuit, appraisers who did not come in "on bid" and provide an appraisal value that justified the sale price would find themselves on Countrywide's blacklist, which meant that a second appraisal had to be obtained. *Capitol West Appraisals, LLC v. Countrywide Fin. Corp.*, 759 F. Supp.2d 1267, 1270 (W.D. Wash. 2010). This additional hurdle caused many brokers to avoid blacklisted firms and choose appraisers who would support an inflated valuation. *Id.*

49.     Countrywide had among the most aggressive underwriting guidelines in the industry, due largely to the fact that its leadership demanded that Countrywide match its competitors by offering any product or program they did. *See* Complaint at 18-19, *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 10-CIV-9591 (S.D.N.Y. Dec. 27, 2010) (quoting a former Countrywide executive as saying: "To the extent more than 5 percent of the [mortgage] market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it . . . . [I]t's the proverbial race to the bottom."). But even those guidelines did not provide the lender enough leeway. Countrywide approved many of its loans as "exceptions" that did not meet its underwriting guidelines. Through a special Exception Processing System, Countrywide approved tens of thousands of loans that should not have been made.

50.     The manner in which Countrywide underwrote its loans not only enabled it to make high-risk, deceptive loans to consumers, but also to mislead investors who purchased the loans in the secondary

1  market.  According to a complaint filed by the SEC, Countrywide did not disclose – and, often,

2  affirmatively misrepresented – that its loans did not meet its guidelines, were based on inaccurate incomes

3  and appraisals (which also made inaccurate the debt-to-income and loan-to-value ratios disclosed by

4  Countrywide in connection with its securitizations), and included multiple layers of risks.

5      51.     Countrywide also did not disclose that the product features and terms discussed in Section

6  IV(A), *supra*, made its loans especially susceptible to default once the loans recast or reset.  For example,

7  Countrywide described its Option ARMs as high quality, a "sound investment" and "prudently

8  underwritten," but did not disclose the high expected default rate for its Option ARMs.  Countrywide Fin.

9  Corp., 2006 Annual Report (Form 10-K) (Mar. 1, 2007); Complaint at 36-37, *SEC v. Mozilo*, No. CV09-

10  03994, 2009 WL 1549287 (C.D. Cal. June 4, 2009) ("SEC Complaint").  Countrywide was well aware of

11  the risks of Option ARMs; in one internal email from Countrywide's CEO, Angelo Mozilo, he noted that

12  Option ARM borrowers "are going to experience a payment shock which is going to be difficult if not

13  impossible for them to manage."  SEC Complaint at 27; see also SEC Complaint at 37 ("It is just a matter

14  of time that we will be faced with much higher resets and therefore much higher delinquencies").

15     52.     Despite its drive to riskier loan features and underwriting, Countrywide executives

16  continued to represent that there had been "no compromise" on loan quality.  In its Forms 10-K for 2005,

17  2006, and 2007, Countrywide misrepresented that it "manage[d] credit risk through credit policy,

18  underwriting, quality control and surveillance activities."  Countrywide Fin. Corp., 2005 Annual Report

19  (Form 10-K), at *92 (Feb. 28, 2006); Countrywide Fin. Corp., 2006 Annual Report (Form 10-K), at *100

20  (Mar. 1, 2007); Countrywide Fin. Corp., 2007 Annual Report (Form 10-K), at *117 (Feb. 28, 2008).  Its

21  2005 and 2006 Forms noted that Countrywide is "consistently producing quality mortgages."  2005

22  Annual Report at *101; 2006 Annual Report at *16.  At the same time, as the Securities and Exchange

23  Commission wrote in its Complaint against Countrywide officers:

24
25
26
27
              [T]he credit risk that Countrywide was taking was so alarming to Mozilo
              that he internally issued a series of increasingly dire assessments of various
              Countrywide loan products and the risks to Countrywide in continuing to
              offer and hold those loans, while at the same time he [and other officers]
              continued to make public statements obscuring Countrywide's risk profile
              and attempting to differentiate it from other lenders.  In one internal email,
28

Mozilo referred to a particularly profitable subprime product as 'toxic,'[16] and in another he stated that the company was 'flying blind,' and had 'no way' to predict the performance of its heralded product, the Pay-Option ARM loan. Mozilo believed that the risk was so high and that the secondary market had so mispriced Pay-Option ARM loans that he repeatedly urged that Countywide sell its entire portfolio of those loans.

SEC Complaint at 4.

53.     In addition, Countrywide did not disclose to investors that it failed to properly transfer mortgages to the securitization trusts from which they were sold. *See* Section VII, *infra*.  Based on reports produced by the trustees for these trusts, ███████████████   had flaws – ████████████ ████████████████████████ – that prevented their transfer. Because Countrywide was provided copies of these reports, it had specific, detailed knowledge that the transfers were invalid.  This meant that investors would not have an enforceable or secured interest in the mortgages.  Countrywide should have made this significant information available to investors.

54.     Countrywide's affirmative misrepresentations and material omissions constitute deceptions under the DTPA.  Nev. Rev. Stat. § 598.092(5)(a) (making it a deceptive trade practice to represent that an investment "is guaranteed, secured or protected in a manner which he or she knows or has reason to know is false or misleading").

**D.     Countrywide's Deceptive Marketing**

55.     To promote its aggressive loan origination practices, Countrywide engaged in unfair and deceptive sales practices through telemarketing, direct mailings, newspaper advertisements and television and radio commercials.  On information and belief, Countrywide's advertisements to consumers hid or obscured the risks associated with different mortgage products. Countrywide even reportedly instructed employees to court customers with a pitch that purposely underplayed risks associated with various loan products and falsely assured unsuspecting borrowers that Countrywide was looking out for their best interests and would obtain for them the best possible loan terms.

56.     In its advertisements, Countrywide encouraged consumers' to defer to its recommendations by emphasizing its experience, professional qualifications, and its devotion to consumers' financial needs. On information and belief, Countrywide promoted itself as "the company you can trust," and urged

---

[16] This was Countrywide's 100 percent financed subprime mortgage.

consumers to "join the millions of homeowners who have trusted Countrywide." *See, e.g.,* Complaint at 27, *People v. Countrywide Fin. Corp.*, No. LC081846 (Cal. Super. Ct. L.A. Cnty June 24, 2008) ("CA Complaint"). Countrywide claimed that it "had years to perfect [its] craft" and "is an expert at finding solutions for all kinds of situations." *Id.* Countrywide claimed it "would go the distance with you to help secure a loan program to fit your financial needs and goals." *Id.* Loans officers were directed to describe themselves to potential customers as "experienced mortgage lending professional[s]" who specialized "in helping people improve their financial situation." *Id.* at 28.

57.     Countrywide not only misled consumers about its motives, but its mortgages. In its marketing, Countrywide both purposefully omitted key mortgage terms and affirmatively misrepresented others.

58.     On information and belief, Countrywide urged loan officers, when handling initial calls from prospective customers, to defer discussing interest rates, to "overcome objections" regarding potential rates, costs and "equity drain" and to focus on the "emotional reasons" each individual customer may want or need to own a new home loan. As one manual noted, "[a]t this point in the sales cycle, rates, points, and fees are not discussed."

59.     While downplaying the rate, Countrywide instructed loan officers "to sell the payment." Loan officers contrasted the minimum monthly payments for ARM products with other, less risky (and ultimately, less expensive) loan products with larger initial payments. Then, loan officers would ask which payment the borrower preferred, without discussing other important differences between the loan products. Loan officers were not to discuss the payment shock and negative amortization that would result when borrowers made minimum payments.

60.     Countrywide ran television commercials for its Option ARMs that promoted a payment rate as low as 1 percent. Print advertisements promised that the loans' low payments would allow borrowers to set aside "extra cash." These ads did not explain that the payment rate was based on the initial teaser rate, and not the interest rate in effect for most of the life of the loan. As a result, borrowers would not know that their payment did not cover the full payment due and would produce negative amortization. Countrywide also failed to disclose that, while making the minimum payment would leave borrowers with more cash, it also would leave them with more debt. Countrywide's written disclosures failed to correct

these misrepresentations – for example, burying any mention of negative amortization in dense, small print and listing the minimum payment in disclosure documents as the initial monthly payment amount. As a result, consumers would not know of the actual interest rate (and corresponding monthly payment) until they received their first statement after the expiration of the teaser rate, after the loan documents were signed.

61.     The misrepresentations described above, which would have reached tens of thousands of Nevada consumers, violated the DTPA and explains how so many consumers ended up in mortgage loans they did not understand and could never repay.

62.     On information and belief, Countrywide's deceptive origination practices also demonstrate their intent to gain an unfair advantage over their competitors and hurt competition in the Nevada mortgage industry.

E.     **Countrywide's Deceptive Servicing Practices**

   1.     **Loan Modification and Workout Abuses**

63.     Countrywide was the largest servicer in the United States, administering collections on $1.5 trillion dollars in loans, including loans it originated and loans that it serviced for others.

64.     On information and belief, Countrywide engaged in deceptive trade practices by seeking to collect impermissible and inflated fees and payments from Nevada consumers in default, foreclosure, and bankruptcy. These fees included, but were not limited to, inaccurate balance and payment amounts, multiple, unnecessary inspections and property valuations and unwarranted and unjustified foreclosure fees. These fees were not permitted by borrowers' mortgage agreements, were not disclosed to borrowers, and exceeded the actual or reasonable cost of the services. In addition, Countrywide inaccurately accounted for borrowers' payments and misrepresented the amounts owed by borrowers.

65.     United States Bankruptcy Trustees ("U.S. Trustee") have taken action against Countrywide for unlawful servicing fees in four states, suggesting an institutional practice or failure. *See* J. Seth Moore & Vincent P. Slusher, *U.S. Trustee Takes on Big Lender*, National Law Journal, Mar. 3, 2008 (describing actions by the U.S. Trustee against Countrywide in Florida, Pennsylvania, and Texas); *In re McLeod*, No. 10-21364-LBR (Bankr. D. Nev. filed June 18, 2010). These trustees alleged, among other things, that

Countrywide Servicing filed inaccurate proofs of claims, inaccurately accounted for borrowers' payments, and made payment demands to consumers after discharge of their bankruptcy, which misrepresented the amount (if any) owed to Countrywide. *See, e.g., In re Chadwick*, No.05-37014-BKC-PGH (Bankr. S.D. Fla. May 27, 2009) (claiming that Countrywide failed to justify a claim for $2,396.29 in arrearages); *see also In re O'Neal*, No. 08-5031 (Bankr. N.D. Ohio May 1, 2009) (alleging that Countrywide had no factual basis for filing a claim).  When referring borrowers' loans to foreclosure counsel, Countrywide Servicing inflated reinstatement figures – the amount of principal, interest, legal and loan fees and costs required to bring the loan current. *See* Nev. Rev. Stat. § 107.080(3)(a) (requiring, inter alia, the provision of a description of the deficiency amount in the Notice of Default and Election to Sell).  Despite representing that the reinstatement figures were accurate, or at least reasonable estimates, Countrywide assessed legal fees over and above those it legitimately or actually incurred.  Countrywide Servicing hid these unwarranted legal fees in lump sum demands that did not itemize fees and costs unless the consumer requested them.

66.    Countrywide Servicing's behavior led U.S. Bankruptcy Judge Bohm in the Southern District of Texas to state in exasperation, "How many times do I have to listen to that before I conclude, 'You know, there's got to be some kind of reckoning' when I keep hearing time after time, 'we made a mistake, we made a mistake, we made a mistake, we made a mistake?'"  Peter Lattman, *Judges Raising Eyebrows Over Countrywide*, Wall St. J. L. Blog (Jan. 14, 2008, 9:17 AM), http://blogs.wsj.com/law/2008/01/14/is-there-something-rotten-in-the-state-of-countrywide.

67.    Countrywide Home Loans and BAC Home Loans last year paid $108 million to settle claims by the Federal Trade Commission ("FTC") that they purposefully inflated fees sought from and paid by 450,000 distressed homeowners, including Nevada homeowners.  Consent Judgment and Order, *Federal Trade Commission v. Countrywide Home Loans, Inc.*, No. 2:10-cv-04193-JFW-SS (C.D. Cal. June 15, 2010).  The FTC alleged that Countrywide Home Loans and BAC Home Loans sought to profit from default-related fees by inflating the costs of home inspections, property maintenance, and other fees related to protecting a lender's interest in troubled properties.  Complaint at 4, *Federal Trade Commission v. Countrywide Home Loans*, Inc., No. 2:10-cv-04193-JFW-SS (C.D. Cal. June 7, 2010).

///

20

68.     More recently, the U.S. Trustee intervened in several Nevada bankruptcies in which Bank of America filed proof of claims with seemingly inaccurate fees. *See In re McLeod*, No. 10-21364-LBR (Bankr. D. Nev.) (claiming Bank of America filed an improper claim for homeowners fees it may not have in fact paid); *In re Medrano*, No. 10-22780-BAM (Bankr. D. Nev) (same); *In re Degomez*, No. 10-22769-LBR (Bankr. D. Nev.) (same); *In re Gaudet*, No. 10-23473-BTB (Bankr. D. Nev.) (same).  The Trustee requested discovery in each of these cases.

69.     On information and belief, Countrywide violated the DTPA by charging Nevada consumers impermissible and inflated fees and misrepresenting the amounts that they owed on their mortgages.

70.     On information and belief, Countrywide's deceptive servicing practices show their intent to gain an unfair advantage over their competitors and hurt competition in the Nevada mortgage industry.

F.     **State's Basis for Asserting Origination, Marketing, and Servicing Claims**

71.     Soon after Bank of America acquired Countrywide, it negotiated, on Countrywide's behalf, a multi-state settlement of charges that Countrywide had engaged in widespread consumer fraud in its origination, marketing, and servicing practices.  The State of Nevada resolved its claims by entering into the Consent Judgment with Countrywide on February 24, 2009.

72.     On December 17, 2010, the State of Nevada filed suit against Bank of America and Countrywide, alleging violations of the Deceptive Trade Practices Act for their deceptive loss mitigation and foreclosure practices.  Complaint, *State of Nevada v. Bank of America Corp.*, No. A631557 (Dist. Ct., Clark Cnty., Nev. Dec. 17, 2010) (attached as Exhibit A to Notice of Removal, ECF No. 1).  On January 19, 2011, the State amended its complaint to include violations of the Consent Judgment.  Amended Complaint, *State of Nevada v. Bank of America Corp.*, No. A631557 (Dist. Ct., Clark Cnty., Nev. Jan. 19, 2011) (attached as Exhibit B to Notice of Removal, ECF No. 1).

73.     As the State began discovery, it found in Bank of America's policies and procedures practices that it believes constitute additional, serious violations of the Consent Judgment, including Countrywide's requirement that borrowers submit full applications for modifications under the Consent Judgment, despite its promise of "streamlined" modifications.  *See* Consent Judgment § 3.1(d).  It also noticed that Countrywide increased the interest rate (and payments) of some borrowers who received modifications under the Consent Judgment, despite its promise that modifications would decrease

1   borrowers' interest rate. *See, e.g.*, Consent Judgment §§ 4.3(a)(iii)(A), (a)(iv)(B), (b)(ii)(C), (agreeing to

2   offer modifications with interest rate reductions).  The State notified Countrywide of these additional

3   grounds of breach by letter on June 1, 2011.  Countrywide has neither corrected nor satisfactorily

4   explained its violations.

5        74.     Given Countrywide's immediate, egregious, and repeated violations of the Consent

6   Judgment, the State seeks to exercise its rights under the Consent Judgment to terminate the Judgment,

7   dissolve its release, and to bring the claims originally available to the State prior to the entry of the

8   Consent Judgment.  Consent Judgment §§ 2.3, 4.12 (allowing the Attorney General to terminate the

9   settlement "if there is a material failure to satisfy this commitment").  Therefore, in its Prayer for Relief,

10   the State requests a declaratory judgment that Bank of America materially breached the Consent

11   Judgment.

12        75.     These claims are timely as they were tolled by the entry of the Consent Judgment and

13   Defendants are equitably stopped from raising statute of limitation defenses.  Having failed to abide by the

14   terms of the Consent Judgment, on which the State relied, and given the Consent Judgment's express

15   provisions allowing the State to terminate the agreement and be released from its own releases and

16   preventing the waiver of a party's claims, Defendants cannot maintain that they are entitled to avoid

17   liability for their original misconduct or would be prejudiced in defending against these claims.

18   **V.    DEFENDANTS' VIOLATIONS OF THE CONSENT JUDGMENT WITH THE STATE OF**

19         **NEVADA**

20        76.     In the event that the Court does not find that Defendants have materially breached the

21   Consent Judgment, precluding the State from terminating the Judgment, the State alleges the violations of

22   the Consent Judgment laid out below.

23        77.     Under the Consent Judgment entered into among the Attorney General and the

24   Countrywide Defendants, Countrywide undertook several obligations, including to:

25   ///

26   ///

27   ///

28   ///

22

- provide National Homeownership Retention Program ("NHRP") modifications to "Eligible Borrowers"[17] in "Qualifying Mortgages"[18] on the terms laid out in the Consent Judgment;

- not initiate or advance foreclosures for Eligible Borrowers who are being evaluated for loan modifications;[19]

- make decisions on modification requests, on average, within 60 days of receiving complete applications from Eligible Borrowers;[20] and

- make streamlined modifications consistent with the programs outlined in the Consent Judgment.

78.    Based on numerous complaints reviewed by the Attorney General's Office, some of which are described in Exhibit I, Bank of America has:

- failed to provide modifications to Eligible Borrowers;

- proceeded with foreclosures while Eligible Borrowers were awaiting decisions on their modification requests;

- failed to make decisions on modification requests within 60 days, on average;

- raised Eligible Borrowers' interest rates despite their commitment to lowering them; and

- failed to provide Eligible Borrowers with streamlined modifications by requiring them to submit extensive documentation.

---

[17] An Eligible Borrower is a borrower with a first mortgage payment due on or before December 31, 2007, secured by an owner-occupied 1-to-4-unit residential property, and serviced by a Countrywide servicer or its affiliate. Consent Judgment § 4.1.
[18] A Qualifying Mortgage is defined in the Consent Judgment as a Subprime Mortgage or Pay Option Adjustable Rate Mortgage where the Eligible Borrower is either "Delinquent" or "Seriously Delinquent" and the ratio between the value of the mortgage and the value of the home ("LTV" or "Loan-to-Value") is 75 percent or more.  Consent Judgment § 4.2.  A Seriously Delinquent Borrower is 60 days or more behind on his or her payments.  A Delinquent Borrower is Seriously Delinquent or subject to an imminent reset or recast and, as a result, likely to become Seriously Delinquent on or before June 30, 2012. Consent Judgment § 1.2.
[19] Consent Judgment § 4.6(a).
[20] Consent Judgment § 4.9.

79.     Consumers with Qualifying Mortgages were unable to obtain decisions on modifications or were wrongly denied NHRP modifications. Bank of America denied one couple a modification because they failed to complete their application, though the homeowners and their credit counseling agency had repeatedly re-sent all of the documents requested by Bank of America; there are many other examples. *See infra* § 89. Bank of America also told Eligible Borrowers that they would not receive modifications because they were not 60 days delinquent, even though the borrowers faced resets or recasts that made imminent default reasonably likely. Therefore, these consumers were eligible under the Consent Judgment.

80.     In addition, Bank of America delayed decisions on Eligible Borrowers' requests for modifications for far more than 60 days. Though Bank of America exclusively possesses the information necessary to calculate the average wait time for decisions, the number of Eligible Borrowers who waited for six months, a year, or more for decisions supports the conclusion that Bank of America did not make decisions, on average, within the time period required by the Consent Judgment. Further, Countrywide's improper requirement that consumers submit applications that documented their incomes meant that it deferred consideration of Eligible Borrowers whose applications should have been deemed complete. Upon information and belief, this additional delay extended the time to consider many consumers beyond the time permitted by the Consent Judgment.

81.     Bank of America also initiated foreclosures on Eligible Borrowers even though the Bank had failed to decide their active requests for modifications. Bank of America sent Notices of Default and Elections to Sell to Eligible Borrowers, even triggering their rights to mediation, in instances where the homeowners' modification requests were pending.

82.     Bank of America increased – and sometimes as much as doubled – the interest rates of borrowers who received modifications under the Consent Judgment, despite its clear commitment that it would decrease their interest rates. *See* Consent Judgment §§ 4.3(a)(iii)(A), (a)(iv)(B), (b)(ii)(C), (agreeing to offer modifications with interest rate reductions). Nowhere among the modification programs is the option to raise borrowers' interest rate. Yet, the Attorney General's Office found numerous consumers whose interest rates and payments went up – also sometimes as much as double – after they received modifications – a perverse outcome for borrowers who were to receive help pursuant to a

settlement to redress their lender's wrongdoing.

83.     Finally, in order to be considered for modifications under the Consent Judgment, Bank of America required borrowers to submit full, verified application packages.  This rendered meaningless the Consent Judgment's promise of "streamlined" modifications.  *See* Consent Judgment §§ 4.3(a)(iii), (a)(iv), (b)(ii), (c)(ii) (affording respective Eligible Borrowers "streamlined" modifications).  Bank of America could abandon streamlined modifications and require "objective prequalification" of borrowers only if it found that there had been "material levels of intentional nonperformance by Eligible Borrowers."  Consent Judgment § 4.10.  The Consent Judgment notes that obtaining "verification of all sources of income" under those circumstances would "inhibit streamlined solutions, and could otherwise significantly slow implementation of the loan modification process." Consent Judgment § 4.10.

84.     Bank of America's policies and procedures describe the documentation required from borrowers to be considered for NHRP:  proof of borrowers' incomes, including permission to obtain the borrower's latest tax return, and hardships.  Specifically borrowers had to produce:

- A signed Internal Revenue Service form 4506-T, requesting a tax transcript;

- A signed affidavit requesting a modification;

- Verification of income; and

- Other documents that can verify HAMP eligibility.

85.     Furthermore, in order to verify their income, Bank of America required borrowers to produce:

- Two recent consecutive year-to-date pay stubs documenting at least 30 days of income that are not more than 90 days old (meaning 2 pay stubs for bi-weekly or 4 pay stubs for people paid weekly); or

- Most recently quarterly year-to-date profit and loss statement for a self-employed borrower, and:

- A copy of the most recent year's tax return with all schedules.

///

While borrowers could take out a Countrywide loan without ever documenting their income, in order to modify that loan, they were required to provide multiple documents to confirm their income, even when Bank of America promised a less burdensome process.

86.     On information and belief, Bank of America never found that borrowers were strategically defaulting on their loans in order to seek modifications.  No such finding was ever communicated to the Attorney General's Office, either in Bank of America's quarterly reports or its response to the State's notice of breach, or any other manner.  Further, because it appears that these rigorous documentation requirements were in place from the beginning of NHRP, there could not yet have been any pattern of strategic default justifying Bank of America's demand for full documentation to objectively prequalify borrowers.

87.     Whatever streamlined means – and the Consent Judgment did not define the term – it could not have meant that Defendants would require the same documentation under the Consent Judgment that it required of every other modification applicant.  Yet, Bank of America required eligible applicants to provide the same documentation required to be considered for the Home Affordable Mortgage Program ("HAMP") and, on information and belief, its other proprietary modification programs.

88.     Further, among the full documentation package, Bank of America required borrowers to provide a letter laying out the hardship that created the need for the modification.  However, the Consent Judgment does not require borrowers to have experienced hardships; they simply have to be Delinquent (not in default yet, but facing imminent reset or recast) or Seriously Delinquent (at least 60 days past due on payments of interest or principal).  Consent Judgment § 1.2.  Therefore, Bank of America improperly required all Eligible Borrowers to provide documentation of their hardships.

89.     According to Bank of America's reporting to the State under the Consent Judgment, ██████. Putting aside whether documents were actually missing, or were missing because of the Bank's failure to manage their documents, rather than borrowers' failures to submit

them, it is clear that this non-streamlined modification process excluded many Nevada borrowers from receiving the help to which they were entitled under the Consent Judgment and constitutes another material breach of that Judgment.

90.     The Consent Judgment specifically allows for on-going enforcement with the ultimate remedy being its dissolution and litigation of the original claims.  See generally Consent Judgment.  The Consent Judgment allows the Attorney General to apply "at any time, for enforcement of any provision of this Judgment."  Consent Judgment § 10.4.  The Consent Judgment does not require that a notice of breach be made within a certain period of time; the only time limitation is the 45-day notice required before a party can seek relief.  Consent Judgment § 10.4(b).  Further, the Consent Judgment has a "no waiver" provision, which affirms that the failure of any party to enforce a right does not constitute waiver of that right.  Consent Judgment § 10.8.  Therefore, the State's request to amend this Complaint to assert the additional reasons that Defendants failed to meet their obligations under the Consent Judgment is entirely proper.

## VI.     BANK OF AMERICA'S DECEPTIVE LOSS MITIGATION AND FORECLOSURE PRACTICES.

91.     As detailed below, Bank of America has violated the Nevada DTPA by misleading consumers in connection with their loss mitigation and foreclosure programs.  Complaints received by the Attorney General's Office, some of which are described in Exhibit K, and its own investigation demonstrate that Bank of America has engaged, and continues to engage, in a pattern and practice of misleading consumers about its mortgage modification program.

### A.     Time for Deciding Consumers' Modifications.

92.     On its website, in form letters, and in its interactions with individual consumers, Bank of America repeatedly promised consumers answers on their modification requests within a specific time frame, typically 30 or 60 days.  Many consumers have waited six months or even a year and still have not received decisions.

93.     Bank of America's website indicates that it will "typically" take 30 to 45 calendar days from the receipt of a consumer's documents to make a decision on a loan modification request.  See Ex.

L.[21]  In addition, Bank of America promises on its website that: "You can expect to hear back from us within 10 business days from when we receive all your required documents.  The purpose of contacting you is to confirm receipt of your information, as well as let you know how the evaluation process works and how long it takes." Ex. L.

94.    Bank of America sent consumers seeking modifications a document with "Frequently Asked Questions."[22]  One question asks how long it will take for Bank of America to process consumers' modification request.  The answer: "up to 45 days." See Ex. M.

95.    These assurances are reinforced in one-on-one conversations between Nevada consumers and Bank of America representatives, attested to by consumers and notes in consumers' servicing files, in which Bank of America promises that consumers will have an answer on their requests within 30, 60, or 90 days.

96.    Despite its representations, Bank of America kept Nevada consumers waiting for six months, one year, or longer for decisions.  These consumers have suffered delay, anxiety, and often foreclosure while trying to secure an affordable payment that allows them to meet their obligations and keep their homes.

97.    One critical source of delay is Bank of America's routine loss of consumer documents.  Bank of America consistently has lost consumers' documents; causing delays while consumers re-sent– sometimes more than half a dozen times–the same documents.  Bank of America has publicly acknowledged "shortcomings" in its document maintenance.[23]  See Ex. N at 3.  Also on information and belief, consumers were deceptively denied modifications because of "missing" paperwork that Bank of America had received.

98.    Bank of America routinely fails to notify consumers of missing documents.  In fact, many consumers found out that their documents were missing or incomplete months after they submitted their

---

[21] http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html (Next Steps: Documents) (visited May 27, 2010, last visited Dec. 14, 2010), attached as Exhibit L.
[22] Although this document includes several answers relating to the Home Affordable Mortgage Program, on information and belief, the Frequently Asked Questions was sent to all consumers seeking modifications.  The 45 day commitment does not relate to any HAMP requirement.
[23] The Private Sector and Government Response to the Mortgage Foreclosure Crisis Before H. Fin. Servs. Comm., 111th Cong. 142 (Dec. 8, 2009) (statement of Jack Schakett, Bank of America Credit Loss Mitigation Strategies Exec.), attached as Exhibit N.

modification requests, and only upon calling Bank of America.  In many instances, Bank of America told consumers that documents were missing after previously assuring them, often repeatedly, that their files were complete and under review.

99.    While waiting for answers, consumers called Bank of America regularly to check on the status of their modification requests.  They were promised calls or letters with updates, which almost never came, or decisions by a specific date or within a set number of days.  Instead, many received multiple foreclosure-related communications, including collection calls.  This long waiting period is not only inconsistent with Bank of America's oral and written commitments to consumers, but extremely trying for homeowners who do not know from day to day whether they will get help or lose their homes.

100.    Bank of America knew, or should have known, that its statements were false because its employees were aware that consumers often suffer delays of more than three months while waiting for action on their modification requests.

**B.    Bank of America Misrepresented to Consumers that their Trial Modifications would be Converted to Permanent Modifications if they made their Trial Payments.**

101.    HAMP sets up a two tier framework.  Borrowers first must qualify for an initial, three-month trial modification.  Consumers who make each of the three payments on time will receive permanent modifications.

102.    Bank of America has made unequivocal promises that consumers who successfully complete trial plans would receive permanent modifications.  For example, its website announced:

- "If you successfully make all your Trial Period Plan payments, you will receive a Modification Agreement defining the changes. After this document has been signed, notarized and returned to us, your modification will be officially made permanent."
  *See* Ex. O, P.

- "If you successfully make your Trial Period Plan payments during the trial period, you will be approved for a permanent modification of your loan."  *See* Ex. Q.

///

29

103.   In addition, Bank of America led consumers to believe that it would convert them to permanent modifications after three or four months on trial periods.  Consumers received three payment coupons with their modification agreement, and report being confused about what to do when they reach the fourth month but have not heard from Bank of America.  Some consumers called the Bank and were told at that time, or were told at the time the trial modification was offered, that they would receive a permanent modification within a month of completing their trial periods.

104.   Bank of America's website again confirms its oral representations: "Your trial period will last 3 or 4 months, depending on your circumstances."[24]  *See* Ex. R.  Bank of America certainly did not advise consumers that they would wait six months or more.

105.   Bank of America's trial modification offer assures consumers, "[i]f you make all of your trial period plan payments ... and return any additional documents that may be required, you may receive a Modification Agreement." *See* Ex. S.

106.   One Nevada consumer made six payments on his first trial modification.  He then received documents for a different loan modification.  When he called Bank of America for an explanation, Bank of America told him that he would have to restart the modification process and complete another trial period before receiving a permanent modification.  After he made those payments, he received yet another trial modification with different terms.

107.   Bank of America knew, or should have known, that its promise that it would make decisions on permanent modifications within a month of completing their trial modifications was deceptive. Bank of America tracked the "age" of trial periods, and knew that many consumers waited more than four (or even six or nine) months for their modifications to be made permanent (or declined).

108.   Though consumers benefit from temporarily lower payments during their trial modification, consumers who are not converted to a permanent modification may end up worse off.  In his most recent report, the Inspector General of the Troubled Assets Relief Program, which oversees HAMP, discussed the fate of borrowers in failed trial modifications who "even in circumstances where they never missed a payment, ... may face back payments, penalties, and even late fees that suddenly become due on their

---

[24] http://homeloanhelp.bankofamerica.com/en/fha-home-affordable-modification.html (Next Steps: Trial Period) (viewed May 27, 2010, last viewed Dec. 14, 2010), attached as Exhibit R.

'modified' mortgages and that they are unable to pay, thus resulting in the very loss of their homes that HAMP is meant to prevent."

## C.   Foreclosures while Modifications were Pending

109.   As noted above, consumers waiting for decisions on their modifications often received foreclosure-related notices.  Upon receiving these communications, many consumers called the number provided by Bank of America on the notices to find out what they mean.  Bank of America has repeatedly and deceptively assured Nevada consumers that they should not worry, their modifications are still in review, and their homes will not be sold while their modification requests were pending.

110.   This promise is reinforced by commitments on Bank of America's website.  Under "Frequently Asked Questions," Bank of America represents to homeowners that their homes will not be sold while they are awaiting decisions on their modification requests or on modification plans:

> I want to try to get a home loan modification under the Making Home Affordable program, but I'm afraid that my lender will go ahead with the foreclosure while I'm trying to make it happen.  Can I get more time to explore this option?
>
> Yes.  While we review your eligibility for the program, your loan will not go to foreclosure sale.  When you enter a trial plan under the program, your loan will not be referred to foreclosure, and any pending foreclosure proceeding will not go to sale.[25]

*See* Ex. T, U, V.

111.   Despite these assurances, Bank of America has pursued or completed foreclosures while homeowners were awaiting decisions upon loan modifications.  In some cases, homeowners incurred foreclosure fees even though the foreclosure process should never have started or proceeded.

112.   Bank of America knew, or should have known, that its statements were false and misleading.  Its employees regularly encountered consumers whose homes were wrongfully foreclosed while their modifications were still under review.  Interviews with former Bank of America call center

---

[25]   http://homeloanhelp.bankofamerica.com/en/frequently-asked-questions.html?documentstate =Foreclosure (visited May 27, 2010), attached as Exhibit T; (last visited Dec. 14, 2010), attached as Exhibit U; Help for Homeowners, *Supplemental Directive 10-02, Home Affordable Modification Program – Borrower Outreach and Communication* at 3, 5-7 (Mar. 24, 2010), available at: https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1002.pdf, attached as Exhibit V.

employees indicate that foreclosures while consumers were awaiting decisions on their modifications were common.

**D.    Reporting to Credit Agencies**

113.    In addition, Bank of America notified consumers or credit agencies that consumers are in default when they are not.  Bank of America indicates on its website that consumers in trial modifications will be reported to the credit agencies because they are not making their full, original mortgage payment.  However, Bank of America does not disclose that even consumers making full payments may be the subject of negative reporting.

114.    One Las Vegas homeowner, who suffered a heart attack that caused him to incur substantial medical expenses and a loss in his income, applied to Bank of America for a modification even though he was current on his mortgage payments.  He continued to pay both his first and second mortgages with Bank of America in full while he waited for a decision on his request.  However, for six months, Bank of America reported to credit agencies that he was delinquent on his loans.  Despite being current, he also received a Notice of Intent to Accelerate.

115.    These false credit reports make it harder and more expensive for consumers to obtain credit.  In addition, misrepresenting the delinquency status of consumers' loans allows Bank of America to impose late fees and other charges to which it is not entitled and which make it even harder for a consumer to remain or become current on their mortgages.

116.    Such misrepresentations about the consumer's payment status violate the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e(2)(A) & (8), and, as a result, the DTPA.  Nev. Rev. Stat. § 598.0923(3).

**E.    Eligibility for and Denials of Modifications**

117.    Bank of America represents publicly, and federal rules require, that consumers need not be delinquent to be eligible for a modification.

118.    Bank of America's website notes: "If you've suffered a hardship that is affecting your ability to make your mortgage payments or have already missed a payment, you may be able to receive a more affordable mortgage payment under the Home Affordable Modification Program." *See* Ex. W; *see*

*also*, Ex. X at 19, Treasury Department's MHA Handbook. ("A loan is eligible for HAMP if the servicer verifies that all of the following criteria are met: . . . The mortgage loan is delinquent or default is reasonably foreseeable.")

119.     Yet Bank of America representatives frequently advised consumers that they must miss payments in order to be considered for loan modifications. One Nevada consumer received a letter advising: "One of the guidelines under the MHA [or HAMP] program requires the loan be 60 days delinquent." Ex. Y. This letter—likely a form document--was inaccurate and deceptive; HAMP never required a loan to be delinquent in order to be eligible for a modification.

120.     Bank of America told consumers, by letter and often by phone, the reasons that their requests for modifications were denied. Among the commonly cited reasons for denying Nevada consumers' applications were:

- investor denial: the owner of the loan with authority to approve the modification would not permit the modification;

- inability to reach the consumer or to obtain missing documents needed to review the request;

- previous modification;

- consumer's income insufficient to support the modified payment;

- failure to make payments or to accept previous modification; and

- current on mortgage payments.

121.     In several cases reviewed by the Attorney General's Office, the reasons offered by Bank of America for denying modifications were inaccurate and misleading.

122.     For instance, Bank of America told some consumers that it had denied their modifications because it was unable to reach them. However, the borrowers regularly called Bank of America to obtain updates on their status and/or resubmit their documents. In addition, none of these consumers reported ever receiving calls from Bank of America but, instead, noted that they were unable to reach their assigned contacts, even after multiple attempts. In other cases, Bank of America claimed that it was missing

documents, even though consumers had repeatedly sent in their documents and/or were told by Bank of America that their files were complete and being reviewed for modifications.

123.    Bank of America's authority to offer modifications is defined by the Pooling and Servicing Agreement ("PSA") that governs the servicing of specific pools of loans.  In some instances, the investor or owner of the loans delegates to Bank of America full authority to make modification decisions consistent with the investor's best interest.  Under some PSA's, only certain types of loans can be modified or certain types of modifications made.  Other investors do not permit modifications or require Bank of America to seek approval before offering modifications.

124.    On information and belief, Bank of America notified consumers that their modifications were declined by the investors in instances where Bank of America had full authority, without the investors' approval, to offer modifications.

125.    In another case, Bank of America denied a loan modification, claiming that a consumer previously received a modification when the consumer had instead rejected a modification based on inaccurate income figures.

126.    Bank of America turned away another consumer for the stated reason that the consumer had failed to make her payments during a three month trial modification when, in fact, the consumer had made (and Bank of America had cashed) all of her payments.

127.    Bank of America knew or should have known that these representations regarding the reasons for denying consumers' modification requests were untrue and deceptive.

F.    **Changing the Terms of Modifications, Failing to Deliver Promised Modifications, or Ignoring or Repudiating Existing Modifications.**

128.    For consumers who were able to secure modification commitments, Bank of America misrepresented whether and on what terms their modification requests had been approved.

129.    Bank of America told consumers that their modifications had been approved, but then notified them that they had never received modifications.  Often, this news came only after consumers had made several payments.

130.    Nev. Rev. Stat. § 107.086, passed by the Nevada Legislature on May 22, 2009, allows homeowners who receive Notices of Default to participate in a pre-foreclosure mediation with their

servicers.  *See* Nev. Rev. Stat. § 107.086(2)(a)(3) (requiring a trustee to send with every Notice of Default a form where the homeowner "may indicate an election to enter into mediation").  If a homeowner sends in the required election form, the servicer must appear at an assigned mediation date with all required documents and the authority to negotiate an appropriate agreement with the borrower.  Nev. Rev. Stat. § 107.086(4) (requiring the servicer to bring "the deed of trust, the mortgage note and each assignment of the deed of trust or mortgage note" and "have authority to negotiate a loan modification").  Participation in good faith in the mediation is prerequisite to moving forward with the foreclosure.  Nev. Rev. Stat. § 107.086(2)(c)(2) (requiring a certification under Nev. Rev. Stat. § 107.086(7), which requires the parties act in "good faith").

131.    Often, Bank of America representatives did not show up at assigned mediation dates or did not have the documents or negotiating authority required by law.  As a result, in a number of instances, mediators issued findings that Bank of America had acted in bad faith.

132.    One mediator's findings issued in January 2010 regarding a Bank of America mediation illustrate the problems:

> Lender initiated foreclosure procedure, did not respond rationally or reasonably in mediation, and under stressful conditions obtained an agreement from HOs [homeowners] to allow foreclosure sale to proceed on May 7.  In sum, the attached SSA [short sale agreement] was entered into by HOs under the duress of "Boulware-like" bargaining strategy and a "take it or leave it" basis of Lender that does not allow HOs to retain their residence even temporarily, but will dispossess the HOs as soon as possible... I find that the Lender failed to participate in mediation in good faith as evidenced by its failure to produce required documentation and information, the lack of serious retention proposal, and the nature of and take-it-or-leave-it basis for its non-retention proposals....

Addendum to Mediator's Statement (Feb. 6, 2010); attached as Exhibit Z.

133.    A number of consumers were promised modifications on a set of terms worked out with (and witnessed by) the mediators.  In one case, Bank of America offered a modification at mediation and promised to send the consumer an agreement reflecting its terms.  Bank of America did not provide the consumer the promised modification agreement.  When Bank of America, after repeated calls, finally provided the agreement, its terms were materially different than those offered at the mediation.

///

134.    For example, Bank of America told one recently widowed, elderly Las Vegas homeowner at her mediation that she was approved for a trial modification and promised to send her the modification agreement in two to four weeks.  The homeowner never received the documents.  When she called Bank of America to follow up, the representative said her file was still being reviewed and told her to send in updated financial information.  She submitted the documents and kept calling.  On one call, a Bank of America representative suggested she re-start the application process.  Bank of America also explained that an employee had failed to enter the results of the mediation into her account.  The homeowner received multiple foreclosure notices.  In June 2010, Bank of America offered the homeowner a permanent modification increasing her payments to more than half her income.  She accepted the modification despite the financial strain because, as she explained, "my nerves, my blood pressure, my state of mind could not stand another 3 months, 6 months, or however long it would have taken of living in fear of thinking this might be the day or the week I lose my home."

135.    Finally, Bank of America provided modifications to consumers and then either attempted to revoke such modifications or failed to honor their terms.  For example, though consumers signed modification agreements, Bank of America failed to implement their terms and continued to seek to collect the original, unmodified payments.

136.    Bank of America's promises of modifications that it failed to provide or refused to honor constitute a deceptive practice.

## VII.   BANK OF AMERICA'S DECEPTIONS WITH REGARD TO ITS AUTHORITY TO COLLECT AND FORECLOSE.

137.    As noted above, the primary driver of Countrywide's origination volume and loan types and features was the demand and price for these loans in the secondary market.  *See supra* ¶ 27.  Virtually all of the loans originated by Countrywide were securitized – grouped into collateral pools and sold to trusts pursuant to Pooling and Servicing Agreements ("PSA"), which governed, among other things, how the mortgages were to be delivered to the trusts.  The trusts raised cash to pay for the loans by selling bonds or certificates to investors.  Countrywide Servicing typically retained the rights to service (for a fee), the mortgages they sold in the secondary market.

///

138.   The PSA's for Countrywide mortgages typically required Countrywide to endorse the mortgage note ("Note") and deliver the original Note to the trustee ("Trustee") of the securitization trust ("Trust"). In order for the transfer to be valid, the properly endorsed, original Note had to be delivered before the trust closed; any transfer outside of that period would violate the governing instrument of the Trust. The failure to follow the terms of the PSA in transferring a Note would invalidate the transfer and mean that the Note never became part of the Trust.

139.   There is mounting evidence that Countrywide failed to follow the steps required to transfer its Notes into securitization Trusts. First, Countrywide failed to ensure that these Notes were properly assigned or endorsed. Second, Countrywide failed to deliver the original Notes to the Trusts, or provided Notes with incorrect terms, missing riders, or missing notary seals.

140.   The recent case of *Kemp v. Countrywide* provides a window into Countrywide's practices. 440 B.R. 624 (D.N.J. Nov. 16, 2010). In *Kemp*, Countrywide attempted to transfer certain mortgages it originated to a Trust for which Bank of New York served as Trustee. *Id.* at 627. The PSA required Countrywide to deliver the original mortgage Notes, endorsed in blank. *Id.* at 627. The Note that was the subject of the Kemp litigation was not endorsed in blank nor delivered to Bank of New York. *Id.* at 629. The only evidence of an endorsement was an undated Allonge, created only weeks before trial in the case (and not at the time of securitization), which purported to endorse the Note to Bank of New York as Trustee; the Allonge also was never attached to the Note. *Id.* at 628. An employee, Linda DeMartini testified that Mr. Kemp's original Note never left Countrywide's possession and that Countrywide customarily held onto the original Notes. *Id.* at 628.

141.   The Court held that under New Jersey State rules (virtually identical to Nevada's) governing negotiable instruments, because Bank of New York did not have the original Note or a proper endorsement, it never became the duly negotiated holder of the Note. *Id.* at 631; *see also Leyva v. Nat'l Default Servicing Inc.*, 255 P.3d 1275, at *9-10 (Nev. 2011). Therefore, Bank of New York did not have authority to enforce the Note and foreclose. While Countrywide may have remained the holder of the Note, it filed its claim for repayment as servicer to the Trust, and not as the holder. The Court concluded: "Because the Bank of New York has no right to enforce the note, Countrywide as its agent and servicer cannot enforce the note." *Id.* at 634.

142.   In the wake of this testimony, CNN identified and reviewed foreclosures filed in two New York counties between 2006 and 2010 in which Bank of New York was foreclosing on behalf of a Countrywide securitization trust.  Abigail Field, *At Bank of America, More Incomplete Mortgage Docs Raise More Questions*, Fort., (June 3, 2011), http://finance.fortune.cnn.com/2011/06/03/at-bank-of-america-more-incomplete-mortgage-docs-and-more-questions/.  None of the 104 Countrywide loans CNN examined were endorsed by Countrywide:  "These notes ostensibly belong to over 100 different Countrywide securities … If the lack of endorsement on these notes is typical – and 104 out of 104 suggests it is – the problem occurs across Countrywide securities …"  *Id.*

143.   On information and belief, as servicer, Bank of America and its subsidiaries and agents similarly sought to enforce mortgage Notes in Nevada, engaged in collection activity in Nevada, pursued nonjudicial foreclosure proceedings in Nevada, defended foreclosure actions in Nevada, and filed proofs of claim in bankruptcy in Nevada in instances in which Bank of America did not have authority to act.  In so doing, Bank of America misrepresented its authority, in violation of the DTPA.  *See* Nev. Rev. Stat. § 598.0915(15) ("Knowingly makes any other false representation in a transaction.").

144.   As servicer, Bank of America and its agents was responsible for recording and sending to borrowers Notices of Default/Notices of Election to Sell, notarized documents that indicate that it is acting as agent for the beneficiary of the mortgage to "cause the trust property to be sold to satisfy the obligations secured thereby."  Bank of America also recorded and sent to consumers Notices of Trustee Sales, which announced the particulars of the sale of the property, and made filings in foreclosure and bankruptcy actions in Nevada courts.  These documents (among others) were deceptive in that they misrepresented the parties authorized to foreclose and indicated that Countrywide had the authority to take or sell the borrowers' properties as a result of default on those Notes.  As explained above, Countrywide did not have that authority.

145.   Countrywide knew that it did not have authority as servicer for the Trusts to enforce invalidly transferred Notes. Deficiencies in transfers to securitization Trusts were noted in discrepancy reports issued by Trustees, such as Bank of New York ("BNY"), and shared with Countrywide.[26]  Among

---

[26] A Trust's governing instrument requires the trustee to review the loan documents on or before the closing date.  The trustee must review the documents and, if anything is missing or materially defective, the trustee must notify the servicer and sponsor of the trust.

the shortcomings specifically identified was Countrywide's failure to deliver original Notes with proper

assignments or endorsements, missing documents, incorrect terms, missing title policies, and other defects.

Despite this warning, Countrywide did not remedy many of the ineffective transfers.  In fact,

Countrywide's botched transfers of mortgage Notes was one ground for a proposed $8.5 billion settlement

between Bank of America and various investors who bought certificates in 530 Countrywide

securitizations for which Bank of New York was trustee.  Verified Petition at 1, In re The Bank of New

York Mellon, No. 651786/2011 (N.Y. Sup. Ct. June 29, 2011).[27]

146.    These are not mere technicalities.  The PSA's spelled out a specific procedure in order to

ensure a proper transfer, protect the Trusts as the holders in due course, and avoid subjecting the Trusts to

taxation.  In addition, borrowers need to know the actual holders of their mortgages so that, for example,

they can investigate and any assert available defenses in foreclosures, including that the agent of the

trustee lacks authority or standing under the Note.28

147.    A number of cases interpreting N.R.S. § 107.080, which governs foreclosures in Nevada,

recently have held that a party could institute a trustee sale without proving that it was a real party in

interest with respect to the relevant mortgage Note.  *See Lasao v. Stearns Lending Co.*, No. 2:10-CV-

01864-KJD-LRL, 2011 WL 3273923 (D. Nev. July 29, 2011); *Villa v. Silver State Fin. Servs., Inc.*, No.

2:10-cv-02024-LDG-LRL, 2011 WL 1979868 (D. Nev. May 20, 2011); *Vega v. CTX Mortg. Co., LLC*,

761 F. Supp.2d 1095, 1098-99 (D. Nev. 2011); *Ritter v. Countrywide Home Loans*, No. 2:10-cv-00634-

[27] On August 4, 2011, the New York Attorney General filed an objection to that settlement.  Mem. of Eric T. Schneiderman, Attorney General of the State of New York, In Supp. of Mot. to Intervene, *In re The Bank of New York Mellon*, No. 6517856/2011.  The settlement, if approved by the court, would release BNY from liability as Trustee for ensuring that Notes were properly deposited into the Trusts. Id. at n.1. The New York Attorney General claimed that Countrywide's failures to properly convey its interests in the securitization Trusts was so pervasive that BNY must have known about them.  Verified Pleading in Intervention, Ex. A to Affirmation of Amir Weinberg, *In re The Bank of New York Mellon*, No. 6517856/2011 (N.Y. Sup. Ct. Aug. 5, 2011).  Moreover, the New York Attorney General noted that the ineffective transfers raised questions about BNY's authority to foreclose: "[Countrywide's] ultimate failure…to transfer complete mortgage loan documentation to the Trusts hampered the Trusts' ability to foreclose on delinquent mortgages, thereby impairing the value of the notes secured by those mortgages. These circumstances apparently triggered widespread fraud, including BoA's fabrication of missing documentation."  *Id.* at 10.
28 *See Leyva,* 255 P.3d at *4 (citing N.R.S. §104.3301 to note that the obligor has the right to know the identity of the entity that is entitled to enforce the mortgage note; otherwise the homeowner may pay funds to a stranger in the case"; and *In re Veal*, 450 B.R. 897, at 921 (B.A.P. 9th Cir. June 10, 2011) (AHMSI not entitled to enforce the mortgage note because if "presented no evidence as to who possessed the original Note" and no evidence showing endorsement of the note in its favor or servicer's)).

1   RLH-RJJ, 2010 WL 3829378 (D. Nev. Sept. 24, 2010).  However, the Nevada Supreme Court's decision

2   in *Foust v. Wells Fargo* seems to upend those decisions. No. 55520, 2011 WL 3298915 (Nev. July 29,

3   2011).  "To enforce a debt secured by a deed of trust and mortgage note, a person must be entitled to

4   enforce the note pursuant to Article 2 of the Uniform Commercial Code." *Id.* at *5.  In that case, the

5   Supreme Court remanded the case to the district court to determine whether Wells Fargo, the assignee of

6   the deed of trust, was entitled to enforce the Note.

7          148.   Further, in two recent decisions arising out of the State's foreclosure mediation program,

8   the Nevada Supreme Court made clear that, for any subsequent holder to enforce the Note, the deed of

9   trust must have been properly assigned and the Note must have been either properly negotiated (which

10   requires possession of a Note endorsed to the holder) or validly transferred (possession of the Note plus an

11   assignment or other evidence of a transfer).  *See Leyva*, 255 P.3d at *6 (citing Nev. Rev. Stat. §

12   104.3201(2) and 3203(2)); *Pasillas v. HSBC Bank USA*, 255 P.3d 1281, 1286 n.9 (Nev. 2011) (citing *U.S.*

13   *Bank Nat'l Ass'n v. Ibanez*, 941 N.E.2d 40, 53 (Mass. 2011)) (assignment of a mortgage Note executed

14   without the name of the assignee is defective and does not establish the putative assignee's authority with

15   regard to the Note).

16          149.   Countrywide's misrepresentations, and the misrepresentations made by its agents and

17   successors in interest, about the true holders of Nevada mortgage Notes and its authority to pursue

18   collections or foreclosures as a matter of law constitute deceptive practices where and because

19   Countrywide failed to properly transfer these Notes to the securitization Trusts on whose behalf it serviced

20   the debts.

21          150.   In addition, Defendants misrepresented their authority to collect payments from borrowers

22   in bankruptcy.  Several consumers reported to the Attorney General's Office that they continued to receive

23   collection calls from Bank of America even after they reminded Bank of America of their bankruptcy

24   status and, in one case, even after they repeatedly directed Bank of America to contact their attorney.  By

25   sending collection letters and making collection calls to Nevada consumers, Defendants misrepresented

26   both that it had authority to seek payments from these consumers and that consumers had an obligation to

27   make those payments.

28   ///

1    151.    On information and belief, some or all Defendants have initiated foreclosure proceedings

2  against active-duty service members in violation of the Servicemembers' Civil Relief Act ("SCRA"), 50

3  U.S.C. app. §§ 501 *et seq.*  On May, 26 2011 the United States Department of Justice announced a

4  settlement with Defendants for foreclosing on the pre-service residences of persons in active military

5  service.  Proposed Consent Order at 2, *U.S. v. BAC Home Loans Servicing, LP*, CV1104534 (C.D.Cal.

6  May 26, 2011).  According to the settlement, Nevada consumers were among the service members who

7  were improperly foreclosed upon.

8    **COUNT I – VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**

9    152.    The State re-alleges all preceding paragraphs in their entirety.

10    153.    Countywide engaged in deceptive acts or practices by originating mortgage loans that

11  misled consumers, among other things, about (a) the actual interest rate and the interest and monthly

12  payment owed on their loans; (b) the likelihood that the borrower would experience negative amortization;

13  (c) the likelihood of payment shock when the loan reset or recast; and (d) their ability to refinance their

14  loans to avoid unsustainably higher payments.

15    154.    Countrywide engaged in deceptive acts or practices by steering consumers, without their

16  knowledge, into more expensive and risky products than those for which they would have qualified.

17    155.    Countrywide engaged in deceptive acts or practices by failing to disclose and affirmatively

18  misrepresenting to investors the characteristics and riskiness of the mortgages that backed the securities

19  they purchased.  Countrywide assured investors of their "high quality" loans while failing to disclose,

20  among other things, that:  (a) borrowers' incomes and property appraisals often were inflated; (b)

21  Countrywide used multiple layers of risk to qualify uncreditworthy borrowers; (c) Countrywide eroded

22  and regularly departed from underwriting guidelines to approve loans to borrowers; and (d) Countrywide

23  failed to effectively transfer mortgage Notes to the securitization Trusts, creating a significant risk that

24  investors would not be able to enforce the Notes.

25    156.    Countywide engaged in deceptive acts or practices by deceptively marketing and

26  advertising its  mortgage loans by, among other things: (a) leading borrowers to believe that Countrywide

27  would obtain for them the best possible loans terms, when, in fact it did not; (b) emphasizing the initial

28  "teaser" rate and minimum payment and failing to disclose the long-term interest rates and payments owed

for ARM loans products; (c) misrepresenting that refinancing into certain riskier loan products could save the borrower money; (d) failing to inform borrowers of the likelihood of negative amortization and payment shock; and (e) suggesting that borrowers could refinance to avoid higher payments.

157.    Countrywide engaged in deceptive acts or practices during the servicing of residential mortgage loans, including, but not limited to, the following: (a) seeking to collect impermissible and inflated fees and payments from Nevada consumers in default, foreclosure and bankruptcy; and (b) misrepresenting the amount paid or owed by Nevada consumers.

158.    Bank of America engaged in deceptive acts or practices during the servicing of residential mortgage loans, including but not limited to, the following: (a) promising to act upon requests for mortgage modifications within a specific period of time, and then failing to do so; (b) promising consumers that they would provide permanent modifications upon successful completion of trial modifications that then failing to do so; (c) falsely assuring consumers that their homes would not be foreclosed while their requests for modifications were pending, but sending foreclosure notices, scheduling auction dates, and even selling consumers' homes while they waited for decisions; (d) falsely notifying consumers or credit reporting agencies that consumers are in default when they are not; (e) misrepresenting the eligibility criteria for modifications and providing consumers with inaccurate and deceptive reasons for denying their requests for modifications; and (f) offering modifications on one set of terms, but then providing consumers with agreements on different terms, misrepresenting that consumers have been approved for modifications, or revoking or failing to honor modifications.

159.    Bank of America engaged in deceptive acts or practices in servicing of residential mortgage loans by representing that it had authority for enforce mortgage Notes and foreclose on behalf of certain Trusts, when it had knowingly failed to properly transfer the interest in the relevant Notes to those Trusts.

160.    Bank of America engaged in deceptive practices by engaging in collection and foreclosure practices in violation of the FDCPA and SCRA.

161.    Defendants' deceptive conduct breached their obligations under Nev. Rev. Stat. §§ 598, *et seq.*, including, but not limited to:

///

///

42

Nev. Rev. Stat. § 598.0915(5), which provides that it is a deceptive practice for a person to

"[k]nowingly make[] a false representation as to the characteristics, ingredients, uses,

benefits, alterations or quantities of goods or services for sale or lease…"

Nev. Rev. Stat. § 598.0915(9), which provides that it is a deceptive practice for a person to

"[a]dvertise[] goods or services with the intent not to sell or lease them as advertised;"

Nev. Rev. Stat. § 598.0915(15), making it a deceptive trade practice for a person to

"[k]nowingly make[] any other false representation in a transaction;"

Nev. Rev. Stat. § 598.092(5)(a), making it a deceptive trade practice for a person to advertise or

offer an opportunity for investment and represent "that the investment is guaranteed,

secured or protected in a manner which he or she knows or has reason to know is false or

misleading;"

Nev. Rev. Stat. § 598.092(5)(c), making it a deceptive trade practice for a person to advertise or

offer an opportunity for investment and make "any untrue statement of a material fact or

omits to state a material fact which is necessary to make another statement, considering the

circumstances under which it is made, not misleading;"

Nev. Rev. Stat. § 598.092(8), which declares that it is a deceptive trade practice for a person to

"[k]nowingly misrepresent[] the legal rights, obligations or remedies of a party to a

transaction;"

Nev. Rev. Stat. § 598.0923(3), which makes knowing violations of "a state or federal statute or

regulation relating to the sale or lease of goods or services" a violation of the Deceptive

Trade Practices Act; and

Nev. Rev. Stat. § 598.0973, allowing a court to impose heightened penalties for "engaging in a

deceptive trade practice directed toward [an] elderly person or person with disability."

Nev. Rev. Stat. § 598.0953, making evidence that someone has engaged in a deceptive practice

"prima facie evidence of intent to injure competitors and to destroy or substantially lessen

competition."

162.    On information and belief, affected consumers included consumers over the age of 60.

163.    In all matters alleged herein, the Defendants acted in the course of their business or occupation within the meaning of Nev. Rev. Stat. §§ 598.0903 to 598.0999.

164.    In all requisite matters alleged herein, the Defendants acted knowingly within the meaning of Nev. Rev. Stat. §§ 598.0903 to 598.0999.

165.    In all matters alleged herein, the Defendants acted willfully in violation of Nev. Rev. Stat. §§ 598, *et seq.* as required by Nev. Rev. Stat. § 598.0999(2).

## COUNT II – VIOLATIONS OF THE CONSENT JUDGMENT

166.    In the event that the Court does not find that Defendants materially breached the Consent Judgment allowing the State to terminate the Consent Judgment, the State pleads as follows in lieu of Paragraphs 153-157.

167.    The State re-alleges all preceding paragraphs in their entirety.

168.    Section 4 of the Consent Judgment requires Defendants to provide modifications to Eligible Borrowers.

169.    Section 4.6(a) of the Consent Judgment provides that the foreclosure process "will not be initiated or advanced for the period necessary to determine such Eligible Borrower's interest in retaining ownership and ability to afford the revised mortgage terms, as well as the investor's willingness to accept a loan modification."

170.    Section 4.9 of the Consent Judgment requires Defendants to "ensure that offers of loan modifications under this Judgment…are made to Eligible Borrowers, on average, no more than 60 days after such Eligible Borrowers make contact with the applicable CFC Servicer and provide any required information concerning a possible modification."

171.    Section 4.3 of the Consent Judgment prohibits Defendants from increasing Eligible Borrowers' interest rates as a part of a modification under NHRP.

172.    Section 4.3 of the Consent Judgment requires Defendants to provide Eligible Borrowers with "streamlined modifications."

173.    Defendants have breached the terms of the Consent Judgment by:

   a.  failing to provide modifications to Eligible Borrowers;

   b.  proceeding with foreclosures while Eligible Borrowers were awaiting decisions on their modification requests;

   c.  failing to make decisions on modification requests from Eligible Borrowers within 60 days, on average;

   d.  raising Eligible Borrowers' interest rates despite their commitment to lowering them; and

   e.  failing to provide Eligible Borrowers with streamlined modifications by requiring them to submit extensive documentation.

174.   The Consent Judgment constitutes "a court order or injunction issued pursuant to the provisions of NRS 598.0903 to 598.0999" for purposes of Nev. Rev. Stat. § 598.0999(1). Therefore, violations of the Consent Judgment also constitute violations of these provisions of the DTPA.

175.   On information and belief, affected consumers include consumers over the age of 60.

### PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests that the Court:

1.   Enter a declaratory judgment that the Defendants' operation of their loan modification, loss mitigation, and foreclosure programs has violated, and continues to violate, the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, et seq.;

2.   Prohibit Defendants from continuing the course of conduct alleged herein as violating the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, et seq. as written now or amended in the future.

3.   Order Defendants to pay a civil penalty in a sum not to exceed $5,000 per violation against any Defendant found by the Court to have engaged in any method, act or practice declared unlawful under the above-cited statutes;

4.   Order Defendants to pay a civil penalty in a sum not to exceed $12,000 per violation against any Defendant found by the Court to have engaged in any method, act or practice declared unlawful under the above-cited statutes, that is directed towards an elderly or disabled person;

///

5.      Order Defendants to pay restitution pursuant to Nev. Rev. Stat. § 598.0993;

6.      Issue an order allowing the State to terminate its Consent Judgment with Defendants on the grounds that Defendants have materially breached the terms of the Judgment;

7.      Enter a declaratory judgment that the Countrywide's loan origination practices alleged herein violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.*

8.      Order Defendants to cover the costs incurred by municipalities and other homeowners due to vacant foreclosed properties that secured residential mortgage loans originated or serviced by Countrywide;

9.      Order Defendants to pay restitution pursuant to Section 10.4 of the Consent Judgment;

10.     Order Defendants to pay the costs of this action; including costs of investigation, pursuant to Nev. Rev. Stat. § 598.0999(2); and

11.     Order such other and further relief as the Court may deem just and proper.

OR IN THE ALTERNATIVE to Paragraphs 6 through 9 above, in the event the Court does not find a material breach allowing the State to terminate the Consent Judgment, the State respectfully requests that the Court:

12.     Enter a declaratory judgment that the Defendant's operation of its loan modification program has violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.* and the Consent Judgment in the *State of Nevada v. Countrywide Financial Corporation, et al.*

13.     Prohibit the Defendant from continuing the course of conduct alleged herein as violating the Consent Judgment and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.* as written now or amended in the future.

14.     Hold Defendants in contempt and order them to comply immediately with all provisions of the Consent Judgment pursuant to Section10.4 of the Consent Judgment.

15.     Extend the Termination Date established in the Consent Judgment and impose additional reporting requirements to allow the State to evaluate Defendants' compliance.

///

///

///

16.    Order Defendants to pay a civil penalty in a sum not to exceed $10,000 per violation against any Defendant found by the Court to have violated a provision of the Consent Judgment.

DATED this 30th day of August, 2011.

SUBMITTED BY:

CATHERINE CORTEZ MASTO
Attorney General

By:    /s/ BINU G. PALAL
       BINU G. PALAL
       Deputy Attorney General
       Nevada Bar No. 010178
       702-486-3128 ph / 702-486-3283 fax
       555 E. Washington Avenue, #3900
       Las Vegas, Nevada  89101
       Attorneys for Plaintiff, State of Nevada

### CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b), I hereby certify that on the 30th day of August, 2011 a true and correct copy of the **STATE OF NEVADA'S SECOND AMENDED COMPLAINT,** was transmitted electronically to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**Matthew W. Close**
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
213-430-7213
213-430-6407 fax
mclose@omm.com

**Paul R. Hejmanowski**
Lionel, Sawyer & Collins
50 W. Liberty Street, Suite 1100
Reno, NV 89501
775-788-8650
775-788-8682 fax
phejmanowski@lionelsawyer.com

**Leslie Bryan Hart**
Lionel Sawyer & Collins
50 W. Liberty Street, Suite 1100
Reno, NV 89501
775-788-8650
775-788-8682 fax
lhart@lionelsawyer.com

**John D Tennert**
Lionel Sawyer & Collins
50 W. Liberty Street, Suite 1100
Reno, NV 89501
775-788-8666
775-788-8682 fax
jtennert@lionelsawyer.com

*Attorneys for Defendants*

An employee of the
Office of the Attorney General

48